UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                            Plaintiff

v.

GADSBY HANNAH, LLP,
                    Defendant

## MEMORANDUM OF THE DEFENDANT GADSBY HANNAH IN SUPPORT OF ITS SUMMARY JUDGMENT MOTION

This litigation concerns a legal malpractice action against Gadsby Hannah LLP.  The case has been bifurcated with liability issues (*i.e.* duty and breach) adjudicated first, and if the claim survives, damage related issues (*i.e.* proximate cause and harm) second.  At the close of discovery in the liability phase, Gadsby Hannah submits this memorandum in support of its motion for summary judgment on all three counts for legal malpractice in the Complaint.

## I.    INTRODUCTION

The plaintiff, the Millgard Corporation ("TMC") was a construction subcontractor headquartered in Michigan that supplied labor and materials to a state-owned bridge project in Connecticut called the Tomlinson Bridge Project.  It alleges that it lost the opportunity to pursue a claim on a payment bond obtained by the general contractor, on that project because of the negligence of its attorneys, Gadsby Hannah.

The undisputed evidence, however, establishes that Gadsby Hannah was not retained to provide advice or representation with respect to the payment bond until a year after the period of limitations for making a bond claim had already expired.  Prior to that time, TMC, an experienced and sophisticated contractor undertook its own representation through negotiation

and a mediation of its claim against the owner and general contractor, eschewing the opportunity to engage Gadsby Hannah for the purpose of providing counsel in the process. When mediation failed and TMC was discharged from the project, it finally turned to Gadsby Hannah to pursue a claim but by that time, the time period for pursuing a claim on the payment bond had already expired by more than a year.

Although TMC now claims that Gadsby Hannah should have advised it to make a bond claim at an earlier time, the contention is belied by the testimony of TMC's president, Dennis Millgard. Dennis Millgard stated (and wrote) that he did not want to do anything that would interfere with or jeopardize his ongoing negotiations and mediation with the owner and general contractor to permit him to complete the job and obtain full payment for his work. In hindsight, TMC no doubt wishes that it had engaged the full scope of services from Gadsby Hannah for this purpose at an earlier time, but it did not do so. It now seeks unfairly to blame Gadsby Hannah for its own short-sighted strategy.

Gadsby Hannah is entitled to summary judgment as a matter of law because the undisputed material facts establish that it had no duty to provide the advice that TMC never sought but which, in an effort at revisionist history, TMC now wishes that it had obtained. TMC did not even provide Gadsby Hannah with the essential bond and other documents necessary for Gadsby Hannah to determine the time limitations on a bond claim until a year after the bond period had expired.

TMC also lacks a legal malpractice expert to address the issue of the scope of Gadsby Hannah's representation of TMC and whether Gadsby Hannah breached the applicable standard of care in its very limited activities undertaken on behalf of TMC. By contrast, counsel for Gadsby Hannah has retained the services of a prominent expert in construction law whose

unchallenged testimony establishes as a matter of law that Gadsby Hannah did not breach the

standard of care. Absent expert testimony that there was a deviation from the standard of care,

TMC could not in any event prevail on this legal malpractice claim.

## II.    UNDISPUTED MATERIAL FACTS[1]

### Background

Dennis Millgard started TMC in the 1960s and was its president. TMC was in the

excavation business, specializing in the construction of deep foundation systems including

caissons (drilled piers), high capacity piling and slurry walls. By the 1990's, TMC grew to 75-

80 full-time employees, with multiple offices. TMC worked in 38 states and overseas on 3,000

to 4,000 public and private projects, at least four of which were in Connecticut.[2]

Due to the nature of its work, TMC frequently made claims for increased compensation

from owners and general contractors for alleged changes in subsurface conditions. It even had

one of its changed site condition cases go to the Fifth Circuit Court of Appeals. See Millgard

Corp. v. McKee/Mays, 49 F.3d 1070 (5th Cir. 1995). Due to its experience and expertise, TMC

negotiated its own contracts without the assistance of attorneys and handled many of its own

contract disputes, including providing notice of and prosecuting claims. TMC was sophisticated

in its use of attorneys and managing the host of legal issues arising on its projects.

