UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                          Plaintiff

v.

GADSBY HANNAH, LLP,
                          Defendant

STATEMENT OF UNDISPUTED MATERIAL FACTS OF THE DEFENDANT, GADSBY
HANNAH LLP, PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, the Defendant, Gadsby Hannah LLP, provides the following statement of material facts as to which there are no genuine issues to be tried.

## I. INTRODUCTORY FACTS

1. Dennis Millgard started TMC in the 1960s and was its president. Dennis Millgard's Deposition Transcript ("Dennis Millgard Transcript") at 17;[1] Richard Millgard Deposition Transcript ("Richard Millgard Transcript") at 20.[2]

2. TMC was headquartered in Michigan and was in the excavation business, specializing in the construction of deep foundation systems including caissons (drilled piers), high capacity piling and slurry walls. Dennis Millgard Transcript at 18-20.

---

[1] Excerpts from Dennis Millgard's Deposition Transcript are attached to the Affidavit of Terri L. Pastori ("Pastori Affidavit") as Exhibit A.

[2] Excerpts from Richard Millgard's Deposition Transcript are attached to the Pastori Affidavit as Exhibit B.

3. By the 1990's, TMC grew to 75-80 full-time employees, with multiple offices. Dennis Millgard Transcript at 18. TMC worked in 38 states and overseas on 3,000 to 4,000 public and private projects, at least four of which were in Connecticut. Dennis Millgard Transcript 18-19; 46; Richard Millgard Transcript at 28-29, 36.

4. TMC worked on such significant projects as Ford Field in Detroit Michigan where the 2006 Super Bowl was held, Rowes Wharf, and the Fleet Center. Richard Millgard Transcript at 25, 33.

5. Due to the nature of its work, TMC frequently made claims for increased compensation from owners and general contractors for alleged changes in subsurface conditions. Richard Millgard Transcript at 14-16.

6. It even had one of its changed site condition cases go to the Fifth Circuit Court of Appeals. See Millgard Corp. v. McKee/Mays, 49 F.3d 1070 (5th Cir. 1995).[3]

7. Due to its experience and expertise, TMC negotiated its own contracts without the assistance of attorneys and handled many of its contract disputes including providing notice of and prosecuting claims. Richard Millgard Transcript at 27; Dennis Millgard Transcript at 186; David Coleman Deposition Transcript ("Coleman Transcript")[4] at 22-24.

8. Dennis Millgard is very knowledgeable and familiar with how payment bonds work, having dealt with them for over 40 years. Dennis Millgard Transcript at 182.

---

[3] A copy of the opinion in Millgard Corp. v. McKee/Mays, 49 F.3d 1070 (5th Cir. 1995) is attached to the Pastori Affidavit as Exhibit C.

[4] Excerpts from David Coleman's Deposition Transcript are attached to the Pastori Affidavit as Exhibit D.

9.      TMC was sophisticated in its use of attorneys and managing the host of legal issues arising on its projects.  Joel Lewin Deposition Transcript ("Lewin Transcript")[5] at 25.

10.     Gadsby Hannah represented TMC in various matters since the early 1990s. Ronald Busconi Deposition Transcript (Busconi Transcript")[6] at 17.

11.     Attorney Busconi was the attorney at Gadsby Hannah who worked primarily with TMC.  Busconi Transcript at 17.

12.     Attorney Busconi has been a member of the Massachusetts bar since 1969 and is a partner at Gadsby Hannah.  Busconi Transcript at 7-9.

## II.    THE TOMLINSON BRIDGE PROJECT

13.     White Oak Inc. ("White Oak") entered into a general contract with the State of Connecticut ("ConnDot") to replace the Tomlinson Bridge on U.S. Route 1 in New Haven. Complaint ¶ 10;[7] Richard Millgard Transcript at 38-39.

14.     National Union issued the payment bond on the Tomlinson Bridge Project, naming White Oak as principal, on June 6, 1994.  Coleman Transcript at 41-42; Bond (Deposition Exhibit 32);[8] Complaint ¶ 11.

