UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                Plaintiff

v.

GADSBY HANNAH, LLP,
                Defendant

## AFFIDAVIT OF RONALD G. BUSCONI IN SUPPORT OF GADSBY HANNAH'S MOTION FOR SUMMARY JUDGMENT

I, Ronald G. Busconi, hereby depose under oath and state as follows:

1.    I am an attorney licensed to practice in the Commonwealth of Massachusetts, the United States District Court for the District of Massachusetts, the United States Court of Appeal for the First Circuit, and the United States Supreme Court.

2.    I graduated from Boston University Law School in 1969.

3.    I am a partner at the law firm of Gadsby Hannah LLP.

4.    I make this affidavit based upon my personal knowledge.

5.    TMC first contacted me about the Tomlinson Bridge Project on May 27, 1998. My communications were with Richard Millgard and David Coleman. TMC had a discrete research question involving changed conditions, which I answered after having an associate perform the necessary research. A copy of my associate's research memorandum is attached hereto as Exhibit A.

6. Richard Millgard did not ask me about bond notification. There is no documentary evidence that would support his claim that he asked about bond notification requirements in May or June 1998.

7. TMC did not provide Gadsby Hannah with the documents necessary to advise TMC about bond notification requirements in May or June 1998. TMC did not give Gadsby Hannah those documents until April 2000.

8. After TMC's general research question about change conditions, no one at Gadsby Hannah had further communication with TMC about the Tomlinson Bridge Project for the next six months – from June 2, 1998 through early December 1998.

9. At the holiday lunch in December 1998 at the Meridien Hotel, TMC's employees did not discuss making a claim on the White Oak bond. They did not instruct Gadsby Hannah to do anything or perform any specific work concerning the Tomlinson Bridge Project at the lunch.

10. Gadsby Hannah attorneys did not bill TMC for their time spent at the lunch.

11. No one from TMC communicated with Gadsby Hannah about the Tomlinson Bridge Project again until the end of February 1999/early March 1999.

12. Dennis Millgard did not consult Gadsby Hannah prior to TMC walking off the job in September 1998

13. Prior to March 15, 1999, TMC had not supplied Gadsby Hannah with its subcontract with White Oak, White Oak's bond, the relevant communications, including those with White Oak and ConnDot, the reports of TMC's and ConnDot's experts concerning the underground conditions, and the calculation of its claim for extra work. TMC did not involve Gadsby Hannah in ConnDot's audit of TMC's records or inform Gadsby Hannah about the audit at the time the audit took place.

14. Dennis Millgard did not ask Gadsby Hannah to represent TMC in the discussions he was having in the fall of 1998 through the time of the mediation in April 1999.

15. From what little Dennis Millgard told me about the Tomlinson Bridge Project prior to the mediation in April 1999, it was apparent to me that Dennis Millgard did not want to do anything that would ruffle the feathers of ConnDot or White Oak and jeopardize TMC going back to work on the Project.

16. Prior to March 2000, TMC was consulting Gadsby Hannah on a very limited basis. TMC did not retain Gadsby Hannah for the purpose of providing comprehensive legal services in connection with the Tomlinson Bridge Project until after the limitations period on the bond expired. It was not until the meeting in late March 2000 that TMC directed Gadsby Hannah to take over the prosecution of the Tomlinson Bridge claim and make demand on White Oak's bond.

17. Deposition Exhibit 68 is a copy of Gadsby Hannah's billing records for TMC's general file and the Tomlinson Bridge matter. In March 2000, TMC asked Gadsby Hannah to pursue its claims related to the Tomlinson Bridge Project and make a claim on White Oak's bond. At that point, I opened a file for the Tomlinson Bridge Project. Prior to that time, Gadsby Hannah's attorneys billed the time that they spent related to the Tomlinson Bridge Project to the general TMC file It is the practice of Gadsby Hannah's attorney to accurately record and submit their time records in close proximity to the time the work is performed. The records are an accurate reflection of the work Gadsby Hannah performed.

18. Gadsby Hannah made demand on White Oak's bond for $70,730 for the balance of the contract and $1,083,585 for extra work on April 7, 2000.

3

19.  I did not draft or assist TMC's Kenneth Woodard with the claim he submitted to White Oak's surety for a changed condition dated January 26, 1999 in connection with the Bridgeport Project owned by the State of Connecticut. The surety on the Bridgeport Project was the same surety on the Tomlinson Bridge Project.

SIGN UNDER THE PAINS AND PENALTIES OF PERJURY THIS 10th DAY OF MARCH 2006.

