## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THE MILLGARD CORPORATION,** )<br>    **Plaintiff** )<br> )<br>**v.** )<br> )<br>**GADSBY HANNAH, LLP** )<br>    **Defendant** )<br> ) | **Civil Action No. 04-12388-RWZ** |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY DEFENSE EXPERT, JOEL LEWIN, DUE TO A CONFLICT OF INTEREST

The Plaintiff, The Millgard Corporation ("TMC"), submits this memorandum in support of its Motion to Disqualify Defense Expert, Joel Lewin, due to a conflict of interest.

## FACTS

The Defendant Gadsby Hannah's expert, Joel Lewin ("Lewin"), is an attorney at Hinckley, Allen & Snyder. Mr. Lewin has been a partner with Hinckley Allen & Snyder since 1979, and he has acted in the capacity as the chairman of the firm's Construction Law Group, which is a specialty practice area of the firm, since 1990. Lewin is one of the two senior partners in the Construction Law Group. *See the Affidavit of Joel Lewin offered by the Defendant.*

Attorney Charles E. Schaub, Jr. ("Schaub") is the other senior partner at Hinckley, Allen, & Snyder practicing in the firm's Construction Law Group. *See Exhibit "1" - Lewin Deposition Transcript pp.10-11.* Schaub has been an attorney at Hinckley Allen & Snyder since 1972, and a partner there since 1977. *See Exhibit "2" – Schaub Attorney Profile.*

Since at least 2002, Schaub has represented The Middlesex Corporation ("Middlesex") of Littleton, Massachusetts. *Coleman Affidavit at 13.*

1

On at least two MHD projects, TMC was a subcontractor to Middlesex. One project was known as MHD Contract No. 98182 to Reconstruct a Bridge over Reserve Channel in Boston. The other project was known as MHD Contract No. 99121 to Reconstruct a Section of Route 146 in Worcester. Disputes arose on both projects with MHD over the payment for removal of obstructions encountered during the course of the work. *Coleman Affidavit at 5-8.*

TMC submitted the payment disputes through Middlesex to the Claims Committee of MHD on the two projects. MHD denied payment on both projects. Subsequently, TMC and Middlesex appealed the denials to the MHD Board of Contract Appeals. TMC was owed approximately 72% of the amount appealed on the Boston project and approximately 57% of the amount appealed on the Worcester project. *Coleman Affidavit at 9-12.*

In pursuing the two respective claims, Schaub represented the legal interests of Millgard as well as those of Middlesex. Schaub's representation of TMC came to be when Middlesex asked TMC to share the legal representation on the prosecution of the claims so that they could split the legal fees. *Coleman Affidavit at 14.* By its offer, Middlesex consented to sharing the representation of Schaub with TMC. Thereafter, Schaub represented the interests of both Middlesex and TMC before the Administrative Law Judge in pursuit of the claims, a process that spanned approximately four years (2002-2005). During that time, Schaub communicated directly with TMC, met with personnel of TMC to strategize and review TMC's documentation, and actively participated in the preparation and presentations of TMC's claims at three administrative hearings on the claims in order to preserve and enforce TMC's rights. Then, at the conclusion of the hearing, Schaub drafted briefs on behalf of both Middlesex and TMC that clearly reflected legal arguments in support of TMC. Schaub and TMC exchanged drafts and discussed editing of the briefs prior to their submission to the administrative judge. *Coleman*

2

*Affidavit at 15-18.*

On January 11, 2006, TMC deposed Lewin. At his deposition, Lewin testified that he was unaware of the extent of the relationship between TMC and Schaub. He testified that he had learned of the potential conflict from defense counsel in this case in and around December of 2005, which was about a month after Lewin authored his expert report. Lewin testified that upon learning of the potential conflict, he discussed the matter in general, and not in detail, with Schaub. At his deposition, Lewin denied having any knowledge that Schaub either represented TMC, conferred with TMC, or knew that TMC was paying Hinckley, Allen & Snyder for legal services rendered by Schaub. *See Exhibit "1" - Lewin Deposition Transcript pp. 12-14.*

Lewin further testified at his deposition that he assumed based on his discussion(s) with Schaub that Schaub had only represented Middlesex. Without articulating a reasonable basis, Lewin asserted that Attorney Schaub only represented Middlesex and not TMC or TMC's claim. Beyond this bald assertion, Lewin offered no factual evidence to negate Schaub's representation of TMC. However, Lewin acknowledged that if there is an attorney-client relationship between TMC and Schaub, then a conflict of interest exists and he (Lewin), cannot testify against TMC in the present case. *See Exhibit "1"- Lewin Deposition Transcript pp. 12-14.*

