UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE MILLGARD CORPORATION,<br>    Plaintiff<br><br>v.<br><br>GADSBY HANNAH, LLP<br>    Defendant | Civil Action No. 04-12388-RWZ |

**PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS, PURSUANT TO LOCAL RULE 56.1**

Pursuant to Local Rule 56.1, the Plaintiff, The Millgard Corporation ("TMC"), provides the following statement of additional undisputed material facts, as follows:

**I.   INTRODUCTORY FACTS**

1. In the early 1990's TMC began doing a considerable amount of work out of its Boston office. Affidavit of Dennis Millgard at ¶ 5.

2. Upon the consideration and recommendation of the key company personnel, the decision was made to engage a law firm in that area to provide TMC legal advice and to represent TMC's interests. Affidavit of Dennis Millgard at ¶ 10.

3. Several representatives of TMC (Edmund Cardoza and David Coleman) interviewed representatives of Gadsby Hannah (Ronald Busconi and Jim Myers ). Affidavit of Dennis Millgard at 11 and Exhibit 1 to same.

4. Attorneys Busconi and Myers represented that Gadsby Hannah was a larger firm that had a practice section specializing in construction law. Affidavit of Dennis Millgard at ¶ 12 and Exhibit 1 to same.

1

5. During the interview process Gadsby Hannah told the TMC representatives why TMC should hire them and not some other firm: they were the best; they had the reputation and knew most of the "handshakes" that are important in local politics; their construction group was second to none; and they could handle what ever came up. Affidavit of Dennis Millgard at ¶ 13.

6. During the summer of 1993, Dennis Millgard made the decision to engage the services of Gadsby Hannah to represent TMC in the northeastern part of the United States. TMC's Response to Interrogatory No. 6 which is Exhibit "T" to the Affidavit of Terri L. Pastori. Affidavit of Dennis Millgard at ¶ 14.

7. There was never any written agreement between TMC and Gadsby Hannah. Busconi Transcript at 15-16. Affidavit of Dennis Millgard at ¶ 15.

8. During the entire duration of the relationship between the two firms from 1993 into 2001, no one at Gadsby Hannah ever explained to the principals at TMC that Gadsby Hannah provided different levels or types of service to their clients or that the degree of responsibility for their services differed depending on the level or type of service. TMC's Response to Interrogatory No. 6 which is Exhibit "T" to the Affidavit of Terri L. Pastori. Affidavit of Dennis Millgard at ¶ 16.

9. From mid 1993 until late May 1998 Gadsby Hannah handled many and very diverse matters for TMC in the Northeast. Some only required the answer to a specific question or two and while others were very involved. Affidavit of Dennis Millgard at ¶ 17.

10. No one at TMC ever noticed a difference between the service or response that they received based upon the complexity of the advice or service that was requested. Affidavit

of Dennis Millgard at ¶ 18.

11. Over that five year period of time, the management personnel at TMC and the attorneys at Gadsby Hannah got to know each other very well. Richard Millgard Transcript at 69.

12. Gadsby Hannah came to know how TMC would respond to problem situations and what TMC expected from their attorneys. Coleman Transcript at 48-52.

13. There certainly was no understanding on the part of the principals at TMC that when it had a question or encountered a problem that required legal advice or participation, TMC would make a list of what TMC needed and how far their attorneys should go and then tell them to stop work. Affidavit of Dennis Millgard at ¶ 19.

14. TMC relied on Gadsby Hannah for advice on how to handle any situation in which TMC might be involved.  What local idiosyncrasies to be aware of in relation to the business of both public and private construction. What notices to file. What statutes were peculiar to the area, and so on. Affidavit of Dennis Millgard at ¶ 20.

15. Over time TMC came to rely on Gadsby Hannah to alert TMC to what the pitfalls were in certain circumstances. Richard Millgard Transcript at 69.

16. An example of that reliance and the typical Gadsby Hannah response occurred when TMC requested Gadsby Hannah to assist in drafting the subcontract agreement for the Flushing Bay Project. Dennis Millgard Transcript at 37.

17. Richard Allen not only drafted the document but alerted TMC to related issues on which TMC should seek additional advice from Gadsby Hannah. Affidavit of Dennis Millgard at ¶ 22 and Exhibit 2 to same.

