**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| THE MILLGARD CORPORATION,<br>    Plaintiff | ) ) ) ) | |
| v. | ) ) | Civil Action No. 04-12388-RWZ |
| GADSBY HANNAH, LLP<br>    Defendant | ) ) ) ) | |

## <u>AFFIDAVIT OF V. DENNIS MILLGARD</u>

Upon oath I, V. Dennis Millgard, depose and say as follows:

1.  I reside at 54878 Grenelefe Circle East, South Lyon, Michigan 48178.

2.  I was employed by The Millgard Corporation from 1964 to 2003.

3.  My last job title with The Millgard Corporation was as its president.

4.  I have personal knowledge of the facts contained herein and if called as a witness could competently testify thereto.

5.  In the early 1990's TMC began doing a considerable amount of work out of its Boston office.

6.  TMC generally negotiated its own contracts but often consulted with counsel for assistance in doing so.

7.  Although TMC negotiated many of its contract disputes on its own including providing notice of and prosecuting of claims, it seldom did so without consulting with counsel as those claims might relate to legal issues.

8.  I am familiar with how payment and performance bonds work but I have always been keenly aware that such bonds are always subject to the laws of the jurisdiction where the project is

1

located.

9. Consequently, it was the custom and practice at TMC to consult with counsel as to such laws.

10. Upon the consideration and recommendation of key company personnel, the decision was made to engage a law firm in that geographical area to provide TMC legal advice and to represent TMC's interests.

11. Several representatives of TMC (Edmund Cardoza and David Coleman) interviewed representatives of Gadsby Hannah (Ronald Busconi and Jim Myers ). See a true copy of a Memorandum dated July 8, 1993 from Ed Cardoza attached to this Affidavit as Exhibit "1".

12. Attorneys Busconi and Myers represented that Gadsby Hannah was a larger firm that had a practice section specializing in construction law.

13. During the interview process Gadsby Hannah told the TMC representatives why TMC should hire them and not some other firm: they were the best; they had the reputation and knew most of the "handshakes" that are important in local politics; their construction group was second to none; and they could handle what ever came up.

14. During the summer of 1993, I made the decision to engage the services of Gadsby Hannah to represent TMC in the northeastern part of the United States.

15. At no time was there was ever any written agreement between TMC and Gadsby Hannah.

16. During the entire duration of the relationship between the two firms from 1993 into 2001, no one at Gadsby Hannah ever explained to me or the other principals at TMC that Gadsby Hannah provided different levels or types of service to their clients or that the degree of responsibility for their services differed depending on the level or type of service.

17. From mid 1993 until late May 1998 Gadsby Hannah handled many and very diverse matters for TMC in the Northeast United States. Some only required the answer to a specific question

or two while others were very involved.

18. It was TMC's perception that the level of attention and quality of legal service it received from Gadsby Hannah was the same on all files no matter the extent of complexity and TMC came to rely on Gadsby Hannah for like service on all matters.

19. There certainly was no understanding on the part of the principals at TMC that when it had a question or encountered a problem that required legal advice or participation, TMC was supposed to make a list of what TMC needed and tell their attorneys how far they should go, and then tell them when to stop work.

20. TMC relied on Gadsby Hannah for advice on how to handle any situation in which TMC might be involved including notice of bond claims and claims for changed conditions or extra work.  For example, TMC relied on Gadsby Hannah to advise it of local idiosyncrasies to be aware of in relation to the business of both public and private construction, the notices that needed to be filed and the statutes relating to the peculiar area of law, and so on.

21. A more specific example of that reliance and the typical Gadsby Hannah response occurred when TMC requested Gadsby Hannah to assist in drafting the subcontract agreement for the Flushing Bay Project in Flushing, New York.

22. Richard Allen not only drafted the document but alerted TMC to related issues on which TMC should seek additional advice from Gadsby Hannah without be asked or instructed to do so. See a true copy of a letter dated August 18, 1997 from Richard K. Allen attached to this Affidavit as Exhibit "2".