Gadsby Hannah represented TMC in various matters since the early 1990s. Attorney

Ronald Busconi was the attorney at Gadsby Hannah who worked primarily with TMC. Attorney

---

[1] For a fuller recitation of the facts not in dispute, Gadsby Hannah respectfully directs the
Court's attention to its Local Rule 56.1 Statement, which contains citations to the record and
supporting affidavits. The supporting documents are attached to the Pastori Affidavit submitted
herewith.

[2] TMC worked on such significant projects as Ford Field in Detroit Michigan where the 2006
Super Bowl was held, Rowes Wharf, and the Fleet Center.

Busconi has been a member of the Massachusetts bar since 1969 and is a partner at Gadsby Hannah.

### The Tomlinson Bridge Project

White Oak Inc. ("White Oak") entered into a general contract with the State of Connecticut ("ConnDot") to replace the Tomlinson Bridge on U.S. Route 1 in New Haven. National Union issued the payment bond on the Tomlinson Bridge Project, naming White Oak as principal, on June 6, 1994.

TMC entered into a subcontract with White Oak on March 22, 1996 for excavation work and the installation of caissons ("subcontract"). Dennis Millgard and White Oak's president, Jack Morrissey, had known each other for 20 to 30 years. The subcontract prohibited TMC from making a claim for additional work unless the work was completed pursuant to a written work order from White Oak. Gadsby Hannah was not involved in the negotiation of TMC's subcontract with White Oak for the Tomlinson Bridge Project. TMC began work on the Tomlinson Bridge Project in October 1997.

TMC claims that it encountered unanticipated subsurface conditions on the Tomlinson Bridge Project. TMC gave notice of the alleged differing site conditions to White Oak and ConnDot, claiming that the rock strata was harder and less fractured than the contract documents indicated. TMC was required to continue working even though it had made a claim for differing site conditions. ConnDot agreed to a change order in early 1998 allowing TMC to use different more expensive machinery to accomplish its work.

TMC claims that it encountered even more differing site conditions and sought to recover additional costs. TMC contends that the subsurface conditions, consisting of quartz and granite

boulders, were not indicated by the contract documents and they significantly obstructed its

ability to perform its subcontract work as planned and caused TMC to incur significant

additional costs.  ConnDot rejected TMC's second claim for differing site conditions, asserting

that TMC should have reviewed the soils report, which showed quartz and granite, before

executing the subcontract.  TMC walked off the job on September 15, 1998.  Any claim on

White Oak's bond had to be made by March 15, 1999.[3]

### The Bridgeport Project

Around the same time that TMC was working on the Tomlinson Bridge Project, TMC

was also working as the caisson subcontractor for White Oak on the Bridgeport Project also in

Connecticut.  Like the Tomlinson Bridge Project, the owner of the Bridgeport Project was the

State of Connecticut.  TMC submitted its own bond claim for changed condition on the

Bridgeport Project on January 26, 1999 without the assistance or participation of Gadsby

Hannah.

### TMC's Limited Use Of Gadsby Hannah

The first time that anyone from TMC spoke to Gadsby Hannah about the Tomlinson

Bridge Project was on May 27, 1998.  TMC's David Coleman had a general research question

about whether White Oak and ConnDot could successfully argue, as a defense to TMC's claim

of differing site conditions, that TMC had a duty to investigate other sources of data concerning

the subsurface conditions at the project site.

---

[3] Technically, 180 days falls on March 14, 1999.  However, Dennis Millgard calculates the 180 days as expiring on March 15, 1999.  For the purposes of this motion, Gadsby Hannah will agree that the time period expired on March 15, 1999.

Attorney Busconi consulted with his partner Richard Allen and had their associate perform the necessary research of Connecticut case law.  The work started on May 27, 1998 and ended on June 2, 1998.  Gadsby Hannah billed TMC a total of 7 hours for the research project.

Richard Millgard (Dennis's brother) claims that he asked Busconi on May 28, 1998 when notification on the bond should be given, and cannot remember what, if anything Busconi, told him.  Attorney Busconi denies that Richard Millgard ever asked him about bond notification. TMC was still performing work on the Tomlinson Bridge Project when it first contacted Gadsby Hannah in May 1998, and as a result, the limitations period for making a claim on White Oak's bond would not yet have started to run.