15.     TMC entered into a subcontract with White Oak on March 22, 1996 for excavation work and the installation of caissons ("subcontract").  Richard Transcript at 97; Subcontract (Deposition Exhibit 14).[9]

---

[5] Joel Lewin's Deposition Transcript is attached to the Pastori Affidavit as Exhibit E.

[6] Excerpts from Ronald Busconi's Deposition Transcript are attached to the Pastori Affidavit as Exhibit F.

[7] A copy of the Complaint is attached to the Pastori Affidavit as Exhibit G.

[8] A copy of the Bond contained within Coleman's fax (Deposition Exhibit 32) is attached to the Pastori Affidavit as Exhibit H.

16. Dennis Millgard and White Oak's president, Jack Morrissey, had known each other for 20 to 30 years. Busconi Transcript at 38.

17. TMC was aware at the time that it contracted that White Oak had a payment bond. Dennis Millgard Transcript at 68-69.

18. TMC was prohibited from making a claim for additional work unless the work was completed pursuant to a written work order from White Oak. Subcontract (Deposition Exhibit 14).

19. TMC was required to continue working even though it made a claim that it had encountered unanticipated subsurface conditions. Dennis Millgard Transcript at 102.

20. Gadsby Hannah was not involved in the negotiation of TMC's subcontract with White Oak for the Tomlinson Bridge Project. Dennis Millgard Transcript at 64.

21. TMC began work on the Tomlinson Bridge Project in October 1997. Richard Millgard Transcript at 42.

22. TMC claims that it encountered unanticipated subsurface conditions on the Tomlinson Bridge Project. Dennis Millgard Transcript at 74-79.

23. TMC gave notice of the alleged differing site conditions to White Oak and ConnDot claiming that the rock strata was harder and less fractured than the contract documents indicated. Dennis Millgard Transcript at 74-77.

24. ConnDot agreed to a change order in early 1998 allowing TMC to use different more expensive machinery to accomplish its work. Dennis Millgard Transcript at 75-76.

---

[9] A copy of the subcontract (Deposition Exhibit 14) is attached to the Pastori Affidavit as Exhibit I.

4

25.     TMC claims that it encountered even more differing site conditions and sought to recover additional costs. TMC contends that the subsurface conditions, consisting of quartz and granite boulders, were not indicated by the contract documents and they significantly obstructed its ability to perform its subcontract work as planned and caused TMC to incur significant additional costs. Dennis Millgard Transcript at 77-79.

26.     ConnDot rejected TMC's second claim for differing site conditions, asserting that TMC should have reviewed the soils report, which showed quartz and granite, before executing the subcontract. Dennis Millgard Transcript at 78.

27.     TMC stopped work on the project on September 15, 1998. Dennis Millgard Transcript at 181.

### III.    THE BRIDGEPORT PROJECT

28.     Around the same time that TMC was working on the Tomlinson Bridge Project, TMC was also working as the caisson subcontractor for White Oak on the Bridgeport Project also in Connecticut. Richard Millgard Transcript at 28, 36; Dennis Millgard Transcript at 205.

29.     Like the Tomlinson Bridge Project, the owner of the Bridgeport Project was the State of Connecticut. Coleman Transcript at 24.

30.     TMC's Kenneth Woodard sent a bond claim for changed condition on the Bridgeport Project on January 26, 1999. Coleman Transcript at 35-39.

31.     Gadsby Hannah did not assist or participate in making the bond claim of January 26, 1999. Busconi Affidavit ¶ 19.

32. A copy of Kenneth Woodward letter to American Home Assurance Co., dated January 26, 1999, is Deposition Exhibit 41.[10]

33. White Oak's surety on the Bridgeport Project was the same surety as on the Tomlinson Bridge Project. Busconi Affidavit ¶ 19.