*Ronald G. Busconi*
Ronald G. Busconi

# EXHIBIT A

# MEMO

To: Ron Busconi

From: Bill Edwards

Date: 5/29/98

RE: MIL2510 – Unforeseen Subsurface Conditions

## ISSUE

Whether a contractor in Connecticut is expected when bidding a job to look outside the contract boring logs to a soils report?

## FACTS

Millgard Corp. submitted a bid to the state based on contract documents that included a soil boring log. The soil boring log did not indicate the presence of subsurface rock. Upon performing the work, Millgard discovered subsurface rock that increased its construction costs, and Millgard consequently submitted claims to the state.

The state has rejected the claims for extra payment, asserting that Millgard should have looked outside of the contract documents to the soils report in addition to the boring log. The soil report was apparently in the possession of the state, and the contract documents did not incorporate the soil report by reference.

GH 0802

## SUMMARY

Based on the line of cases discussed below, it appears that the question of whether Millgard can recover for the extra costs due to the rock will depend largely upon the language of the contract itself. If, for example, the contract specifically disclaims the completeness or accuracy of the underground conditions, then the disclaimer would likely prevent any recovery for additional costs (such disclaimers are common based on my experience with construction contracts that include soil reports/borings). See Maskel Constr. Co. Inc.

Since the plans did not explicitly incorporate the soil report by reference, then it is unlikely that a court would look to such a report in determining whether the rocky conditions encountered were intended to be within Millgard's scope of work. To the extent that the state contends that the soil report – and thus the rock – was intended to be included in the scope of work, but was not actually included in the contract, the contract documents may be argued to be defective. Thus, under the general rule in Connecticut, a contractor in Millgard's position will not bear the burden of defective plans or specs. See Southern N.E. Contr'g.

Additionally, Millgard may not be expected to have sought clarification of the specs if it had no reason to anticipate otherwise. Based on the short amount of time that a bidder has to prepare his estimates, it is not reasonable to expect contractors to speculate that the soil borings may in fact be erroneous. See id.

DISCUSSION

I discovered no case law that specifically discussed a contractor's duty to look outside of the specs at a soils report, in addition to the boring log in the specs. However, in Maskel Constr. Co., Inc. v. Town of Glastonbury, 158 Conn. 592 (1969), the plaintiff contractor sought extra payment from the town for certain conflicts encountered underground during a sewer installation. The contractor claimed that the extra work was required because the plans and specs showed conditions differently than those encountered during construction. Id. at 595.

The court denied the claims, because the unit price contract between the owner and contractor specifically anticipated conflicts in the course of the work, and expressly disclaimed the completeness or accuracy of the underground conditions indicated in the drawings and specs. Id. at 594. The court found this express disclaimer particularly convincing, because it affirmatively stated that the information was "neither complete nor accurate." Id. at 596.

Somewhat similar claims were asserted by a contractor in John Arborio, Inc. v. Cox, 134 Conn. 545 (1948). The contractor entered into a unit price contact with the state for the construction of a section of highway, and subsequently sought extra payment for excavation alleged not to be within the scope of the contract. Specifically, the contractor claimed that its contract proposal form contained a unit price schedule for "unclassified excavation," but that this price did not cover the additional costs incurred for excavating rock. Id. at 547.

The contractor's claims were denied, because although the underlying contract did not contain provisions for rock excavation, the plans and specs did. Importantly, the plans

and specs were by reference explicitly made a part of the contract, and based on these plans it was determined that the rock excavation was intended to be included in the scope of the contractor's undertaking. Id. at 548.

The issue of defective specs and the contractor's duty to seek clarification was addressed in Southern N.E. Contr'g Co. v. State, 165 Conn. 644 (1974), where the issue was whether the general contractor was responsible for the wiring of the building. The state argued that the contract, read as a whole, required the wiring whether it was actually included in the plans and specs or not. Id. at 655-56. The court dismissed this argument based on two "well-developed rules of contract law: (1) that a contract which is susceptible of two meanings must be construed against the party who drew it; and (2) that a contractor will not be responsible for loss or damage resulting from defective plans or specs supplied by the contractee." Id. at 656 (citations omitted).

The state also argued that the contractor knew, or should have known, of an apparent inconsistency in the specs, and therefore had a duty to seek clarification of the specs as a bidder on a public construction project. Id. Although the court did not reject this reasoning, it did reject the argument, because on public bids the contractor has very little time to discover such errors. Under the circumstances, therefore, it was not reasonable to expect that the contractor "should have known" of the defect at the time of bidding. Id.