Since the deposition, Lewin has submitted an affidavit dated March 9, 2006 that is silent as to his knowledge or further investigative efforts as to Attorney Schaub's prior representation of TMC. *See Affidavit of Joel Lewin.*

## **ARGUMENT**

1.   <u>An Attorney-Client Relationship Exists Schaub and TMC</u>

Under Massachusetts law, an attorney-client relationship may be demonstrated when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains

to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give the desired advice or assistance . . . In appropriate cases, the third element may be established by proof of detrimental reliance, when the person seeking legal services reasonably relies on the attorney to provide them, and the attorney, aware of such reliance, does nothing to negate it." _International Stategies Group, LTD. V. Greenberg Traurig_, LLP, 2006 Westlaw 229034 (D.Mass. 2006) (Zobel, J.) citing _Devaux v. Amer. Home Assurance Co. et al_, 387 Mass. 814, 818, 444 N.E.2d 355 (1983), quoting _Kurtenbach v. TeKippe_, 260 N.W.2d 53, 56 (Iowa 1977). See also _Flaherty v. Baybank Merrimack Valley N.A._, 808 F.Supp. 55 (1st Cir. 1992)(Zobel, J.).

   TMC, through its officers and/or employees, clearly received advice and assistance from Schaub. Furthermore, Schaub did not refuse to represent TMC or conduct himself in a manner inconsistent with one representing a client's legal interest. Therefore, there was a reasonable belief on the part of TMC that a confidential relationship with Schaub existed.

*2.*     _Knowledge of Representation of TMC  is Imputed to Attorney Lewin_

   Most courts will impute the knowledge of one member of a law firm to all its members for purposes of disqualification. _Commonwealth v. Geraway_, 364 Mass. 168, 177, 301 N.E.2d 814, 820 n. 1 (1973). "The premise upon which disqualification of law partners is based is that there is within the law partnership a free flow of information, so that knowledge of one member of the firm is knowledge to all." _Id._ citing _People v. Wilkins_, 28 N.Y2d 53, 56, 320 N.Y.S.2d 8, 10, 268 N.E. 2d 756, 757 (1971). In fact, "the knowledge and duties [of one partner] are imputed to his partners **as a matter of law**." _National Credit Union Admin. Board v. Stone_, 1994 WL 175044 (D.Mass. 1994) (Zobel, J.) (Emphasis added).

   Therefore, the knowledge and duties of Attorney Schaub to TMC must be imputed as a

matter of law to Attorney Lewin.  Furthermore, as Chairman of the Construction Law Group, a

specialized practice at Hinckley, Allen & Snyder, Attorney Lewin was in the superior position to

know of the matters being handled within the specialty group he oversaw, including the

representation of TMC by Schaub.  Based on Attorney Schaub's undeniable representation of

TMC, there is a clear conflict of interest and Attorney Lewin cannot testify against TMC in the

present case.

<u>CONCLUSION</u>

Wherefore, the Plaintiff, The Millgard Corporation respectfully requests that this

Honorable Court order that Attorney Joel Lewin be disqualified from offering expert testimony

of behalf of the Defendant, Gadsby Hannah, LLP in the present action.

**The Millgard Corporation**
By its attorneys,

Date:   3/30/2006

/s/ John S. Davagian, II
John S. Davagian, II, Esq.
B.B.O. No. 114740
Thomas E. Sartini, III, Esq.
B.B.O. No. 637971
Davagian & Associates
365 Boston Post Road, Suite 200
Sudbury, MA 01776
978-443-3773

<u>CERTIFICATE OF SERVICE</u>

I, John S. Davagian, II, hereby certify that on March 30, 2006 I served a copy of the
foregoing document upon counsel for the Defendant, Terri L. Pastori, Esquire, by electronic mail
at  tpastori@peabodyarnold.com.

/s/ John S. Davagian, II

John S. Davagian, II, Esq.

5

# Exhibit "1"

Page 1

1                                          Volume:  I

2                                          Pages:  1-37

3                                          Exhibits:  1

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7

8   Civil Action No. 04-12388-RWZ

9   - - - - - - - - - - - - - - - - - - x

10  THE MILLGARD CORPORATION,

11              Plaintiff,

12  vs.