18. Subsequently, when TMC was terminated on the Flushing Bay project in January of 1998, Ron Busconi wrote TMC a three page letter explaining what his legal interpretation

of TMC's rights and problems in relation to the project. Dennis Millgard Transcript at 94-95. Affidavit of Dennis Millgard at ¶ 23 and Exhibit 3 to same.

19. It was a simple relationship. TMC was good at putting holes in the ground and the attorneys at Gadsby Hannah were suppose to be good at the law. Affidavit of Dennis Millgard at ¶ 24.

20. The attorneys within the construction group at Gadsby Hannah sold themselves as experts and that's what TMC bought and paid very handsomely for. Affidavit of Dennis Millgard at ¶ 25.

21. From October of 1993 through December of 2001, Gadsby Hannah maintained twenty (20) files and invoiced TMC nearly $480,000.00 for its services. Dennis Millgard Transcript at 45. Affidavit of Dennis Millgard at ¶ 26. Exhibit "T" to the Affidavit of Terri L. Pastori.

22. On the Tomlinson Project, from June 1998 through September of 2000, Gadsby Hannah invoiced TMC $19,010.03 for its services. Affidavit of Dennis Millgard at ¶ 27.

II. **THE TOMLINSON BRIDGE PROJECT**

23. The TMC's work on the project was delayed approximately three years because White Oak encountered a pre-existing bridge which had not been called out in the plans and specifications. Richard Millgard Transcript at 42-44.

24. Upon commencing work on the project in late 1997, TMC encountered a differing subsurface condition which made its work of installing casings more difficult and costly to perform. Specifically, the rock encountered was harder than originally anticipated from the bid documents. Richard Millgard Transcript at 44-46. Dennis Millgard Transcript at 74-76.

4

25. TMC provided White Oak with written notice of the differing subsurface condition. Richard Millgard Transcript at 46-47.

26. At that same time Dennis Millgard did have some conversations with Ron Busconi with respect to this issue. Dennis Millgard Transcript at 94-95.

27. Subsequently White Oak filed a claim with ConnDOT on account of the differing subsurface condition and ConnDOT agreed to a change order to compensate White Oak and TMC for the extra work involved changing the method of installation of the casings into the harder rock. Richard Millgard Transcript at 47-52. Dennis Millgard Transcript at 74-77.

28. However, once that problem was resolved, TMC began encountering "skulls of quartz and granite in the sandstone" while attempting to drill its shafts into the rock. Dennis Millgard Transcript at 77-79.

29. Again TMC provided White Oak with written notice of the differing subsurface condition but ConnDOT would not acknowledge that TMC and White Oak were entitled to payment for the additional work required to drill the shafts for the caissons. Dennis Millgard Transcript at 77-79. Richard Millgard Transcript at 56-57.

30. It was at that point in time, late May of 1998, that Richard Millgard contacted Ron Busconi to obtain legal advice with respect to the problems with the project. Richard Millgard Transcript at 57-59.

31. On May 28, 29 and June 1, 1998 Richard Millgard had telephone conversations with Ron Busconi and specifically inquired as to bond notification requirements and other notice requirements with respect to Connecticut law. Richard Millgard Transcript at 60-63. Affidavit of Richard Millgard at ¶¶ 8-11.

32. Mr. Busconi does not recall requesting a copy of the TMC contract from Richard Millgard at that time. Busconi Transcript at 23.

33. TMC throughout the summer and fall of 1998 TMC continued to look to Gadsby Hannah for direction and advice as to how to manage its interests relative to the project. Richard Millgard Transcript at 68, 71-72.

34. In July of 1998 White Oak, at the direction of ConnDOT, directed TMC to stop work on the project because the cofferdam in which TMC was working became unstable and was moving. Dennis Millgard Transcript at 102.

35. After a three week delay, TMC returned to work on the project. Dennis Millgard Transcript at 103.

36. On September 15, 1998 TMC stopped work on the project because it had completed all of its work in the initial work area provided by White Oak and no other area was available to it to work. Dennis Millgard Transcript at 241-242. Busconi Transcript at 35.

**III.   THE BRIDGEPORT PROJECT**

**IV.   TMC'S CONSULTATION WITH GADSBY HANNAH**

37. TMC was communicating with Gadsby Hannah during the fall of 1998 and winter of 1999 with respect to the status of the Tomlinson project. Dennis Millgard Transcript at 103-108, 115-125.