23. Subsequently, when TMC was terminated on the Flushing Bay project in January of 1998, Ron Busconi wrote TMC a three page letter explaining what his legal interpretation of TMC's rights and problems in relation to the project. See a true copy of a letter dated July 20,

3

1998 from Ron Busconi attached to this Affidavit as Exhibit "3".

24. It was a simple relationship. TMC was good at putting holes in the ground and the attorneys at Gadsby Hannah were suppose to be good at the law.

25. The attorneys within the construction group at Gadsby Hannah sold themselves as experts and that's what TMC bought and paid very handsomely for.

26. From October of 1993 through December of 2001, Gadsby Hannah maintained twenty (20) files and invoiced TMC nearly $480,000.00 for its services.

27. On the Tomlinson Project, from June 1998 through September 2000, Gadsby Hannah invoiced TMC $19,010.03 for its services.

28. The first time that I ever met Jack Morrissey was August 10, 1998 on the Tomlinson jobsite.

29. Although I may have spoken with Mr. Morrissey by telephone beginning in June or July of 1998, I did not have a long standing working relationship with him prior to the Tomlinson and Bridgeport projects.

30. Further, I never represented to anyone that Mr. Morrissey and I had known each other for 20 to 30 years.

31. TMC never received a copy of the research memorandum attached to Mr. Busconi's Affidavit as Exhibit "A".

32. During the luncheon at the Meridien Hotel in Boston in December of 1998, the question as to whether or not to file a claim against White Oak's payment bond was discussed.

33. To the best of my recollection, I paid for the luncheon at the Meridien.

34. The last day that TMC performed work on the Tomlinson project was September 7, 1999 when we completed demobilization.

35. At no time did I ever tell Peter Huntsman or anyone else that TMC was unwilling to pay

4

Gadsby Hannah to get involved in the Tomlinson claim process.

36. I did speak and correspond with the mediator, Carmen Reiss, directly because she requested me to do so as regarded scheduling, production of documents and technical issues.

37. I specifically requested that Ron Busconi attend the mediation sessions on April 26 and May 19, 1999 because I wanted him present to provide TMC with legal advice and to have the benefit of his counsel during the mediation.

WHEREFORE, I have read the foregoing and state under the penalties of perjury that the information contained herein is true and accurate to the best of my knowledge.

Dated:

MARCH 28, 2006

V. Dennis Millgard

5

### CERTIFICATE OF SERVICE

I, John S. Davagian, II, hereby certify that on March 31, 2006 I served a copy of the foregoing document upon counsel for the Defendant, Terri L. Pastori, Esquire, by electronic mail at tpastori@peabodyarnold.com.

/s/ John S. Davagian, II

John S. Davagian, II, Esq.

1

# Exhibit "1"

**THE MILLGARD CORPORATION**
ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS 02111

TEL. NO. (617) 345-9999
FAX. NO. (617) 345-9936

## TELEFAX TRANSMITTAL

DATE: July 8, 1993

TO: ~~GROS~~ Richard Millgard

FROM: Ed Cardoza

NUMBER OF PAGES TRANSMITTED (including this page): 6

SUBJECT: Grosby & Hannah Meeting

Following are my thoughts and comments on the above meeting.

Also following is a copy of their rates in a letter which they mailed to Dave today.

Regards,

Ed

Please copy Dave

Tx

Should you have any questions, please call.

Regards,

M01045

**THE MILLGARD CORPORATION**
ONE FINANCIAL CENTER
BOSTON, MASSACHUSETTS  02111

TEL. NO. (617) 345-9999
FAX. NO. (617) 345-9936

## MEMORANDUM

DATE: July 8, 1993

TO: Richard Millgard

FROM: Ed Cardoza

COPY: David Coleman

SUBJECT: Boston Law Firm

I just finished a very pleasant and informative lunch with Ron Busconi and Jim Myers of Gadsby and Hannah, the law firm with which David visited a few weeks ago.  They indicated that they had heard nothing from David since the meeting until he arranged my meeting.  I explained that you wanted me to meet with them before any decisions were taken regarding representation.