There is no documentary evidence of Richard Millgard's alleged inquiry about requirements for bond notification in Gadsby Hannah's files or in TMC's files.  Richard Millgard testified that he did not remember what documents were sent to Gadsby Hannah in connection with this question and when they were sent (if at all) and could not recall what if any response he got to his alleged inquiry about the payment bond.  He does not know if TMC even had a copy of White Oak's bond to send to Gadsby Hannah in May 1998.  Richard Millgard and/or TMC did not provide Gadsby Hannah with the documents necessary to advise TMC about bond notification requirements in May 1998.  In fact, TMC did not give Gadsby Hannah those documents until April 2000 -- a year after the limitations period expired.

After TMC's general research question about differing site conditions, no one at Gadsby Hannah had further communication with TMC about the Tomlinson Bridge Project for the next six months – from June 2, 1998 through early December 1998.

In December 1998, Attorneys Allen and Busconi took Dennis Millgard, Ed Cardozza, and David Coleman out for a holiday lunch at the Meridien Hotel in Boston.  At the lunch, there

was general discussion about TMC's business, including the Tomlinson Bridge Project. They did not discuss making a claim on the White Oak bond. TMC did not instruct Gadsby Hannah to do anything or perform any specific work concerning the Tomlinson Bridge Project at the lunch. Gadsby Hannah attorneys did not bill TMC for their time spent at the lunch.

No one from TMC communicated with Gadsby Hannah about the Tomlinson Bridge Project again until the end of February/early March 1999. On March 2, 1999, Jack Morrissey of White Oak wrote to Dennis Millgard and informed him that because TMC had walked off the job in September 1998 and refused to complete its work on the Tomlinson Bridge Project, White Oak intended to hire another subcontractor to finish TMC's work and would pursue TMC for damages. TMC's last day of work on the Tomlinson Bridge Project had been September 15, 1998. Dennis Millgard did not consult Gadsby Hannah prior to TMC walking off the job.

On March 3, 1999, Dennis Millgard asked Attorney Busconi to assist him in drafting a response to Jack Morrissey's letter, which he did. Dennis Millgard told Attorney Busconi that he was optimistic that the matter would be settled and TMC would be back to work on the Project. Dennis Millgard did not want to do anything that would "rock the boat" and jeopardize going back to work on the Project.

Prior to March 15, 1999, Gadsby Hannah had only performed approximately 8.2 hours of work, 7 hours on a research project involving whether Connecticut law imposed a duty on a contactor to investigate the subsurface condition in late May 1998, and 1.2 hours providing general input to correspondence in early March 1999. Prior to March 15, 1999, TMC had not supplied Gadsby Hannah with its subcontract with White Oak, White Oak's bond, the relevant communications, including those with White Oak and ConnDot, the reports of TMC's and ConnDot's experts concerning the underground conditions, and the calculation of its claim for

7

extra work.  TMC kept Gadsby Hannah so far removed from its handling of the claim that it did not even see fit to involve Gadsby Hannah in ConnDot's audit of TMC's financial records or inform Gadsby Hannah about the audit when it happened.

### The Mediation

In the fall of 1998 and early winter 1999, Dennis Millgard communicated with officials from ConnDot, White Oak, and a mediator, Carmen Reiss in an attempt to resolve TMC's claim and get back to work.  He did not ask Gadsby Hannah to represent TMC in these discussions or mediation.

Dennis Millgard served a document request on ConnDot in preparation for the mediation and called Peter Huntsman, an Assistant Attorney General for the State of Connecticut who was representing ConnDot, about TMC's claims.  Attorney Huntsman had some questions about whether TMC was represented by counsel, and in response Dennis Millgard explicitly told Attorney Huntsman that TMC was not represented and did not want his lawyers involved because he did not want to incur the expense.  Dennis Millgard sent written confirmation of this fact to Attorney Huntsman on April 16, 1999.

The mediation between ConnDot, White Oak, and TMC finally occurred on April 26, 1999 in Connecticut.  Attorney Busconi attended the mediation at Dennis Millgard's last minute request as a personal favor to Dennis Millgard but was never given TMC's written submission prior to the mediation.  Dennis Millgard made a four-hour presentation of TMC's claim at the mediation.  The mediation was unsuccessful.