### III. TMC'S LIMITED USE OF GADSBY HANNAH

34. A copy of Gadsby Hannah's billing records that include the time Gadsby Hannah's attorneys spent on the Tomlinson Bridge Project were marked as Deposition Exhibit 68.[11]

35. The first time that anyone from TMC spoke to Gadsby Hannah about the Tomlinson Bridge Project was on May 27, 1998. Billing Records; Richard Transcript at 58.

36. TMC's David Coleman had a general research question about whether White Oak could successfully argue, as a defense to TMC claim of differing site conditions, that TMC had a duty to investigate other sources of data concerning the subsurface conditions at the project site. Billing Records.

37. Attorney Busconi consulted with his partner Rich Allen and had their associate perform the necessary research of Connecticut case law. Billing Records.

38. A copy of the research memorandum of Attorney Busconi's associate is attached to the Busconi Affidavit as Exhibit A.

39. The work started on May 27, 1998 and ended on June 2, 1998. Gadsby Hannah billed TMC a total of 7 hours for the research project. Billing Records.

---

[10] A copy of Woodard's letter is attached to the Pastori Affidavit Exhibit J.

[11] A copy of the billing records are attached to the Pastori Affidavit as Exhibit K.

40. Richard Millgard (Dennis's brother) claims that he asked Busconi on May 28, 1998 when notification on the bond should be given, and cannot remember what, if anything Busconi, told him. Richard Millgard at 103-04.

41. Attorney Busconi denies that Richard Millgard ever asked him about the limitations period. Busconi Affidavit ¶ 6.

42. TMC was still performing work on the Tomlinson Bridge Project when it first contacted Gadsby Hannah in May 1998, and as a result, the limitations period for making a claim on White Oak's bond had not yet started to run. Richard Millgard Transcript at 68; Dennis Millgard Transcript at 109-10; 181.

43. There is no documentary evidence of Richard Millgard's alleged inquiry about requirements for bond notification in Gadsby Hannah's files. Busconi Affidavit ¶ 6.

44. Richard Millgard testified that he did not remember what documents where sent to Gadsby Hannah in connection with his question and when they were sent (if at all) and could not recall what if any response he got to his alleged inquiry about the payment bond. Richard Millgard Transcript at 62-67; 103-04.

45. He does not know if TMC even had a copy of White Oak's bond to send to Gadsby Hannah in May 1998. Richard Millgard Transcript at 66.

46. Richard Millgard and/or TMC did not provide Gadsby Hannah with the documents necessary to advise TMC about bond notification requirements in May 1998. Lewin Report, which is attached to the Lewin Affidavit; Lewin Transcript at 32; Busconi Affidavit ¶ 7.

47. In fact, TMC did not give Gadsby Hannah those documents until April 2000 -- a year after the limitations period expired. Busconi Affidavit ¶ 7.

48. Dennis Millgard does not remember what Attorney Busconi found and reported. Dennis Millgard Transcript at 162-63.

49. After TMC's general research question, no one at Gadsby Hannah had further communication with TMC about the Tomlinson Bridge Project for the next six months – from June 2, 1998 through early December 1998. Billing Records.

50. In December 1998, Attorneys Allen and Busconi took Dennis Millgard, Ed Cardozza, and David Coleman out for a holiday lunch at the Meridien Hotel in Boston. Busconi Transcript at 31-32.

51. At the lunch, there was general discussion about TMC's business, including the Tomlinson Bridge Project. Busconi Transcript at 31-33.

52. They did not discuss making a claim on the White Oak bond. Busconi Affidavit ¶ 9.

53. TMC did not instruct Gadsby Hannah to do anything or perform any specific work concerning the Tomlinson Bridge Project at the lunch. Busconi Affidavit ¶ 9.

54. Gadsby Hannah attorneys did not bill TMC for their time spent at the lunch. Busconi Affidavit ¶ 10.

55. No one from TMC communicated with Gadsby Hannah about the Tomlinson Bridge Project again until the end of February/early March 1999. Busconi Affidavit ¶ 11; Billing Records.