13  GADSBY HANNAH, LLP,

14              Defendant.

15  - - - - - - - - - - - - - - - - - - x

16

17           DEPOSITION OF JOEL LEWIN

18         Wednesday, January 11, 2006

19            Peabody & Arnold, LLP

20              30 Rowes Wharf

21            Boston, Massachusetts

22         10:40 a.m. to 11:55 a.m.

23     Reporter:  Karen A. Morgan, CSR/RPR

24

Joel Lewin

Page 10

1 firm from Connecticut or do you handle that matter
2 internally or what is your internal procedure that way
3 with regard to that kind of an issue?
4     A.  Depending upon the particular question, I
5 would -- if I thought there were questions which
6 required knowledge of Connecticut law, then generally
7 speaking I would make contact with a couple different
8 lawyers in Connecticut to get a quick read on
9 Connecticut law.  If I thought that I did not have to
10 check Connecticut law on the matter because of the
11 nature of the matter, then I wouldn't make such
12 contacts.
13     Q.  So whether or not you make contact with a
14 Connecticut attorney would depend on the factual
15 situation and the nature of the problem that has been
16 presented to you?
17     A.  That's correct.  I might check Connecticut
18 law on my own if it was a simple question.
19     Q.  Okay.  Is there a lawyer that works in your
20 construction group by the name of Charles Schaub?
21     A.  Yes.
22     Q.  And what is his position relative to you
23 within the firm?
24     A.  Is this on the record?  Chuck is my partner.

Page 11

1 He has been my partner since 1978 and we were
2 classmates in law school and we are the two senior
3 partners in the group, in the construction group.
4     Q.  Does one answer to the other or are you
5 equals or how does that work?
6     A.  We have equal votes as far as the governance
7 of the law firm is concerned.
8     Q.  Within the construction group?
9     A.  I'm the chairman of the construction group.
10 I would like him to take my job but he won't.
11     Q.  Does your firm have a client by the name of
12 the Middlesex Corporation?
13     A.  Yes.
14     Q.  And does Mr. Schaub represent the Middlesex
15 Corporation?
16     A.  Yes.
17     Q.  Are you aware of a dispute that occurred
18 between the Middlesex Corporation and the Massachusetts
19 Highway Department in which Millgard Corporation was a
20 subcontractor to Middlesex?
21     A.  Yes.
22     Q.  When did you become aware of that dispute?
23        MR. STONE:  Of the dispute or whether
24 Millgard was a subcontractor?

Page 12

1     Q.  I want to know of the dispute.
2     A.  I learned about both at the same time
3 approximately a month ago.
4     Q.  How did you hear about them?
5     A.  I heard about it through a conversation with
6 Mike Stone.
7     Q.  Okay.  Upon learning of this situation, did
8 you have a conversation with Mr. Schaub about his
9 representation of Middlesex?
10     A.  Yes.
11     Q.  Did Mr. Schaub tell you that he represented
12 the Millgard Corporation with respect to their
13 involvement in the dispute?
14     A.  No.
15     Q.  He didn't tell you that?
16     A.  No.
17     Q.  Did he tell you whether or not he had any
18 communications with people from Millgard relative to
19 that dispute?
20     A.  No.
21     Q.  Are you aware that Millgard has agreed to pay
22 a portion of Mr. Schaub's fees relative to that
23 dispute?
24     A.  No.

Page 13

1     Q.  Did you discuss the details of that dispute
2 with Mr. Schaub?
3     A.  I discussed in general the dispute with him.
4 I wouldn't say in detail.
5     Q.  If Mr. Schaub did represent Millgard's
6 position in that dispute, do you believe that your
7 testimony as an expert in this matter on behalf of
8 Gadsby Hannah is a conflict of interest?
9        MR. STONE:  Objection.
10     A.  No, not the way I define the term Millgard's
11 position.
12     Q.  How did you define Millgard's position?
13     A.  I assume that based upon my discussions that
14 Middlesex Corporation, our client, has a claim against
15 the Mass. Highway Department which as it typically does
16 would include one or more claims of subcontractors and
17 the claim is Middlesex's claim.  Chuck Schaub and my
18 firm represents Middlesex and Middlesex's claim.  It
19 does not represent Millgard nor does it represent
20 Millgard's claim.  It only represents Middlesex's
21 claim.  Therefore, we only have one client in that
22 dispute, Middlesex Corporation, not Millgard and I
23 would say that if Chuck were representing as an
24 attorney Millgard and Middlesex in that dispute, then