38. In late February Dennis Millgard had a telephone conversation with Ron Busconi concerning the directive from White Oak to return to work on the project. Busconi Transcript at 35-36. Deposition Exhibit 53.[1]

---

[1] Exhibit 9 to the Affidavit of John S. Davagian, II.

39. During that conversation Mr. Busconi warned Dennis Millgard that if TMC failed to return to work it could amount to a breach of contract with serious consequences. Busconi Transcript at 38-39.

40. Yet, Mr. Busconi did not request a copy of TMC's contract at that time. Busconi Transcript at 39-40.

41. However, Mr. Busconi did assist Dennis Millgard in drafting a response to the directive and other letters in early March of 1999. Busconi Transcript at 40-43. Deposition Exhibit 10.[2]

### III. THE MEDIATION

42. Dennis Millgard requested Mr. Busconi's assistance in the preparation of the TMC presentation at the mediation. Busconi Transcript at 48-53. Deposition Exhibits 55, 56 and 57.[3]

43. TMC consulted with Gadsby Hannah with respect to legal issues related to the mediation. Dennis Millgard Transcript at 127-132.

44. Ron Busconi attended a second mediation session at the ConnDOT offices on May 19, 1998. TMC's Response to Interrogatory No. 18 which is Exhibit "T" to the Affidavit of Terri L. Pastori. Dennis Millgard Transcript at 175.

45. Mr. Busconi was present in both the mediation sessions and in the private meetings when settlement discussions took place with representatives of ConnDOT and White Oak. TMC's Response to Interrogatory No. 18 which is Exhibit "T" to the Affidavit of Terri L. Pastori. Dennis Millgard Transcript at 175-178.

---

[2] Exhibit 7 to the Affidavit of John S. Davagian, II.

[3] Exhibits 10-12 to the Affidavit of John S. Davagian, II.

**IV.     POST MEDIATION**

46. On May 21, 1999, just two days after the second mediation session White Oak sent TMC a letter of termination. Dennis Millgard Transcript at 188. Busconi Transcript at 76.

47. TMC kept Gadsby Hannah informed of any communications concerning the Tomlinson project during the summer of 1999. Dennis Millgard Transcript at 187-190. Busconi Transcript at 81.

48. In fact Mr. Busconi was communicating directly with Mr. Lassman and learned from him that White Oak had been taken over by its surety by July of 1999. Dennis Millgard Transcript at 188.

49. Before Gadsby Hannah filed the bond claim for TMC on the Tomlinson project in 2000, Ron Busconi and John Giffune were not sure where they stood and they were confused. Coleman Transcript at 70-74, 101-104.

50. Certainly no later than June 22, 2000, Gadsby Hannah was on notice that its notice to the surety on behalf of TMC was late. Exhibit 36 to the Deposition of John Giffune.[4]

51. In Civil Action No. 3:00CV1685(CFD) Judge Droney of the United States District Court ruled that Gadsby Hannah's notice of a bond claim was not timely under Connecticut law.[5]

52. According to Mr. Busconi, the attorney-client relationship between Gadsby Hannah and TMC was determined by the circumstances of each matter and his ethical and professional responsibility was determined by the information provided by TMC. Busconi Transcript at 18-21.

---

[4] Exhibit 8 to the Affidavit of John S. Davagian, II.

[5] Exhibit 13 to the Affidavit of John S. Davagian, II.

53. Over the entire time that Mr. Busconi represented TMC, he never explained to TMC the difference between providing general counsel and being retained for a matter. Busconi Transcript at 108-109.

**The Millgard Corporation**
By its attorney,

Date:   3/31/2006

/s/ John S. Davagian, II
John S. Davagian, II
B.B.O. No. 114740
Davagian & Associates
365 Boston Post Road, Suite 200
Sudbury, MA 01776
978-443-3773

**CERTIFICATE OF SERVICE**

I, John S. Davagian, II, hereby certify that on March 31, 2006 I served a copy of the foregoing document upon counsel for the Defendant, Terri L. Pastori, Esquire, by electronic mail at tpastori@peabodyarnold.com.

/s/ John S. Davagian, II

John S. Davagian, II, Esq.