Much of our discussions were centered around their experience with construction law suits and with the local cast of characters.  They were surprised that we had so many things in common such as people we both worked with at the MBTA and MIT.

I questioned them about their client list and they indicated that they did not represent any of the local major contractors including: Modern Continental, Perini, J.F. White, Cashman nor Kiewit.  They said their client list included medium sized contractors and others from out-of-town.  They have represented Nicholson for many years; I remembered a case in Washington D.C. which eci-Soletanche lost to them and Nicholson was totally in the wrong.  I remember being very impressed with their litigation skills twenty years ago.

Jim Myers is in charge of their construction group which includes several engineer/attorneys.  He made it a point to explain that they do much of their claims work in-house with their technically trained staff.  Jim told "speaks directly to the President of Bechtel."  Ron emphasized his relationship with the MBTA and State officials.

M0104-6

Page 2. Gadsby & Hannah Meeting

We discussed the dilemma of the Prime Contractors with disputes with the MWRA and/or CA/T because of the hammer they hold over those which are working and the projects. I explained that we were trying to make our points through AGC, CIM and Foundation & Marine Contractors' Associations. Jim Myers said that these groups are not forceful enough and the only thing these entities understand are law suits or the threat thereof.

I told them that we are in a similar position with the Primes and that we were concerned about being "black-balled" for future work. I gave them very brief descriptions of potential suits on the North Station, MWRA Seawall and New Boston Garden projects. I explained that we have not decided to litigate these issues and may need some help with the decisions to do so. They suggested the only time the Primes will listen is after we file suit. At this time, they have to defend themselves and they might have to pay interest from the time the suit is filed if we are successful. They said the Primes are very happy to have the use of our monies while we decide to sue and that many settlements occur when the suit is filed.

Jim Myers also said that only the attorneys win when a case is litigated which is not news to any of us.

I told them that I would discuss their thoughts and mine with you and Dave and recommend that we summarize all our potential law suits on one piece of paper and sit with you to determine a course of action. They suggested a letter simple letter agreement to begin a relationship. I don't believe they are interested in any more free consultations. I recommend we do this and get some of these issues resolved. I think we might gain more respect among the Primes than we lose by allowing them to "push us around."

Please give me a call with your thoughts. I told them we will be back to them within a week.

Regards,

M01047

**GADSBY & HANNAH**
BOSTON

125 SUMMER STREET
BOSTON, MASSACHUSETTS 02110
(617) 345-7000
*TELEFAX (617) 345-7050
TELEX: 681752 GADHAN BSN

**Direct Line**
**(617) 345-7002**

1747 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C 20006
(202) 429 9600
TELEFAX: (202) 429-9084
TELEX: 501752 GADHAN WSH

July 8, 1993

David B. Coleman
Vice President
The Millgard Corporation
12822 Stark Road
P.O. Box 2248
Livonia, Michigan 48151

Re: <u>Professional Services</u>

Dear Mr. Coleman:

   With regard to your inquiry yesterday concerning the firm's
billing policies, Gadsby & Hannah's fees for its professional
services are based solely upon hourly rates and
disbursements. Hourly billing rates of the firm's attorneys
are derived from the years of experience in their areas of
concentration. Gadsby & Hannah's billing rates are believed
to be below or at least competitive with firms offering
similar services. The firm bills its clients monthly for its
services and disbursements and payment is expected within 30
days of billing.

   The firm bills its clients for major disbursements as
incurred at the firm's cost with no mark up. Major
disbursements are out-of-state travel, hotel, engaged experts
and stenographers and the like. Incidental disbursements such
as photocopying, telephone, fax and routine postage and
messenger services are charged on the computed based on
average expense with incidental disbursements.