White Oak terminated TMC on May 21, 1999.  White Oak claimed that TMC had breached its subcontract by walking off the job in September 1998 and refusing to return to

work.  Notwithstanding the termination, Dennis Millgard remained hopeful that he would be able to settle with ConnDot and White Oak and get TMC back to work.

### TMC Retains Gadsby Hannah To Pursue A Claim In March 2000

On March 21, 2000, David Coleman of TMC wrote Attorney Busconi to confirm a meeting on March 29, 2000 to discuss work that TMC wanted Gadsby Hannah to perform on a number of matters so that TMC would get paid by its contractors.  Coleman noted that "The Tomlinson Bridge and Kane 'A' projects are probably the most complicated.  The others basically require a quick fix such as surety notification or demand for direct payments, prior to the meeting."  It was not until the meeting in late March 2000 that TMC directed Gadsby Hannah to take over the prosecution of the Tomlinson Bridge claim and make demand on White Oak's bond.  Gadsby Hannah ran a conflict check and opened a file on March 31, 2000.

On April 5, 2000, TMC provided Gadsby Hannah with the documents necessary to assess the applicable limitations period and make a claim on the bond.  Gadsby Hannah made demand on White Oak's bond for $70,730 for the balance of the contract and $1,083,585 for extra work on April 7, 2000.  National Union rejected the claim as untimely.[4]

The version of Connecticut General Laws § 49-42 applicable to White Oak's bond dated June 6, 1994 required that notice of a claim must be made within 180 days after the date on which the contractor performed the last of the labor or furnished the last of the material for which the claim is made.  The statute was revised effective October 1994 but the amended statute did not apply to the June 6, 1994 bond.  The October amendment changed the way in

---

[4] Subsequently, TMC hired a Connecticut firm to sue National Union and White Oak.  National Union obtained summary judgment because notice of the claim on the bond was not timely.  TMC voluntarily dismissed its claims against White Oak.  White Oak arbitrated its claims

which the limitations period was measured.  However, the bond's date controls which version of the statute applies.

### Gadsby Hannah's Conduct Satisfied The Applicable Standard Of Care

Gadsby Hannah has retained attorney Joel Lewin, a prominent attorney in construction law to offer his expert opinion on the standard of care required of Gadsby Hannah.  Attorney Lewin's unchallenged opinion is that at no time from April 1998 through March 15, 1999 did the standard of care require Gadsby Hannah's attorneys to conduct research and advise TMC of its obligations under Connecticut law to give notice to White Oak's surety.  Gadsby Hannah did not have a duty to offer advice beyond the specific task that TMC assigned to Attorney Busconi.  It was not required to provide TMC with general advice about all of its rights and responsibilities related to the Tomlinson Bride Project.  Attorney Lewin's testimony establishes that Gadsby Hannah met the standard of care in all respects.  TMC does not have an expert to contradict Attorney Lewin's testimony.

### III.    ARGUMENT

#### a.  Summary Judgment Standard.

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995).  In order to succeed on a motion for summary judgment, the moving party must demonstrate that there is an

---

against ConnDot.  The panel awarded ConnDot over $1.1 million and awarded White Oak nothing.

absence of evidence necessary to support the non-moving party's position.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment ... upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "Therefore to survive a motion for summary judgment, [the plaintiff] must produce competent evidence sufficient to raise a jury question as to the standard of care to which the attorney should be held, the scope of the attorney's duty to the client, the existence of a breach of that duty, and the damages to [the plaintiff] proximately caused by that breach."  Flanders & Medeiros, Inc. v. Bogosian, 868 F. Supp. 412, 421 (D.R.I. 1994), aff'd in part, rev'd in part, 65 F.3d 198 (1st Cir. 1995).