56. On March 2, 1999, Jack Morrissey of White Oak wrote to Dennis Millgard and informed him that because TMC walked off the job in September 1998 and refused to complete its work on the Tomlinson Bridge Project, White Oak intended to hire another subcontractor to

finish TMC's work and would pursue TMC for damages. Dennis Millgard Transcript at 123-24; Letter of March 2, 1999 (Deposition Exhibit 10).[12]

57. TMC's last day of work on the Tomlinson Bridge Project had been September 15, 1998. Dennis Millgard Transcript at 181.

58. Dennis Millgard did not consult Gadsby Hannah prior to TMC walking off the job. Busconi Affidavit ¶ 12.

59. On March 3, 1999, Dennis Millgard asked Attorney Busconi to assist him in drafting a response to Jack Morrissey's letter. Dennis Millgard Transcript at 125.

60. A copy of Dennis Millgard's letter to Ron Busconi, dated March 3, 1999, was marked as Deposition Exhibit 11, and is attached to the Pastori Affidavit as Exhibit M. Dennis Millgard Transcript at 124-25.

61. Attorney Busconi assisted Dennis Millgard in drafting a response. Dennis Millgard at 125.

62. Dennis Millgard told Ron Busconi that he was optimistic that the matter would be settled and TMC would be back to work on the Project. Dennis Millgard at 125-26; Busconi Transcript at 44.

63. Dennis Millgard did not want to do anything that would ruffle any feathers and jeopardize TMC going back to work on the Project. Dennis Millgard Transcript at 137; Busconi Affidavit ¶ 15.

64. Prior to March 15, 1999, Gadsby Hannah had only performed approximately 8.2 hours of work, 7.0 hours researching the isolated legal issue that TMC requested in late May

---

[12] A copy of the March 2, 1999 letter is attached to the Pastori Affidavit as Exhibit L.

1998 and 1.2 hours providing general input to correspondence in early March 1999. Billing Records.

65.    Prior to March 15, 1999, TMC had not supplied Gadsby Hannah with its subcontract with White Oak, White Oak's bond, the relevant communications, including those with White Oak and ConnDot, the reports of TMC's and ConnDot's experts concerning the underground conditions, and the calculation of its claim for extra work. Busconi Affidavit ¶ 13.

66.    TMC kept Gadsby Hannah so far removed from its handling of the claim that it did not even see fit to involve Gadsby Hannah in ConnDot's audit of TMC's records or inform Gadsby Hannah about the audit at the time it took place. Busconi Affidavit ¶ 13.

## IV.    THE MEDIATION

67.    Dennis Millgard is a self described "benevolent dictator." Dennis Millgard Transcript at 54.

68.    In the fall of 1998 and early winter 1999, Dennis Millgard communicated with officials from ConnDot, White Oak, and a mediator, Carmen Reiss in an attempt to resolve TMC's claim and get back to work. Dennis Millgard Transcript at 125-27.

69.    He exercised complete control over the negotiations of TMC's claim for extra compensation for the alleged unanticipated site conditions. He called all the shots. Busconi Transcript at 56.

70.    He was always optimistic that he could work it out and get TMC back to work since he had a 20 to 30 year relationship with White Oak's president, Jack Morrissey, and did not want anything or anyone to jeopardize that negotiation and mediation process. Dennis Millgard Transcript at 126-27; 137; Busconi Transcript at 34, 38, and 56.

71. He neither asked nor was willing to pay Gadsby Hannah to get involved in this claim process. Peter Huntsman Deposition Transcript ("Huntsman's Transcript")[13] at 23, 26; Busconi Transcript at 56.

72. All communications concerning TMC's claim came through Dennis Millgard. Dennis Millgard Transcript at 120.

73. He alone spoke to White Oak. Dennis Millgard at 230-31; Busconi Transcript at 56.

74. He corresponded and met with the mediator, Carmen Reiss, on his own. Dennis Millgard Transcript at 126-28.

75. He sought out and spoke to Peter Huntsman, the Assistant Attorney General of the State of Connecticut, on his own. Dennis Millgard Transcript at 230-31

76. He did not ask Gadsby Hannah to represent TMC in these discussions or mediation. Huntsman Transcript at 23, 26; Dennis Millgard Transcript at 230-31; Busconi Affidavit ¶ 14.