4 (Pages 10 to 13)

Page 14

1 that may be a conflict of interest. He may not be able
2 to represent both.
3      Q.   But that would not be a conflict for you if
4 that were the case?
5      A.   If Chuck Schaub was the attorney -- of my
6 firm was an attorney to Millgard Corporation in any
7 matter, then I could not testify against Millgard
8 Corporation but I don't believe we are attorneys to
9 Millgard Corporation in any matter no more than Ed
10 Glassman was an attorney to Millgard Corporation when
11 it had a claim that they were trying to -- that
12 Millgard was trying to pass through to the Connecticut
13 Department of Transportation.
14      Q.   Unless there was some type of formal
15 agreement between Millgard and Hinckley Allen?
16      A.   Yes.  I agree with that.  If Millgard had
17 retained Hinckley Allen as its counsel and there was an
18 attorney-client relationship, then there would be a
19 conflict.
20      Q.   Would that attorney-client relationship have
21 to be a written relationship, a written document
22 evidencing the relationship?
23      A.   In that instance, in the instance of the
24 Middlesex Corporation claim against the Mass. Highway

Page 15

1 Department I believe it would have to be.  Because of
2 the potential conflicts between Millgard and Middlesex
3 there would have to be something in writing.
4      Q.   In the second paragraph of your letter you in
5 general terms reference the documents that you have
6 reviewed prior to drafting this opinion?
7      A.   Yes.
8      Q.   Where did you view those documents?
9      A.   There were in my possession.  I had to take
10 my daughter to school in late August at the University
11 of Wisconsin and so she and I flew out there for
12 several days and I took the documents with me and
13 that's where I read them.  That's where I read them for
14 the first time.
15      Q.   For the first time?
16      A.   Yes.
17      Q.   How voluminous were those documents?
18      A.   About ten inches high.
19      Q.   And from whom did you receive those
20 documents?
21      A.   I received them from Mike Stone's office.
22      Q.   Are you aware of the totality of all the
23 documents involved in this case?
24      A.   Probably not.  That's a broad question so if

Page 16

1 I said yes, I would probably be mistaken.
2      Q.   I would just make a comment that there are
3 several file boxes of documents.
4           MR. STONE:  Well, with respect to the
5 underlying case there may be numerous documents.
6 You're welcome to examine Mr. Lewin about what he
7 looked at and any particular documents that you're
8 interested in.
9      Q.   Do you retain a file that contains those
10 documents?
11      A.   Yes.
12      Q.   And that is still in your possession?
13      A.   Yes.
14      Q.   I note here that you reviewed some deposition
15 transcripts?
16      A.   Yes.
17      Q.   Do you recall the names of the people who
18 were deposed?
19      A.   Dennis Millgard, Richard Millgard, David
20 Coleman, John Giffune, Ron Busconi.  That's all I can
21 recall right now of the transcripts I reviewed.  I'm
22 not sure if there were others that were deposed.
23      Q.   You stated earlier that when you first looked
24 at documents for this case, that was in August of 2005?

Page 17

1      A.   Yes.
2      Q.   And did Mr. Stone subsequently provide you
3 with other documents after that date?
4      A.   Yes.
5      Q.   Is it fair to say those documents contained
6 the deposition transcripts and the exhibits?
7      A.   Yes.  I'm not sure if I had deposition
8 transcripts in late August but ultimately I reviewed
9 all of those deposition transcripts that I just
10 identified.
11      Q.   I'm not trying to trip you up here because
12 the depositions I believe --
13      A.   Took place after that.
14      Q.   September, October, November I believe or
15 were the majority of the depositions.  In the next
16 sentence you state that in your opinion Gadsby Hannah
17 was not under a duty to conduct research and advise
18 Millgard during the period April 1998 and March 15,
19 1999 of Millgard's obligation under Connecticut law to
20 give notice to White Oaks Bonding Company.  What is the
21 significance of those dates?
22      A.   The April 1998 date is the date that I
23 believed was the first contact between or the earliest
24 date of the first contact between Millgard and Gadsby &

5 (Pages 14 to 17)