   Following is a list of Gadsby & Hannah attorneys who
appropriately could be called upon to perform specialized work
required by Millgard together with the hourly rate which would
be charged:

M01048

David B. Coleman
July 8, 1993
Page 2

| | |
|---|---|
| Richard K. Allen | $160.00 |
| Ronald G. Busconi | 175.00 |
| William J. Ferguson | 195.00 |
| Stanley A. Martin | 175.00 |
| Michael T. McInerny | 160.00 |
| John B. Miller | 195.00 |
| James J. Myers | 195.00 |
| Linda A. Surdacki | 120.00 |

The following is a background sketch of the foregoing individuals, beginning with your two principal contacts, Jim Myers and I. All these attorneys are dedicated to construction industry law.

Jim Myers, the partner in charge of the firm's construction and engineering law practice, has specialized in serving construction industry clients for over twenty-five years, with an emphasis on Massachusetts construction law, and has supervised and coordinated the firm's construction and engineering law programs and commitment.

I was formerly Assistant General Counsel of the Massachusetts Bay Transportation Authority from 1969 to 1992, and was Chief Construction Attorney in the MBTA's Law Department for my last seven years there. During that time, I represented the Authority in construction law matters in every major capital project.

The remaining lawyers listed above all have specialized undergraduate construction expertise in addition to their law degrees. Gadsby & Hannah attorney John B. Miller is a graduate civil engineer (MIT - B.S., Civil Eng.; M.S. - Soil Mechanics) and currently teaches construction law at MIT graduate school. William J. Ferguson, Jr. is a graduate electrical engineer (Johns Hopkins Univ., 1973), having had over ten years of experience serving construction industry clients in all aspects of construction and engineering law. Gadsby & Hannah partner Stanley A. Martin is a graduate architect, (B.S. MIT, 1977). Attorney Michael T. McInerny is a graduate civil engineer, (B.S. Notre Dame University, 1979). Attorney Richard K. Allen is a registered professional engineer in a number of states (Masters, Civil Eng., University of Washington, 1979; B.S., Worcester Polytechnic Institute, 1976); and Attorney Linda Surdacki has an undergraduate degree in building construction (B.S. Texas A&M, 1982).

M01049

David B. Coleman
July 8, 1993
Page 3


    I trust the foregoing information satisfies your inquiries
and we look forward to working with you in a cooperative
effort to resolve any legal problems that Millgard may
encounter in this area.

                Sincerely,

                Ronald G. Busconi

RGB:286:hb

# Exhibit "2"

# GADSBY & HANNAH LLP
## ATTORNEYS AT LAW
### BOSTON

228 FRANKLIN STREET
BOSTON, MASSACHUSETTS 02110-2811
(617) 345-7000
FAX: (617) 345-7050
gadsby@ghlaw.com

1747 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006-4604
(202) 429-8600
FAX: (202) 429-9894
gadsby@ghlaw.com

Direct Line
(617) 345-7017

August 18, 1997

**BY FAX AND MAIL**

Mr. Dennis Millgard
The Millgard Corporation
12822 Stark Road
P.O. Box 510027
Livonia, MI 48151

Re:  Review of Flushing Bay Facility Subcontract

Dear Dennis:

Enclosed please find a draft letter to Franklin E. Tretter who we understand represents the general contractor on the Flushing Bay project. We have spoken to Franklin briefly, and he advised us that he was not interested in any alternate subcontract form and that we should provide him with our comments on his client's proposed form. The proposed form is very onerous and shifts most of the project risks onto The Millgard Corporation. Additionally, this form incorporates by reference the general contract which we have yet to see although we assume you have or will have a copy of that general contract. The provisions of the general contract may conflict with what is in the subcontract form. We therefore recommend that we be provided the opportunity to compare the various provisions between the subcontract and the general contract before The Millgard Corporation enters into a subcontract.

RECEIVED
AUG 2 1 1997
THE MILLGARD CORP.
LIVONIA, MI

M 001051

GADSBY & HANNAH LLP

Mr. Dennis Millgard
August 18, 1997
Page 2


        Let us know what additional comments you have on the
draft letter, and we will send it to Attorney Tretter upon
your approval.  We look forward to hearing from you.