> **b.  Gadsby Hannah Is Entitled To Summary Judgment Because TMC Has Failed To Designate An Expert Witness And Therefore Cannot Establish That Gadsby Hannah Was Negligent.**

Under Massachusetts law, the standard of care against which an attorney's actions must be measured is beyond the experience and knowledge of the ordinary layperson and therefore, must be established by expert testimony.  Pongonis v. Saab, 396 Mass. 1005, 1005 (1985); Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein PC, 25 Mass. App. Ct. 107, 111 (1987).  A plaintiff generally has the burden of introducing expert testimony that the attorney did not exercise that degree of skill ordinarily possessed by attorneys in similar circumstances.  If the plaintiff fails to present credible expert testimony that the attorney breached the applicable

standard of care, its legal malpractice claim fails.  See, e.g., Brown v. Gerstein, 17 Mass. App.

Ct. 558, 566 (1984); DiPiero v. Goodman, 14 Mass. App. Ct. 929, 930 (1982).

 TMC does not have an expert to establish what the standard of care required of Gadsby

Hannah and that the firm's conduct fell below that standard.  TMC responded to Gadsby

Hannah's expert interrogatory stating that "Millgard does not intend to call any expert witnesses

at trial of this matter on the issue of liability."  Pastori Affidavit, Exhibit T.  Without an expert to

establish its claim, TMC's claim fails and Gadsby Hannah is entitled to summary judgment.

Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 206 (1st Cir. 1995) (Rhode Island law)

(movant discharged its burden on summary judgment by pointing to absence of expert testimony

in support of opponent's claims for malpractice); Atlas Truck Corp. v. Donabed, 47 Mass. App.

Ct. 221, 227-28 (1999) (summary judgment appropriate because absent expert testimony plaintiff

had no reasonable expectation of proving its case); Aronovitz v. Abodeely, No. 001422, 2002

WL 31973227 (Nov. 8, 2000) (summary judgment granted in favor of defendant attorney in

absence of expert testimony supporting plaintiff's claims).

  **c.** **The Undisputed Expert Testimony Establishes That Gadsby Hannah**
    **Satisfied The Standard Of Care.**

 Counsel for Gadsby Hannah has retained Attorney Joel Lewin to provide testimony

concerning the applicable standard of care and whether it was breached in this case.  Attorney

Lewin's uncontradicted opinion is that the standard of care did not require Gadsby Hannah to

conduct research and advise TMC during the period between April 1998 and March 15, 1999 of

TMC's obligations under Connecticut law to give notice to TMC's bonding company.  TMC

assigned Gadsby Hannah discrete tasks between May 1998 and early March 1999.  The standard

of care did not require Gadsby Hannah to provide advice beyond the specific tasks that TMC

assigned to it.  Gadsby Hannah was not required to provide TMC with general advice about all of

its rights and risks related to the Tomlinson Bridge Project, including bond notification.  Gadsby Hannah satisfied the applicable standard of care.  Based upon this undisputed evidence, Gadsby Hannah is entitled to summary judgment.

      **d.**      **TMC Kept Gadsby Hannah In The Dark Until After The Limitations Period Expired To Avoid Legal Expenses And Now Seeks To Blame Gadsby Hannah For Its Shortsighted Strategy.**

In a legal malpractice action, it is not sufficient for a plaintiff to merely prove that an attorney-client relationship existed with respect to some matters.  It is necessary to establish that the relationship existed with respect to the act or omission upon which the malpractice is based. Page v. Frazier, 388 Mass. 55, 62 n.10 (1982) (citing Kurtenbach v. Tekippe, 260 N.W. 2d 53, 56 (Iowa 1977)).  The fact that an attorney represented a client in a particular matter does not necessarily create an attorney-client relationship as to other matters or affairs of the client. Robertson v. Gaston, Snow & Ely Bartlett, 404 Mass. 515, 522-23 (1989).  See also Symmons v. O'Keeffe, 419 Mass. 288, 299-301 (1995).

While TMC used Gabsby Hannah on a number of matters over the years, it never retained the firm for the purpose of providing comprehensive legal services in connection with the Tomlinson Bridge Project until after the limitations period on the bond expired.  It is undisputed that TMC first contacted Gadsby Hannah on May 27, 1998 with a discrete question about whether under Connecticut law, TMC had a duty, prior to contracting, to investigate subsurface conditions on its own.  It is undisputed that Gadsby Hannah attorneys spent a total of 7 hours from May 27, 1998 to June 2, 1998 responding to TMC's discrete question.  The bulk of the 7 hours was spent researching the case law on differing site conditions and drafting a memorandum.  The bill also included a total of two brief telephone calls with Richard Millgard and one with David Cardozza.