77. Dennis Millgard served a document request on ConnDot in preparation for the mediation and called Peter Huntsman, an Assistant Attorney General for the State of Connecticut who was representing ConnDot, about TMC's claims. Dennis Millgard Transcript at 127-28.

78. Attorney Huntsman had some questions about whether TMC was represented by counsel, and in response Dennis Millgard explicitly told Attorney Huntsman that TMC was not represented and did not want lawyers involved because he did not want to incur the expense.

---

[13] Peter Huntsman's Transcript is attached to the Pastori Affidavit as Exhibit N.

Dennis Millgard sent written confirmation of this fact on April 16, 1999 to Attorney Huntsman. Huntsman Transcript at 22-26, 30-32; Deposition Exhibit 13.[14]

79. The mediation between ConnDot, White Oak, and TMC finally occurred on April 26, 1999 in Connecticut. Busconi Transcript at 72.

80. Attorney Busconi attended the mediation at Dennis Millgard's last minute request as a personal favor to Dennis Millgard but was never given TMC's written submission prior to the mediation. Busconi Transcript at 60-63.

81. Dennis Millgard made a four-hour presentation of TMC's claim at the mediation. Dennis Millgard Transcript at 133.

82. The mediation was unsuccessful. Dennis Millgard Transcript at 39-40.

83. White Oak terminated TMC on May 21, 1999. White Oak claimed that TMC had breached its subcontract by walking off the job in September 1998 and refusing to return to work. Dennis Millgard Transcript at 139; Busconi Transcript at 76-77; Termination Letter (Deposition Exhibit 65).[15]

84. Notwithstanding the termination, Dennis Millgard remained hopeful that he would be able to settle with ConnDot and White Oak and get TMC back to work. Dennis Millgard Transcript at 138-39, 177-80.

**V. TMC RETAINS GADSBY HANNAH TO PURSUE A CLAIM IN MARCH 2000**

85. On March 21, 2000, David Coleman of TMC wrote Attorney Busconi to confirm a meeting on March 29, 2000 to discuss work that TMC wanted Gadsby Hannah to perform on a

---

[14] A copy of Millgard's Letter to Huntsman is attached to the Pastori Affidavit as Exhibit O.

[15] A copy of the Termination Letter is attached to the Pastori Affidavit as Exhibit P.

number of matters so that TMC would get paid by its contractors. Coleman Transcript at 65-66; Memorandum of David Coleman dated March 21, 2000 (Deposition Exhibit 76).[16]

86. Coleman noted that "The Tomlinson Bridge and Kane 'A' projects are probably the most complicated. The others basically require a quick fix such as surety notification or demand for direct payments, prior to the meeting." Coleman Memorandum.

87. It was not until the meeting in late March 2000 that TMC directed Gadsby Hannah to take over the prosecution of the Tomlinson Bridge claim and make demand on White Oak's bond. Busconi Affidavit ¶ 16.

88. Gadsby Hannah ran a conflict check and opened a file on March 31, 2000. Busconi Transcript at 56.

89. On April 5, 2000, TMC provided Gadsby Hannah with the documents necessary to assess the applicable limitations period and make a claim on the bond. Coleman Transcript at 41-42; Facsimile of David Coleman to John Giffune, dated April 5, 2000, enclosing the bond and a calculation of TMC's claim (Deposition Exhibit 32).

90. Gadsby Hannah made demand on White Oak's bond for $70,730 for the balance of the contract and $1,083,585 for extra work on April 7, 2000. Busconi Affidavit ¶ 18.

91. National Union rejected the claim as untimely. Dennis Millgard Transcript at 208-09.

92. The limitations period for making a claim on the White Oak Bond expired on March 15, 1999. Dennis Millgard Transcript at 181.