Joel Lewin

36

```
1                    C E R T I F I C A T E

2        I, JOEL LEWIN, do hereby certify that I have read

3    the foregoing transcript of my testimony, and further

4    certify that it is a true and accurate record of my

5    testimony (with the exception of the corrections listed

6    below):

7      Page      Line             , Correction

8       18        21      add "to do the work" after retained
       ─────    ─────    ──────────────────────────────────────
9       24        15      substitute "fill" for "fuel"
       ─────    ─────    ──────────────────────────────────────
10      26        12      substitute "are" for "is"
       ─────    ─────    ──────────────────────────────────────
11      26        13      strike "and the subcontractor"
       ─────    ─────    ──────────────────────────────────────
12      27        21      substitute "of" for "on"
       ─────    ─────    ──────────────────────────────────────
13      27        22      strike "is" and add "is" after "client"
       ─────    ─────    ──────────────────────────────────────
14     ─────    ─────    ──────────────────────────────────────

15     ─────    ─────    ──────────────────────────────────────

16     ─────    ─────    ──────────────────────────────────────

17     ─────    ─────    ──────────────────────────────────────

18     ─────    ─────    ──────────────────────────────────────

19     ─────    ─────    ──────────────────────────────────────

20

21        Signed under the pains and penalties of perjury

22    this ___1___ day of _____February_____, 2006.

23

24                      JOEL LEWIN
```

# Exhibit "2"



**HinckleyAllenSnyder LLP**
ATTORNEYS AT LAW

Our Attorneys & Other Key Personnel

**About Our Firm**

**Practice Capabilities**

**Our Attorneys &
Other Key Personnel**

**Events & News**

**Career Opportunities**

**Contact Us**

Charles E. Schaub, Jr., Partner

Email: cschaub

**PRACTICE:**

- Charles focuses his practice in the area of dispute resolution with an emphasis on the construction industry and the representation of general and subcontractors, suppliers, and owners in the public and private sectors of vertical and horizontal construction. Representative construction matters include bid protests; pre-qualification challenges; allegations relating to inadequate or defective work or design; professional malpractice of architects/engineers; delay/disruption claims; DSC claims; scope issues; and debarment/suspensions. Other matters have included shareholder disputes, professional malpractice, business regulation, UCC issues, Public Records issues; and general business litigation.

**WORK EXPERIENCE:**

- HINCKLEY, ALLEN & SNYDER LLP
  Construction Law Group
  Partner (1977 - Present)
  Associate (1972 - 1976)

**EDUCATION:**

- BOSTON COLLEGE LAW SCHOOL, J.D., 1972
  *cum laude*
- LEHIGH UNIVERSITY, B.A., 1968
  *cum laude*
- AMERICAN ARBITRATION ASSOCIATION AND CPR
  Mediation and arbitration training

**ADMISSIONS TO BAR:**

- Massachusetts, 1972
- U.S. District Court of Massachusetts
- U.S. Court of Claims
- U.S. Court of Appeals for the First Circuit

**PUBLICATIONS/LECTURESHIPS:**

- **Forums**
  State and Federal Courts of Massachusetts; New York; and the U.S. Court of Claims.

  Bid Protests at the Massachusetts Attorney General's Bid Protest Unit; Comptroller General of the United States and various courts.

  Arbitration and Mediation Proceedings in private proceedings and in conjunction

with the American Arbitration Association.

Administrative Forums including the Massachusetts Highway Department; VABCA; ASBCA; ODRA (FAA).

- Monthly Legal Column for Construction Outlook for the Utility Contractors of New England for over 10 years.
- Speaker at numerous ABA Forum Committee on Construction Conferences including Boston; Charleston (SC); Chicago; Las Vegas; New York City as well as the publication of materials by the ABA to accompany such presentations.
- Speaker at conferences for the American Arbitration Association; ARTBA; Construction Industries of Massachusetts; Utility Contractors of New England; Associated Builders & Contractors (NH, MA, RI Chapters).

**MEMBERSHIPS:**

- Massachusetts Bar Association
- Massachusetts Bar Foundation
- American Bar Association

**SPECIAL HONORS:**

- Named as one of Massachusetts Super Lawyers (Construction Category) in Boston Magazine (November 2004)

**REPORTED CASES:**

- The leading decision by the Supreme Judicial Court on the scope of the Public Records statute in Massachusetts.
- The most frequently cited Supreme Judicial Court decision on the applicable standards in a bid protest on a public construction project.
- Application of the Uniform Commercial Code to certain aspects of a construction project.
- Challenges to the scope of local government regulation of businesses
- Numerous issues related to the interpretation of Construction contracts, statutory provisions relating to construction and also the standards of review for public procurement of construction and other goods and services.

- Print Friendly Version -

Privacy Policy \ Legal \ © 2006 Hinckley, Allen & Snyder LLP