                              Very truly yours,

                              Richard K. Allen

RKA:jf

cc:  Ronald G. Busconi (w/encl.)


G:\ALLEN\MILL0010.DOC


M 001052

# Exhibit "3"

**GADSBY & HANNAH LLP**
ATTORNEYS AT LAW
BOSTON

225 FRANKLIN STREET
BOSTON, MASSACHUSETTS 02110-2811
(617) 345-7000
FAX:(617)345-7050
gadsby@ghlaw.com

1747 PENNSYLVANIA AVENUE, N.W.
WASHINGTON, D.C. 20006-4604
(202) 429-9600
FAX: (202) 429-9294
gadsby@ghlaw.com

July 20, 1998

Direct Dial
(617) 345-7002

**VIA FACSIMILE & MAIL**

Mr. Dennis Millgard
The Millgard Corporation
196 Boston Avenue, Suite 2900
Medford, MA 02155-4236

RE:  Flushing Bay

Dear Dennis:

You have asked me to review your Subcontract with the
Joint Venture in order to determine the options available to
Millgard after the termination.

As we have discussed, there appear to be two
possibilities favorable to Millgard, namely, termination for
convenience and wrongful termination.

(1)  **Termination for Convenience**

The Subcontract contains language which makes reference
to termination for convenience, but no paragraph specifically
addresses the remedy as it might affect the Joint Venture and
Millgard.  For example, paragraph 9 states that the Joint
Venture shall have the right to terminate the Subcontract,
but only after the City, as Owner, terminates the work or the
General Contract.  Paragraph 70 states that each sub-
subcontract "shall include a provision authorizing
termination for necessity or convenience as herein provided
between the parties hereto."  However, there is no further
reference to any such termination for convenience remedy.

Finally, in paragraph one, the Subcontract incorporates
the terms of the General Contract between the City and the
Joint Venture.  The General Contract contains a termination

(30041578.DOC;1)

Mr. Dennis Millgard
July 20, 1998
Page 2

GADSBY & HANNAH LLP

for convenience clause in Article 45a, but only as between
the City and the Joint Venture. Article 45a sets forth the
remedies for such termination.

Therefore, although the Subcontract contains references
to a right of termination for convenience by the Joint
Venture, the agreement does not provide any procedure or
remedy for such termination as between the Joint Venture and
Millgard.

(2) **Wrongful Termination**

In light of the inconsistent language regarding
termination for convenience, Millgard's strongest argument
may be to assert wrongful termination. If provable, the
Joint Venture's wrongful termination would constitute, by
definition, a breach of the Subcontract and, consequently,
Millgard would be entitled to recover actual, or
compensatory, damages. New York case law provides that a
party may recover damages, including lost profits, if it can
demonstrate:

(a) That the damages were caused by a breach of
contract;

(b) That the alleged loss is capable of proof with
reasonable certainty; and,

(c) That the particular damages were within the
contemplation of the parties to the contract at the time it
was made. **Ashland Management Inc. v. Janien & Janien, 82
N.Y. 2d 395 (1993).**

With respect to the first element, Millgard should be
able to establish that it was damaged by the breach of the
Joint Venture.

Regarding the second element, Millgard should be able to
demonstrate its damages with reasonable certainty. The New
York courts do not require absolute certainty but only a
reasonable approximation.

Finally, Millgard can argue that lost profits were
within the contemplation of the parties as a result of the

{B0041578.DOC;1}

Mr. Dennis Millgard
July 20, 1998
Page 3

GADSBY & HANNAH LLP

breach, because contractors ordinarily anticipate making a profit on such projects.

To conclude, Millgard's best argument is wrongful termination, as this approach allows recovery for direct costs plus the potential of lost profits.

I trust the foregoing satisfies your concerns.

Very truly yours,

Ronald G. Busconi

RGB/dm

{R0041379.DOC/1}