Gadsby Hannah's attorneys were not asked to perform any additional work until March 1999 – a full nine months later.  In March 1999, Attorney Busconi received a few phone calls from Dennis Millgard and commented on the correspondence Dennis Millgard sent him.  The total time spent on these tasks was 1.2 hours.   In total, Gadsby Hannah's attorneys spent 8.2 hours responding to TMC's two discrete assignments, which were 10 months apart.

Dennis Millgard is a self-described "benevolent dictator."  He exercised complete control over the negotiations of TMC's claim for extra compensation for the alleged unanticipated site conditions.  He called all the shots.  He was optimistic that he could work it out and get TMC back to work since he had a 20 to 30 year relationship with White Oak's president, Jack Morrissey, and did not want anything or anyone to jeopardize that negotiation and mediation process.  He neither asked nor was willing to pay Gadsby Hannah to get involved in this claim process.  All communications concerning TMC's claim came through Dennis Millgard.  He alone spoke to White Oak.  He corresponded and met with the mediator, Carmen Reiss, on his own.  He sought out and spoke to Peter Huntsman, the Assistant Attorney General of the State of Connecticut, on his own.

Ironically, Attorney Huntsman asked Dennis Millgard whether TMC was represented in connection with the Tomlinson Bridge Project in March or April 1999.  Attorney Huntsman testified that:

- "I had at least one and maybe several conversations with him directly, about which I was very uncomfortable, <u>but he kept assuring me that he wasn't represented, and Mr. Busconi confirmed that.  So I had – I continued – I had at least one, and I think two or three conversations with Mr. Millgard.</u>  So he sort of impressed me, in that he impressed himself upon my memory in that regard.  I know he made a presentation. . . ."  Huntsman Depo. at 23.

- "<u>And he told me – he said at the beginning of the conversation, and he told me again, that he was – he didn't want to incur the expense of an attorney.</u>

14

He wanted to – he had some people he was consulting, and <u>he mentioned Mr. Busconi, but that he had not hired an attorney to represent him or the company</u>."  Huntsman Depo at 26.

Dennis Millgard confirmed his position in writing, stating that "I discussed this matter with Mr. Busconi and he suggested that I send you this letter informing you that we are only consulting with his firm at this time and <u>have not formally retained them</u>."  Pastori Affidavit, Exhibit O. Dennis Millgard's own admissions establish that TMC had not retained Gadsby Hannah to handle its claims on the Tomlinson Bridge Project as of April 1999.

TMC kept Gadsby Hannah in the dark concerning the Project, asking Gadsby Hannah to perform very discrete and isolated tasks because Dennis Millgard did not want to incur legal expenses.  The timeline belies TMC's claims to the contrary:

- <u>Late May to Early June 1998</u>:  Gadsby Hannah does 7 hours of work on a research project involving differing site condition claims.
- <u>December 1998</u>:  Gadsby Hannah and TMC enjoy a holiday lunch.
- <u>January 1999</u>:  TMC makes its own bond claim on the Bridgeport project, another ConnDot job on which TMC was the subcontractor to White Oak.
- <u>Early March prior to March 15, 1999</u>:  Gadsby Hannah bills 1 hour in time providing input to White Oak's correspondence.
- <u>March 15, 1999</u>:  Claim on White Oak's bond expires.
- <u>March 2000</u>:  TMC retains Gadsby Hannah and gives the firm the bond and other necessary documentation to pursue TMC's claims.

Dennis Millgard, an experienced and seasoned contractor, handled the vast majority of tasks in the claims process himself.  He purposefully limited the use of counsel to only those tasks he specifically assigned.  It was not until well after the limitations period for making a bond claim expired that TMC turned the matter over to Gadsby Hannah to handle.