93. TMC did not perform any work on the Tomlinson Bridge Project after September 15, 1998. Dennis Millgard Transcript at 140, 181.

---

[16] A copy of Coleman's Memorandum is attached to the Pastori Affidavit as Exhibit Q.

94. The version of Connecticut General Laws § 49-42 applicable to White Oak's bond dated June 6, 1994 required that notice of a claim must be made within 180 days after the date on which the contractor performed the last of the labor or furnished the last of the material for which the claim is made. See Exhibit S to the Pastori Affidavit.

95. The statute was revised effective October 1994 but the amended statute did not apply to the June 6, 1994 bond. See Exhibit T to the Pastori Affidavit.

96. The October amendment changed the way in which the limitations period was measured. See Exhibit T to the Pastori Affidavit.

97. The bond's date controls which version of the statute applies. See American Mason's Supply Co. v. F.W. Brown, 174 Conn. 219, 226-27 (1978).

## VI. GADSBY HANNAH'S CONDUCT SATISFIED THE APPLICABLE STANDRAD OF CARE

98. Gadsby Hannah has retained attorney Joel Lewin, a prominent attorney in construction law to offer his expert opinion on the standard of care required of Gadsby Hannah. See Lewin Affidavit and Exhibit A thereto.

99. Attorney Lewin's unchallenged opinion is that at no time from April 1998 through March 15, 1999 did the standard of care require Gadsby Hannah's attorneys to conduct research and advise TMC of its obligations under Connecticut law to give notice to White Oak's surety. Lewin Affidavit, Exhibit A.

100. Gadsby Hannah did not have a duty to offer advice beyond the specific task that TMC assigned to Attorney Busconi. Lewin Deposition at 34.

101. TMC assigned Gadsby Hannah discrete tasks between May 1998 and early March 1999. The standard of care did not require Gadsby Hannah to provide advice beyond the specific tasks that TMC assigned to it. Gadsby Hannah was not required to provide TMC with general

advice about all of its rights and risks related to the Tomlinson Bridge Project, including bond notification. Lewin Affidavit ¶ 9.

102. Gadsby Hannah satisfied the applicable standard of care. Lewin Affidavit ¶ 10.

103. Richard Millgard claimed in his deposition testimony that he asked Ronald Busconi about bond notification in late May 1998. Richard Millgard testified that Attorney Busconi asked him for certain documents in order for Attorney Busconi to answer Richard Millgard's alleged questions but conceded that he does not remember what documents were sent to Attorney Busconi and when they were sent. Lewin Affidavit ¶ 11.

104. There is no documentary evidence to support Richard Millgard's bare testimony that he requested information about bond notification. Nevertheless, based on Richard Millgard's testimony, Gadsby Hannah did not have a duty to provide any advice concerning bond notification without the necessary information that Richard Millgard claims Attorney Busconi requested but which Richard Millgard did not provide. Even under those circumstances, Gadsby Hannah and its attorneys did not breach the applicable standard of care. Lewin Affidavit ¶ 12.

105. TMC does not have an expert to establish the standard of care and any breach. TMC's Interrogatory Answer Number 4.[17]

                                            Respectfully submitted,

---

[17] A copy of TMC's interrogatory answers are attached to the Pastori Affidavit as Exhibit T.

GADSBY HANNAH LLP

By its attorneys,


/s/ Terri L. Pastori
Michael J. Stone, Esquire, BBO#482060
Terri L. Pastori, Esquire, BBO#635323
PEABODY & ARNOLD LLP
30 Rowes Wharf
Boston, MA 02110
(617) 951-2100

**CERTIFICATE OF SERVICE**

    I, Terri L. Pastori, hereby certify that on March 10, 2006, the foregoing document was served upon counsel for the plaintiff, John S. Davagian, Esquire, by electronic mail at jsdavagian@jsdlawgroup.com.

                                                  /s/ Terri L. Pastori
                                                  Terri L. Pastori