**e.**      **The Facts Of This Case Do Not Rise To The Level Of Obvious Malpractice.**

The only narrow exception to the general rule requiring expert testimony to establish the standard of care and a breach is where "the claimed legal malpractice is so gross or obvious that laymen can rely on their common knowledge to recognize or infer negligence."  <u>Wagenmann v.</u>

15

Adams, 829 F.2d. 196, 218 (1st Cir. 1987). This case is not one where an attorney was hired to sue for a personal injury and simply forgot to file the complaint before the limitations period expired, ignored his client's pleas for assistance, or failed to show up at trial. This case is one of subtleties. A sophisticated analysis far beyond the experience of a layperson is required to define the contours of the applicable standard of care and a corresponding breach.

The undisputed facts establish that TMC was consulting Gadsby Hannah on a very limited basis. In late May 1998, TMC asked Gadsby Hannah to research Connecticut law on whether it had a duty to independently investigate soil information concerning the project site. Almost a year later in March 1999, TMC asked Gadsby Hannah for assistance responding to some correspondence. From these brief engagements, TMC now contends that Gadsby Hannah had a duty to advise it of all its rights involving the Tomlinson Bridge Project, including the deadline for filing a bond claim and because Gadsby Hannah did not, it committed malpractice.

This case is not one where even "the untutored eye can discern blundering of an egregious and uncomplicated sort." Id. at 220. Gadsby Hannah, by Dennis Millgard's own admissions, was not retained to represent TMC because Dennis Millgard did not want to incur the expense. TMC now wants to hold Gadsby Hannah liable for not doing something it was not hired to do. TMC needs an expert to establish whether a lawyer faced with such discrete assignments would undertake to give advice about making a claim on White Oak's bond. Brown v. Gerstein, 17 Mass. App. Ct. 558, 566 (1984) (where the only evidence in a case was that the attorney was hired to bring suit against a bank for breach of contract, expert testimony was required to establish "[w]hether a lawyer whose employment was so limited would undertake to give his client general advise about ways to avoid foreclosure"). TMC does not have an expert to establish what the applicable standard of care required of Gadsby Hannah, and therefore its

claims fail.

TMC may argue that Richard Millgard asked Attorney Busoni about the requirements for bond notification in May 1998. Richard Millgard does not remember what advice Attorney Busconi gave him about making a bond claim. TMC cannot base its claim for malpractice based upon reliance on advice it cannot even remember receiving. Based on that fact alone, TMC cannot establish that Gadsby Hannah was negligent in advising TMC.

Richard Millgard's newly manufactured claim notwithstanding, the undisputed documentary evidence belies his contention. There is no documentation whatsoever that would support Richard Millgard's testimony that he made such an inquiry, and most significantly he "could not recall" what, if any, response was allegedly provided. TMC did not send Gadsby Hannah the documents that were necessary to determine which version of the Connecticut bond claim statute applied – and therefore which limitations period applied – until a year after the limitations period expired. Any calculation of the deadline for filing a bond claim in May 1998 would have been theoretical at best because the bond deadline was dependent on the project work and TMC was still working on the project. TMC also did not furnish Gadsby Hannah with a calculation of its claim, which is further evidence that TMC had no intention of pursing a bond claim in 1998.

Even if Richard Millgard inquired about Connecticut's bond notification requirements in May 1998, he testified that Attorney Busconi asked him for certain information in order to answer his questions and concedes that he has no memory of ever sending the requested documents to Attorney Busconi and cannot establish when they were sent. The documentary evidence establishes that the information was not sent until April 2000, long after the limitations period expired. Attorney Busconi would have needed the bond to identify which version of the

bond claim statute applied and to identify the appropriate limitations period. The uncontraverted expert testimony of attorney Lewin establishes that even if Richard Millgard's testimony were true, Gadsby Hannah did not have a duty to provide any advice concerning bond notification because Richard Millgard failed to provide the requested information. The absence of an expert to support TMC's claim is fatal.

>   **f.      Gadsby Hannah Is Entitled To Summary Judgment On TMC's Claim Seeking Cost Profits And Overhead Costs For Gadsby Hannah.**

The Complaint raises one damage issue that is appropriate for consideration in this stage of the litigation. Even if this Court concludes that TMC's claims for legal malpractice should survive summary judgment, Gadsby Hannah should be granted summary judgment on Count II of the Complaint because it seeks "anticipated profits and overhead" as damages, which are not recoverable in a legal malpractice action.

In an attorney malpractice action based upon negligent representation, the defendant may be liable for "any reasonably foreseeable loss caused by his negligence." Fishman v. Brooks, 396 Mass. 643, 646 (1986). TMC claims that it would have received $1,485,625 in profits and overhead on $6,000,000 in additional work that it thought it could do for White Oak and ConnDot on the Tomlinson Bridge Project. TMC alleges that because Gadsby Hannah did not inform it of the statute of limitations on the bond, it was precluded from making a bond claim and thereby protecting its rights to payment. From that claim, TMC makes a wild leap and alleged that it was not able to do $6,000,000 in additional work on the project and it is Gadsby Hannah's fault. There is simply no evidence that White Oak termination of TMC had anything at all to do with the payment bond and/or the lapse of the notice period under it.

Further, lost profits are not recoverable in this action as a matter of law. Lost profits are a form of special damages. Anthony's Pier Four, Inc. v. HBC Associates, 411 Mass. 451, 479

(1991).  By definition, special damages are not the natural and necessary consequence of a cause of action.  Pacy v. Long, No 92-3440 1995 WL 1146843 at **1 (Mass. Super. November 15, 1995) (Gershengorn, J.).  As a result, lost profits are not to be recoverable in a legal malpractice action in the absence of conduct which is "intentional or deliberately wrongful."  Cavallo v. Warner & Stackpole, No. 90-1151, slip op. at 2 (Mass. Super. August 12, 1993 (Bohn, J.).  There is not a shred of evidence in this case that Gadsby Hannah acted intentionally or deliberately wrongful.

TMC also cannot recover because it is seeking what it (implausibly) claims to be the benefit of its putative claim on the payment bond.  Massachusetts law is clear that benefit of the bargain damages are not recoverable in a negligence action.  Danca v. Taunton Savings Bank, 385 Mass. 1, 8 (1982).  Danca defined "benefit of the bargain" damages in the context of a misrepresentation claim as "the difference between the value of the relevant property as represented and its actual value at the time of the misrepresentation."  Id.  The Danca court clearly held that "benefit of the bargain" damages are not recoverable unless a plaintiff can show "deceit," that is, knowing or willful conduct.  Id.  The proper measure of damages for negligent misrepresentation, according to Danca, is "the difference between the value of what [was] received and the purchase price plus any other pecuniary loss suffered as a consequence of their reliance on the misrepresentation."  Id.  As applied to this case, Danca requires the conclusion that TMC is only entitled to out-of-pocket tort damages.[5]  TMC cannot recover wildly

_____

[5] Even if Gadsby Hannah's alleged legal malpractice is analyzed as a breach of contract, lost profits and consequential damages would still be unrecoverable.  Contract damages must be "1) within the contemplation of the parties at the time of contracting; 2) the natural, primary and probable consequence of the breach; and 3) not so uncertain or contingent as to be incapable of reasonable proof."  Pacy, 1995 WL 1146843 at **2 (citing Gagnon v. Sperry and Hitchinson

speculative sums involving business it might have done absent a showing of common-law deceit

by Gadsby Hannah.


**IV.    CONCLUSION**

Based on the foregoing, Gadsby Hannah is entitled to summary judgment on all counts in

the Complaint.

Respectfully submitted,

GADSBY HANNAH LLP

By its attorneys,

/s/ Terri L. Pastori
Michael J. Stone, Esquire, BBO#482060
Terri L. Pastori, Esquire, BBO#635323
PEABODY & ARNOLD LLP
30 Rowes Wharf
Boston, MA 02110
(617) 951-2100

---

Co., 206 Mass. 547, 555 (1910)).  Consequently, similar limitations of foreseeability and natural
consequence of the breach are applied, and the damages Millgard seeks are too speculative.

## <u>CERTIFICATE OF SERVICE</u>

       I, Terri L. Pastori, hereby certify that on March 10, 2006, the foregoing document was served upon counsel for the plaintiff, John S. Davagian, Esquire, by electronic mail at jsdavagian@jsdlawgroup.com.

                                 /s/ Terri L. Pastori
                                 Terri L. Pastori