UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                                    Plaintiff

v.

GADSBY HANNAH, LLP,
                            Defendant

## AFFIDAVIT OF TERRI L. PASTORI IN SUPPORT OF GADSBY HANNAH'S MOTION TO STRIKE

I, Terri L. Pastori, hereby depose under oath and state as follows:

1.       I am an attorney in good standing, and admitted to practice before the Bar of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, among other courts.

2.       I am partner in the law firm of Peabody & Arnold LLP, and I am an attorney for the Defendant, Gadsby Hannah LLP in this matter.

3.       Attached hereto as Exhibit A is a true and accurate copy of the Plaintiff, The Millgard Corporation's response to Gadsby Hannah's document requests.

4.       Richard Millgard's notes that are attached to his affidavit were not produced during the discovery in this case.

5.       Attached hereto as Exhibit B are true and accurate copies of excerpts from Richard Millgard's deposition transcript.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 11TH DAY

APRIL 2006.

/s/ Terri L. Pastori
Terri L. Pastori

## <u>CERTIFICATE OF SERVICE</u>

I, Terri L. Pastori, hereby certify that on April 11, 2006, the foregoing document was served upon counsel for the plaintiff, John S. Davagian, Esquire, by electronic mail.


/s/ Terri L. Pastori
Terri L. Pastori

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

COPY

|  |  |
|---|---|
| THE MILLGARD CORPORATION,<br>**Plaintiff** | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) |
|  | ) |
| GADSBY HANNAH, LLP<br>**Defendant** | ) |
|  | ) |
|  | ) |

Civil Action No. 04-12388-RWZ

## RESPONSES OF THE MILLGARD COPRORATION TO THE FIRST SET OF REQUESTS FOR DOCUMENTS OF GADSBY HANNAH, LLP

Now comes the Plaintiff, The Millgard Corporation ("Millgard") and states that subject to the qualifications as set forth herein, Millgard either has previously produced, or will produce the documents requested.

## GENERAL OBJECTIONS

Millgard objects to each and every request to the extent that the request is:

    a.    unreasonably vague;

    b.    overly broad;

    c.    unduly burdensome;

    d.    not reasonably calculated to lead to the discovery of relevant, material or otherwise admissible evidence;

    e.    violative of the attorney-client privilege;

    f.    calculated to obtain work product prepared in connection with the subject litigation;

    g.    reflects trade secrets;

    h.    is confidential commercial information; or

1

i.    information made confidential by law.

Furthermore, Millgard would reserve its rights under the rules as to:

1.    All objections as to competency, relevancy, materiality, privilege and admissibility of each document and the subject matter thereof as evidence for any purpose in any further proceedings in this action (including trial thereof), and in every other action;

2.    The right to object to the use of any such document, or the subject matter thereof, on any grounds in any further proceeding in this action (including trial thereof), and in every other action; and

3.    The right at any time to revise, correct, add to, supplement, or clarify any of its responses contained herein.

Without waiving and subject to the foregoing objections, Millgard responds as follows to each specific request:

## REQUESTS

### REQUEST NO. 1

All documents concerning Gadsby Hannah's representation of Millgard in connection with the Tomlinson Bridge Project.

### RESPONSE NO. 1

Millgard has previously produced all documents in its care, custody or control that are responsive to this request.

### REQUEST NO. 2

All documents concerning communications between Gadsby Hannah and Millgard concerning the Tomlinson Bridge Project.

2

**RESPONSE NO. 2**

Millgard has previously produced all documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 3**

All documents concerning communications between Gadsby Hannah and any other person concerning the Tomlinson Bridge Project.

**RESPONSE NO. 3**

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 3 (sic)**

All documents concerning communications between Millgard and any other person concerning the Tomlinson Bridge Project.

**RESPONSE NO. 3 (sic)**

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 4**

All documents concerning the Tomlinson Bridge Project.

**RESPONSE NO. 4**

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request as they may relate to liability.

**REQUEST NO. 5**

All documents concerning communications between Millgard and anyone else, except its attorneys, concerning Gadsby Hannah's representation of it in connection with the Tomlinson

3

Bridge Project.

## RESPONSE NO. 5

Millgard has previously produced all documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 5 (sic)

All documents concerning communications between Gadsby Hannah and Millgard concerning Gadsby Hannah's representation of Millgard in connection with the Tomlinson Bridge Project.

## RESPONSE NO. 5 (sic)

Millgard has previously produced all documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 6

All documents concerning Millgard's contention that Gadsby Hannah was negligent in its representation of Millgard as alleged in the complaint.

## RESPONSE NO. 6

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 7

All documents, including but not limited to reports, that were filled out and/or completed by any expert concerning Millgard's claims against Gadsby Hannah.

## RESPONSE NO. 7

As of the date of this response, Millgard has not retained any expert concerning Millgard's claims against Gadsby Hannah.

4

**REQUEST NO. 8**

All documents concerning communications between Millgard and any expert that it intends to

call as an expert witness at the trial in this case.

**RESPONSE NO. 8**

As of the date of this response, Millgard has not retained any expert concerning Millgard's

claims against Gadsby Hannah.

**REQUEST NO. 9**

All documents that you intend to introduce at the trial of this action.

**RESPONSE NO. 9**

As of the date of this response, Millgard has not determined what documents it intends to

introduce at the trial of this action.

**REQUEST NO. 10**

All documents concerning the lawsuit Millgard brought against White Oak and National Union

involving the Tomlinson Bridge Project.

**RESPONSE NO. 10**

Millgard has previously produced all non-privileged documents in its care, custody or control

that are responsive to this request.

**REQUEST NO. 11**

All documents concerning any other lawsuits between Millgard and White Oak.

**RESPONSE NO. 11**

There are no other lawsuits between Millgard and White Oak.

**REQUEST NO. 12**

All documents concerning the authority of Millgard to pursue a claim against Gadsby Hannah in

5

light of its bankruptcy.

## RESPONSE NO. 12

Millgard has or will produce all non-privileged documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 13

All documents filed in Millgard's bankruptcy proceeding, docketed as 03-49710-R.

## RESPONSE NO. 13

Millgard objects to this request as being overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant material or otherwise admissible evidence. Further, to the extent such documents are a matter of public record, they are readily available to the Defendant.

Notwithstanding these objections, Millgard will produce all non-privileged documents in its care, custody or control that are responsive to Request No. 12.

## REQUEST NO. 14

All documents filed in Millgard's bankruptcy proceeding, docketed as 03-49710-R, concerning Millgard' s claim against Gadsby Hannah.

## RESPONSE NO. 14

Millgard will produce all non-privileged documents, if any, in its care, custody or control that are responsive to this request.

## REQUEST NO. 15

All documents concerning the mediation involving Millgard' s claim for payment on the Tomlinson Bridge Project.

6

**RESPONSE NO. 15**

Millgard has previously produced all non-privileged documents in its care, custody or control

that are responsive to this request.

**REQUEST NO. 16**

All documents concerning the arbitration between White Oak and ConnDot.

**RESPONSE NO. 16**

Millgard has previously produced all non-privileged documents in its care, custody or control

that are responsive to this request.

**REQUEST NO. 17**

All documents concerning communications between Millgard and White Oak and/or

ConnDot concerning Millgard's claim for additional payment for work on the Tomlinson Bridge

Project because of unexpected subsurface conditions.

**RESPONSE NO. 17**

Millgard has previously produced all non-privileged documents in its care, custody or control

that are responsive to this request.

**REQUEST NO. 18**

All documents concerning Millgard's claim that it encountered differing subsurface conditions

on the Tomlinson Bridge Project.

**RESPONSE NO. 18**

Millgard has previously produced all non-privileged documents in its care, custody or control

that are responsive to this request.

**REQUEST NO. 19**

All documents concerning advice that Gadsby Hannah provided to Millgard concerning the

7

Tomlinson Bridge Project.

## RESPONSE NO. 19

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 20

All documents concerning any requests by Millgard for an increase in any contract price as a result of alleged unexpected subsurface conditions at the Tomlinson Bridge Project.

## RESPONSE NO. 20

Millgard has previously produced all non-privileged documents in its care, custody or control that are responsive to this request.

## REQUEST NO. 21

All documents concerning claims Millgard has ever made on a bond.

## RESPONSE NO. 21

Millgard objects to this request as being overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of relevant material or otherwise admissible evidence. Notwithstanding that objection, Millgard will produce all non-privileged documents, if any, in its care, custody or control that are responsive to this request to the extent of providing the identity of the project, contractor(s), surety and/or owner.

## REQUEST NO. 22

All documents concerning claims made against bonds in which Millgard was named principal.

## RESPONSE NO. 22

None in the past ten (10) years. Millgard's records prior to that time have been destroyed.

## REQUEST NO. 23

All documents concerning White Oak's assurances that Millgard's claim would soon be resolved

8

with ConnDot and Millgard would be able to complete its work on the Tomlinson Bridge Project as alleged in Paragraph 27 of the complaint.

**RESPONSE NO. 23**

Millgard has produced all non-privileged documents in its care, custody or control that may be responsive to this request.

**REQUEST NO. 24**

All documents concerning the lunch meeting in December 1998 between representatives of Millgard and Gadsby Hannah.

**RESPONSE NO. 24**

Millgard has produced all documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 25**

All documents concerning Millgard's meetings with ConnDot concerning the Tomlinson Bridge Project.

**RESPONSE NO. 25**

Millgard has produced all documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 26**

All documents concerning the date on which Millgard last performed work on the Tomlinson Bridge Project.

**RESPONSE NO. 26**

Millgard has produced all documents in its care, custody or control that are responsive to this request.

**REQUEST NO. 27**

All documents concerning the date upon which Millgard demobilized from the Tomlinson

Bridge Project.

**RESPONSE NO. 27**

Millgard has produced all documents in its care, custody or control that are responsive to this

request.

**REQUEST NO.28**

All documents concerning any legal claim that Millgard brought, or defended, other than this

action.

**RESPONSE NO. 28**

Millgard objects to this request as being unreasonably vague, overly broad, unduly burdensome,

and not reasonably calculated to lead to the discovery of relevant material or otherwise

admissible evidence.

The Millgard Corporation
By Its Attorneys,

John S. Davagian, II, BBO#114740
Davagian & Associates
365 Boston Post Road, Suite 200
Sudbury, MA 01776
(978)443-3773

Date: 6|28|2005

**CERTIFICATE OF SERVICE**

I, John S. Davagian, II, hereby certify that on June 28 , 2005 I served a copy of the

foregoing by first class mail, postage prepaid, to all counsel of record.

John S. Davagian, II, Esq.

10

# EXHIBIT B

Page 1

```
 1                              Volume:  I

 2                              Pages:  1-124

 3                              Exhibits: 1-17

 4           UNITED STATES DISTRICT COURT

 5            DISTRICT OF MASSACHUSETTS

 6                  C.A. No. 04-12388-RWZ

 7

 8    ----------------------------------

 9    THE MILLGARD CORPORATION,

10                    Plaintiff,

11       v.

12    GADSBY HANNAH, LLP,

13                    Defendant.

14    ----------------------------------

15

16

17         DEPOSITION of C. RICHARD MILLGARD

18       Tuesday, September 20, 2005, 10:03 a.m.

19              PEABODY & ARNOLD, LLP

20                 30 Rowes Wharf

21              Boston, Massachusetts

22

23

24       Court Reporter:  Paulette Cook, RPR/RMR
```

Page 6

1    A. Northville, Michigan.
2    Q. Can you give us a street address, please.
3    A. 17028 Lochmoor -- that's L O C H M O O R --
4  Circle, East Northville, Michigan.
5    Q. How long have you lived there?
6    A. A little over four years.
7    Q. Do you have any plans to move from that
8  address within the next two years?
9    A. No, sir.
10    Q. Why don't you give me your educational
11  background, if you would, from high school?
12    A. Well, I did attend high school in the city
13  of Chicago. Went to the University of Wisconsin for
14  a short time and then finished up at Western
15  Illinois University in Macomb, Illinois with a
16  bachelors degree in education, and since that time
17  there was no other formal college education.
18    Q. When did you get your bachelors degree from
19  Western Illinois?
20    A. I believe that was in 1963.
21    Q. Okay. As we sit here today, are you under
22  the -- have you taken any drugs or medication that
23  would prevent you from understanding or responding
24  to any of the questions that you're asked today?

Page 7

1    A. No, sir.
2    Q. Since the -- in preparation for your
3  deposition today, have you met with anyone prior to
4  today?
5    A. We've talked about it.
6    Q. And when you say we, who are you talking
7  about?
8    A. John and my brother Dennis.
9    Q. Have you reviewed any documents prior to
10  coming here today?
11    A. A few very briefly.
12    Q. Can you tell me which documents you've
13  looked at?
14    A. I think I looked at some -- some billings
15  from Gadsby Hannah. I looked at some minutes from
16  the project. I glanced at the contract.
17    Q. Do you maintain any records from the
18  Tomlinson Bridge project?
19    A. Not specifically since I left the Millgard
20  Corporation.
21    Q. When was it that you left Millgard?
22    A. It's about two and a half years ago.
23    Q. What do you do presently?
24    A. I work for the Case Foundation Company.

Page 8

1    Q. What is that company?
2    A. That's a national company that does
3  underground work throughout the country, case-ons,
4  pilings, slurry wall.
5    Q. How do you spell case?
6    A. C A S E.
7    Q. Where are they located?
8    A. They have offices throughout the United
9  States. The main office is in the Chicago, Illinois
10  area.
11    Q. Are you employed in any particular office?
12    A. I work out of my home.
13    Q. What's your title with the company?
14    A. Area manager.
15    Q. What are your job duties?
16    A. To locate, promote, market, bid case on work
17  piling, work things of that nature.
18    Q. In layman's terms can you describe what
19  case-on work is?
20    A. It's drilled in foundations similar to what
21  you have throughout the Boston area in all of the
22  artery work but filled with concrete reinforcement
23  to support the structures that will be built on top.
24    Q. Is this work that's done on land or on the

Page 9

1  water?
2    A. It can be both.
3    Q. What's the difference between case-on work
4  that's done on land versus case-on work that's done
5  on water?
6    A. A lot of similar techniques other than on
7  water you'd be working off of barges or other type
8  structures that were built specifically to set your
9  equipment on.
10    Q. Prior to going to work for Case Foundation
11  Company where were you employed?
12    A. The Millgard Corporation.
13    Q. From what period of time to what period of
14  time?
15    A. That would have been I believe 1964 through
16  2002.
17    MR. DENNIS MILLGARD: Three.
18    A. Two thousand three, excuse me.
19    Q. What was your last job title when you left
20  the Millgard Corporation?
21    A. Executive vice president.
22    Q. Have you ever been deposed before, sir?
23    A. Yes, I have.
24    Q. How many occasions?

3 (Pages 6 to 9)

C. Richard Millgard

1     A. Mr. Ron Busconi with Gadsby Hannah.

2     Q. Okay. Anyone else?

3     A. Not initially, no.

4     Q. Okay. Prior to May of 1998 was Mr. Busconi

5 involved in any fashion with respect to this

6 project?

7     A. I don't recall on this specific project.

8     Q. Well, did he have anything to do with the

9 contract agreement?

10     A. No, not to my knowledge.

11     Q. Did he have anything to do with the

12 notification to White Oak of the asserted changed

13 conditions?

14     A. Only that because we had retained Gadsby

15 Hannah on some other projects that we were working

16 on in the area that these were prudent things to do,

17 make proper notification. But, no, they did not

18 specifically have a hand in the writing of it. No.

19     Q. Did he provide you with advice prior to May

20 of 1998 as to any steps you should or shouldn't be

21 taking?

22     A. Not on this specific job.

23     Q. On any specific jobs?

24     A. I'm sure there was other projects that -- I

1 don't recall specifically when the Millgard

2 Corporation initially retained Gadsby Hannah, but

3 there were a number of projects through the nineties

4 that -- because Gadsby Hannah was retained by

5 Millgard on a number of other projects.

6     Q. Now why were you consulting with Gadsby &

7 Hannah in a project that was occurring in

8 Connecticut?

9     A. 'Cause they were already representing us in

10 other areas and felt it a responsible thing to do to

11 talk to -- I have no idea whether they were familiar

12 with or not. So it was to call and get some advice.

13     Q. Okay. Prior to May of 1998, -- strike it in

14 that form.

15       In May of 1998 what was the status of

16 the Bridgeport project?

17     A. I don't know for sure. I can't tell you. I

18 don't remember.

19     Q. And the Founders Bridge --

20     A. It may have gotten started. The Founders

21 Bridge was completed -- had been completed for quite

22 some time. Bridgeport was probably underway. May

23 not have gotten started exactly, but it was awfully

24 close.

1       MR. STONE: Why don't we go off for a

2 minute?

3       (A recess was taken.)

4 BY MR. STONE:

5     Q. When we started the break, we were talking

6 about before Busconi and a meeting that you had with

7 him in May of 1998. Was that a physical meeting or

8 a telephone meeting?

9     A. Telephone.

10     Q. Who else was involved in that call?

11     A. Just myself and Mr. Busconi.

12     Q. Can you tell me to the best of your memory

13 what was said?

14     A. I specifically called regarding the

15 Tomlinson project. There may have been some

16 discussions early on with other people in our

17 company and/or myself regarding it, but at that

18 specific time I felt it necessary to inquire about

19 the laws, what we can and can't do in the State of

20 Connecticut, notification on the bond, what was

21 appropriate for us because myself personally I

22 wasn't familiar with the -- or with any of the laws.

23 So that's obviously why we got a hold of our

24 attorney.

1     Q. What did he tell you?

2     A. With regard to some of the laws and/or the

3 bonding notification requirements, that he would

4 look into this. He didn't specifically have the

5 answers at that time, as I recall. He would

6 specifically check into it. And we had

7 conversations on the 28th. I heard again from him

8 on the 29th that he was still looking into it.

9       And I believe there was even a

10 conversation on June 1 -- there was like two or

11 three days in a row where I had conversations and we

12 were trying to get up to speed as to what we should

13 do, how should we proceed, again, regarding

14 notifications of which we had done that we

15 discussed. We had notified according to the

16 contract. That was good. We were told that that

17 was the right thing to do which we believed was the

18 right thing as well.

19       We asked if there was anything else we

20 should do, and at that time Ron said he would do

21 some investigating and looking into specific laws

22 and/or bond notification requirements on the

23 contract and/or the State of Connecticut.

24     Q. Bond notification requirements?

Page 62

1  A. Yes. That's one thing we will do after a
2  point in time is make claim or notification on the
3  bond as required.
4  Q. Okay. Had you ever made a bond claim on any
5  other project?
6  A. Oh, I'm sure we had.
7  Q. Had you ever been involved in making a bond
8  claim on any other project?
9  A. Myself personally? No. I mean I've been
10  involved with the project maybe but, no, I've never
11  personally made claim on a bond.
12  Q. Who within Millgard was responsible for
13  making claims on the bonds if a bond claim had to be
14  made?
15  A. Well, generally that was done through an
16  attorney.
17  Q. Millgard would not do that itself?
18  A. No. We would get the language and the
19  necessary paperwork, the necessary direction from
20  our attorney as we did in this case.
21  Q. Did you send Mr. Busconi any material, any
22  paperwork about the project in May of 1998?
23  A. I don't recall if -- I do know that we had
24  sent information to the office, not only to

Page 63

1  Mr. Busconi but to associates of Mr. Busconi over a
2  period of time, and I don't recall exactly what
3  those dates were.
4  Q. Okay. Let me show you a document -- it
5  appears to be dated May 29 -- and ask you if you're
6  familiar with that document?
7  A. I've seen this.
8  MR. STONE: We have an extra for you.
9  MR. DAVAGIAN: Thank you.
10  Q. Can you tell me what that document is?
11  A. I believe it was part of the contract --
12  well, I shouldn't say it was part of the contract
13  documents 'cause it was marked for information only,
14  but these were questions that were raised prior to
15  the bidding of the project by various contractors to
16  the State of Connecticut with the State of
17  Connecticut's responses.
18  Q. Did you --
19  MR. STONE: Let's mark that as Exhibit 1
20  and proceed from there if we could, please.
21  (Exhibit No. 1 marked
22  for identification.)
23  Q. The fax seems to be dated May 29. Can you
24  help us with who sent it to Gadsby Hannah?

Page 64

1  A. I don't recall specifically if I sent this
2  or not.
3  Q. Do you have a memory of sending it?
4  A. Not specifically. As I said earlier, we
5  know exchanged or we sent various pieces of
6  information that Ron had requested or his associates
7  had requested, but I can't specifically remember.
8  Q. Do you have a recollection of discussing
9  that exhibit with anyone at Gadsby Hannah?
10  A. May very well have.
11  Q. Do you have any memory of that?
12  A. Not specifically, no.
13  Q. Do you have any memory of any advice or
14  information provided to you by Mr. Busconi or anyone
15  at Gadsby Hannah about that document?
16  A. About this document?
17  Q. Yes.
18  A. I can't say that I do.
19  Q. Okay. Within the Millgard company who was
20  overall in charge of the Tomlinson Bridge project?
21  A. Overall would have been Dennis Millgard.
22  Q. And did he have a second in command with
23  respect to this project? Was there a project
24  manager?

Page 65

1  A. Probably myself. That would have been
2  myself.
3  Q. Okay. Now after your communications with
4  Mr. Busconi in May and June of 1998, can you tell us
5  what you recall Mr. Busconi advising you you should
6  be doing?
7  A. Well, he wanted to know as I recall whether
8  or not we had made notification, and if we would
9  forward him certain information as he was going to
10  look into the Connecticut law as it might apply
11  and/or the bond notification requirements.
12  Q. Okay. Did you send him in May or June of
13  1998 a copy of the Tomlinson Bridge contract with
14  White Oak?
15  A. We may have. I don't specifically remember
16  what was sent and how it was sent, but we obviously
17  sent this.
18  Q. Okay. You refer to this, you're referring
19  to a two-page --
20  A. Sorry.
21  Q. -- document that we have labeled as Exhibit
22  1?
23  A. Right. I assume we sent it.
24  Q. Do you have any recollection of sending

17 (Pages 62 to 65)

C. Richard Millgard

Page 66

1  Mr. Busconi a copy of the entire contract document
2  at that time?
3      A.  I believe we did.  Now at which specific
4  time, I can't tell you exactly when it was sent.
5      Q.  And with respect to the bond that was
6  obtained -- the payment bond that was obtained by
7  White Oak, did you send a copy of that to
8  Mr. Busconi as well?
9      A.  We may have.  I don't know if we had a copy
10  at that time.
11      Q.  And when you say you may have, does that
12  mean you don't recall one way or the other as to
13  whether you sent it to him in May or June of 1998?
14      A.  That's a fair statement.
15      Q.  Is it your testimony that you recall sending
16  it to him at some point but you just don't recall
17  when?
18      A.  As I said before, I know that we sent
19  certain information onto Mr. Busconi, but I don't
20  recall exactly all of the documents that were
21  included.
22      Q.  Okay.  Did you send Mr. Busconi the
23  documents that -- for which you had questions and
24  were looking for Mr. Busconi's input?

Page 67

1      A.  Yes, definitely we were looking for his
2  input because we had been utilizing his office in
3  other areas as well, and we were certainly looking
4  for feedback as to direction and where to go.
5      Q.  Okay.  And so when you were looking for
6  feedback and information, you would send Mr. Busconi
7  documents or information essentially saying,
8  Mr. Busconi, here's some document or information,
9  what do you think about this or that or this piece
10  of it?  Something along those lines?
11      A.  That would be fair.
12      Q.  All right.  Were you involved in the
13  Flushing Bay retention facility contract?
14      A.  No.
15      Q.  Do you have any knowledge or information
16  about it?
17      A.  (Shakes head.)
18      Q.  Strike it in that form.  Did you receive any
19  of the paperwork or see any of the paperwork
20  involving the Flushing Bay retention facility
21  contract?
22      A.  No.
23      Q.  Do you know whether a bond claim was
24  advanced on the Flushing Bay retention facility

Page 68

1  contract?
2      A.  I don't know.
3      Q.  What's the next thing that you recall after
4  June 1998 with respect to the progress on the
5  Tomlinson Bridge project?
6      A.  We continued to speak with White Oak.  In
7  response to our submittal, we attempted to push for
8  a resolution as best we could.  We continued to look
9  for direction in one way or another from
10  Mr. Busconi's office as to how to proceed.
11      Q.  And this is in June of 1998; is that right?
12  And thereafter?
13      A.  That would have been correct.
14      Q.  As of June of 1998, was the Millgard
15  Corporation still mobilized on the job at the
16  Tomlinson Bridge project?
17      A.  Yes, we were.
18      Q.  And you had people working there?
19      A.  I know there was a couple periods where
20  there were some shut-downs, but I don't recall
21  specifically.
22      Q.  Why were there shut-downs?
23      A.  For meetings to discuss the changes, was
24  there in fact changes, resolutions -- trying to

Page 69

1  reach resolutions with the state.
2      Q.  As of the summer of 1998 did you still
3  retain general counsel for the Millgard Corporation
4  in Detroit?
5      A.  Yes, we had an ongoing with Bodman Longley,
6  yes.
7      Q.  And that was with Mr. Koch?
8      A.  Yes, Mr. Koch would be still our general
9  counsel.
10      Q.  And for what purpose did you retain Gadsby
11  Hannah different from what Mr. Koch was doing?
12      A.  Well, we had utilized Gadsby Hannah on a
13  number of other projects as well and felt that it
14  was a fine law firm that had given us good direction
15  in the past, were familiar with the changed
16  conditions in our work.  They were local.  And,
17  obviously, our attorney back home could not handle a
18  case here in Connecticut.
19      Q.  What projects had Gadsby Hannah worked on
20  with you prior to the Tomlinson Bridge project?
21      A.  Well, I'd have to look back at the dates.
22  There were a number of projects ongoing that we had
23  utilized their office one way or another.
24      Q.  All right.  Did Gadsby Hannah represent you

18 (Pages 66 to 69)

C. Richard Millgard

Page 70

1  on any lawsuit that had been commenced by the
2  Millgard Corporation prior to June of 1998?
3      A. Lawsuit? I don't believe so. I don't
4  know --
5      Q. Did they represent you in any arbitration
6  proceeding prior to June of 1998?
7      A. I don't believe there was any arbitration,
8  no.
9      Q. Did they represent you in any ongoing bond
10 claim prior to June of 1998?
11     A. May have.
12     Q. Had they made a bond claim on behalf of the
13 Millgard Corporation prior to June of 1998?
14     A. May have.
15     Q. Do you have any recollection as to any
16 specific --
17     A. Not specifically, no.
18         THE REPORTER: There was no end to that
19 question.
20         MR. STONE: I understand. I'll finish
21 that up.
22     Q. You have no recollection of Gadsby Hannah
23 representing you with respect to any bond claim
24 prior to June of 1998?

Page 71

1      A. Could very well have been. I just don't
2  recall.
3      Q. If they had represented you prior to June of
4  1998, would there be a record somewhere within the
5  Millgard Corporation's records?
6      A. Could be. Millgard has moved. I'm not sure
7  where all the records are.
8      Q. As we sit here today though, you have no
9  memory of any particular project in which Gadsby
10 Hannah represented the Millgard Corporation in
11 pursuing a bond claim?
12     A. I can't say for sure.
13     Q. Was Gadsby Hannah in June 1998 retained to
14 represent the Millgard Corporation in pursuing its
15 claim against White Oak Corporation and the
16 Department of Transportation in Connecticut?
17     A. That was my understanding.
18     Q. Was there a retention letter between the
19 Millgard Corporation and Gadsby Hannah setting out
20 what tasks Gadsby Hannah was engaged to undertake?
21     A. I don't believe even in all of the other
22 cases that that occurred.
23     Q. Was there an understanding between you and
24 Mr. Busconi as to what Mr. Busconi was going to be

Page 72

1  doing and what you -- the personnel from the
2  Millgard Corporation was going to be doing?
3      A. At the time I believe so.
4      Q. What was your understanding as to what that
5  agreement was as to who was doing what?
6      A. That I'm sure we would supply Mr. Busconi
7  and his office certain documentation from the
8  project and that in turn Mr. Busconi and his office
9  would review that documentation and give us advice
10 with respect to the Connecticut law, what we could
11 or couldn't do, as I said earlier, notification on
12 the bond and just review all the documentation to
13 make sure that we were proceeding in a proper form
14 and fashion.
15     Q. What information on notification on the bond
16 were you seeking?
17     A. It was a general question because I had no
18 knowledge myself about notification, and that's why
19 I would have asked the question of the attorney --
20 of Mr. Busconi and his office.
21     Q. What notification information were you
22 seeking?
23     A. When notification, if any, should be given.
24     Q. Did you know who the bonding company was for

Page 73

1  White Oak?
2      A. I can't remember. I'm just not sure who
3  that was, if that was indicated or not.
4      Q. Okay. Do you know or are you familiar with
5  the company of the Steven M. Hain -- H A I N --
6  Company?
7      A. Yes.
8      Q. Who were they?
9      A. They are a manufacturer of drilling rigs and
10 tools for the drilling industry.
11     Q. Were they a supplier of Millgard's on the
12 Tomlinson Bridge project?
13     A. They had some participation, some
14 involvement, yes.
15     Q. Do you recall whether there was a complaint
16 from the Steven Hain company for nonpayment by
17 Millgard?
18     A. I don't recall that.
19     Q. Was Millgard supposed to pay the Steven M.
20 Hain Company directly for supplies on the Tomlinson
21 Bridge project?
22     A. That's probably true. Certain items.
23     Q. Let me show you a letter dated July 15, 1998
24 and ask if you're familiar with that?

19 (Pages 70 to 73)

Page 74

1    A. I may have seen this letter back at the
2  time, but I'm not really familiar with it.
3    Q. Okay. Let me show you another letter dated
4  August 14, 1998 and ask you if you're familiar with
5  that?
6    A. Again, same. I may have seen it at the
7  time, but I don't recall much about it.
8      MR. STONE: Why don't we have those
9  letters marked as the next two exhibits in order,
10  please.
11      (Exhibit Nos. 2 and 3 marked
12      for identification.)
13    Q. I'll show you another letter dated March 1,
14  1999 and ask you if you're familiar with that one?
15    A. Again, I'm sure I've seen this. It's sent
16  to my attention.
17    Q. Do you recall what happened with the Steven
18  M. Hain Company? Was the bill paid?
19    A. I believe it probably was, but I don't know
20  when.
21    Q. Do you know why it wasn't paid when
22  requested back in July and August of 1998?
23    A. Well, earlier it was because Millgard was so
24  far behind, and the job was costing in excess of,

Page 75

1  you know, a million dollars, and it was becoming a
2  cash flow problem.
3    Q. So because -- strike it in that form.
4      Did the Steven M. Hain Company have
5  anything to do with the differing site conditions --
6    A. No.
7    Q. -- encountered?
8    A. No.
9    Q. They were simply a supplier of material for
10  Millgard?
11    A. Yes.
12    Q. And Millgard wasn't paying them because they
13  weren't being paid for what Millgard said were
14  differing site conditions?
15    A. We weren't being paid on time for what we
16  were doing and because of cash flow problems we
17  could not pay them.
18      MR. STONE: Why don't we mark this
19  letter dated March 1, 1999 from Paul Mayotte of the
20  White Oak Corporation to the Millgard Corporation as
21  the exhibit next in order, please.
22      (Exhibit No. 4 marked
23      for identification.)
24    Q. Now over the summer of 1998 what was

Page 76

1  happening with respect to the Tomlinson Bridge
2  project?
3    A. My brother became more and more involved and
4  basically took over the position for Millgard with
5  respect to discussions with White Oak, the
6  attorneys, state, although I assisted.
7    Q. Well, did you stay involved in monitoring
8  what was going on?
9    A. To a certain extent, yes.
10    Q. Did you participate in any of the meetings
11  that took place in Connecticut?
12    A. There was a mediation. There was another
13  meeting that I attended with not only Dennis but
14  Mr. Busconi at the ConnDOT headquarters. I attended
15  -- again, there was a meeting that we attended at
16  ConnDOT's office. Then there was a mediation -- I
17  don't recall all the specific dates -- that I
18  attended with my brother and Mr. Busconi.
19    Q. Let's start first with the summer of 1998.
20  Was there a meeting with ConnDOT in which they
21  denied the change request?
22    A. I believe that's correct.
23    Q. Did you participate in that meeting?
24    A. I know there was one meeting I participated

Page 77

1  at their offices I said, and I don't know if that
2  was the specific meeting, but there was a meeting in
3  which I attended.
4    Q. Was that in the summer of 1998?
5    A. I believe so.
6    Q. That was before the work stoppage in
7  September 1998?
8    A. That's probably true.
9    Q. Did Mr. Busconi attend that meeting?
10    A. I don't recall if he attended it. I don't
11  think so, but -- I don't believe so.
12    Q. Was he representing Millgard in negotiating
13  with ConnDOT with respect to the change conditions?
14    A. Not at maybe that specific meeting. There
15  was one meeting when we were directed by the State
16  of Connecticut not to have our attorneys with us,
17  and that would have been the only reason that
18  Mr. Busconi or an associate did not attend because
19  we were told specifically not to bring attorneys.
20    Q. Okay. When -- strike it in that form.
21      At some point in the fall of 1998
22  Millgard stopped work on the project?
23    A. I believe that's true.
24    Q. Why is it that Millgard did that?

C. Richard Millgard

Page 78

1    A. We couldn't finance -- I believe it was we
2 just couldn't finance the project anymore.
3    Q. Can you explain that a little bit more?
4    A. We had no money coming in. We couldn't
5 finance the project. It goes back to cash flow.
6    Q. And that's because the Connecticut
7 Department of Transportation was not accepting your
8 position of changed site conditions?
9    A. That's probably a fair statement. We
10 weren't getting paid.
11    Q. Was White Oak supporting the position of
12 Millgard with respect to the changed site conditions
13 as of September of 1998?
14    A. I believe so.
15    Q. Was White Oak of the opinion that Millgard
16 could stop work in the fall of 1998?
17    A. I don't know if they were in agreement.
18    Q. Was the Connecticut Department of
19 Transportation that Millgard could stop work on the
20 project?
21    A. That I don't know either.
22    Q. All right. Let me show you a letter dated
23 September 17, 1998 from Arthur Gruhn -- G R U H N --
24 to John F. Morrissey at White Oak. Before I show

Page 79

1 you the letter, do you know who Arthur Gruhn is?
2    A. I believe a high position within the
3 Connecticut DOT.
4    Q. All right. Let me show you the letter dated
5 September 17, 1998 and ask you if you're familiar
6 with it?
7    A. I'm sure I saw the letter at the time or
8 within a few days it was received assuming it was
9 received by the Millgard Corporation.
10    Q. Okay. Did you have any role in addressing
11 the Connecticut Department of Transportation's
12 position as set forth in its letter of September
13 17th?
14    A. I'm sure there were discussions in the
15 office.
16    Q. Do you have any memory of any discussions?
17    A. Not specifically.
18    Q. Did you discuss the September 17, 1998
19 letter from ConnDOT with Mr. Busconi?
20    A. I can't say that I did or I didn't. I don't
21 recall.
22    Q. Okay.
23    MR. STONE: Let's mark this as the next
24 exhibit in order, please.

Page 80

1    (Exhibit No. 5 marked
2    for identification.)
3    Q. Who is John Luebbe, L U E B B E?
4    A. John is an estimator or was an estimator
5 with the Millgard Corporation at the time.
6    Q. Let me show you a letter of Mr. Luebbe's
7 dated November 24, 1998 to the State of Connecticut
8 Department of Transportation and ask you if you're
9 familiar with that?
10    A. I believe this letter was discussed, and I
11 had John send the letter -- Dennis had John send the
12 letter because we had talked with Gadsby Hannah's
13 office and were told we could make demand through
14 the State of Connecticut for funds. And that's what
15 we were doing.
16    Q. Why wasn't Gadsby & Hannah sending the
17 letter?
18    A. I can't specifically say at the time. From
19 what I understand, it had to come from the
20 contractor.
21    Q. But Gadsby & Hannah couldn't send letter
22 letters --
23    A. I don't know if they could send a letter
24 like this or not.

Page 81

1    Q. Okay. In any event, Gadsby & Hannah was not
2 requested to do that particular letter; is that
3 correct?
4    A. I don't know that.
5    Q. You didn't ask Gadsby & Hannah to do that
6 letter?
7    A. Again, I don't recall specifically -- we got
8 information -- because we didn't know about the
9 Connecticut law, we got information that this was
10 something we could do, and we may very well have
11 gotten it from Gadsby Hannah's office. I don't
12 know.
13    MR. STONE: Let's mark this as the next
14 exhibit in order, please. While you're doing that,
15 why don't you mark a letter dated December 9, 1998
16 from Brian Castler -- C A S T L E R -- of ConnDOT to
17 Millgard as the next exhibit after that one. And
18 we'll discuss it after you've marked that.
19    (Exhibit Nos. 6 and 7 marked
20    for identification.)
21    Q. Are you familiar with the response by
22 ConnDOT?
23    A. I'm sure that I looked at it at the time.
24 But I knew it was a problem trying to collect money.

21 (Pages 78 to 81)

C. Richard Millgard

Page 82

1    Q.  They told you to take it up directly with
2  White Oak?
3    A.  That's what this letter says, yes.
4    Q.  On Exhibit number 5, the September 17th
5  letter from ConnDOT, they were attempting to
6  persuade or they were taking the position that
7  Millgard was wrong about the differing site
8  conditions?  You recall that?
9    A.  That's what it says.
10    Q.  And the state DOT says in the letter the
11  determination that a differing site condition does
12  not exist at this site has been made after careful
13  consideration and investigation by the department.
14  You recall them --
15    A.  That's what it says.
16    Q.  Okay.  Millgard continued to try to persuade
17  the state DOT that there was a differing site
18  condition?
19    A.  Well, I do know that my brother had ongoing
20  discussions at that time with Gadsby Hannah's
21  office, probably Mr. Busconi, and we were talking
22  with Mr. Giffune.  We were also talking with
23  Mr. Allen regarding again Connecticut law, what we
24  could or could not do, looking for direction from

Page 83

1  our attorneys.
2    Q.  Did you ask Gadsby Hannah to prepare a
3  position paper to be presented to the DOT?
4    A.  I can't say that I did, no.
5    Q.  Did anyone from Millgard ask Gadsby Hannah
6  to present a position or an argument on behalf of
7  Millgard to try and persuade the DOT that there were
8  differing site conditions?
9    A.  I'm sure my brother in his discussions with
10  their office looked for again direction, what we
11  could and we couldn't do.
12    Q.  Okay.  You don't have any memory or
13  participation in those discussions?
14    A.  No.
15    Q.  There was a meeting that took place in
16  December of 1998 with some of the people of Millgard
17  and Mr. Busconi and Mr. Richard Allen.  Did you
18  participate in that meeting?
19    A.  I don't believe so.
20    Q.  Did anyone tell you what was discussed at
21  that meeting?
22    A.  Yes.  I think that information was brought
23  back to the office because there was a number of
24  projects that -- if I'm recalling correctly, there

Page 84

1  were a number of other projects besides Tomlinson.
2    Q.  So that a number of projects were under
3  discussion with Gadsby Hannah as of December 1998?
4    A.  I believe so.
5    Q.  What, if anything, were you told about the
6  meeting in December 1998 insofar as the Tomlinson
7  Bridge project?
8    A.  I guess I would have to look at the record
9  specifically, but there were discussions regarding
10  it and Gadsby Hannah was looking into it because we
11  were obviously having ongoing, you know, discussions
12  with them.
13    Q.  Okay.  Let me show you a letter dated
14  December 11, 1998 and ask you if you're familiar
15  with that letter?
16        (Pause.)
17    Q.  Are you familiar with that letter, sir?
18    A.  I'm sure -- I'm copied.  So I got a copy of
19  it, and I'm sure I read it at the time.
20    Q.  Okay.
21        MR. STONE:  Let's have that marked as
22  the next exhibit in order.
23        (Exhibit No. 8 marked
24        for identification.)

Page 85

1    Q.  Now this is a letter -- this letter dated
2  December 11, 1998 is a letter of Dennis Millgard,
3  the president of Millgard?  It's his letter?
4    A.  I believe it is, yes.
5    Q.  And in it he notes that specifications in
6  contracts require Millgard to continue to work
7  during disputes.  Do you recall that?
8        MR. DAVAGIAN:  Objection.
9    Q.  Item number 2.
10    A.  That's what it says.
11    Q.  And that means, does it not, that when you
12  have differing site conditions the requirement is
13  that you have to continue to work through it while
14  you iron out your dispute with the owner?
15    A.  That's generally what a contract might --
16  might have that type of language.  Maybe not all
17  contracts but most contracts.
18    Q.  It's not something that you were unfamiliar
19  with?
20    A.  That's correct.
21    Q.  Now after the first of the year, January of
22  1999, Millgard was in the process of working out or
23  trying to work out a mediation of the dispute with
24  ConnDOT, was it not?

22 (Pages 82 to 85)

Page 86

1    A. I believe that's correct.
2    Q. Did you participate in the mediation?
3    A. I was there.
4    Q. Who else from Millgard was there?
5    A. The mediation, I believe -- obviously Dennis
6 Millgard was there, and I know there was several
7 meetings -- I believe more than one -- I think
8 Mr. Busconi might have been at one of them as well.
9    Q. Did Mr. Busconi or Gadsby & Hannah prepare
10 information to be submitted during the course of the
11 mediation?
12    A. I don't recall that.
13    Q. Have you ever attended a mediation prior to
14 the one in early 1999 on the Tomlinson Bridge
15 project?
16    A. No.
17    Q. That was your very first mediation?
18    A. That's correct.
19    Q. Since that time have you attended any other
20 mediations?
21    A. No.
22    Q. In addition to Millgard representatives,
23 what other parties were represented at the
24 mediation?

Page 87

1    A. Besides Millgard, I believe that White Oak
2 was there. Their attorney was there. And, as I
3 said earlier, Mr. Busconi was there from Gadsby &
4 Hannah.
5    Q. Let me show you a letter dated January 11,
6 1999 and ask if you're familiar with that letter? I
7 believe you're noted as a recipient of a carbon
8 copy.
9        (Pause.)
10    A. I'm sure I got a copy of it. I'm listed as
11 a recipient.
12    Q. Okay.
13        MR. STONE: Let's mark that as the next
14 exhibit in order. Well, let's do that, and then
15 I'll ask you a couple more questions about it, sir.
16        (Exhibit No. 9 marked
17        for identification.)
18    Q. I noticed that you received a carbon copy of
19 this; is that correct, sir?
20    A. That's what it says, sir, yes.
21    Q. I notice that all of the other recipients of
22 the CCs were members of the Millgard Corporation.
23 Is that accurate?
24    A. That's correct.

Page 88

1    Q. This is the mediation that's going to be
2 taking place with Carmin Reiss as the meditator?
3    A. I believe that's correct.
4    Q. I don't see Mr. Busconi or Gadsby & Hannah
5 copied on that document. Do you know why?
6    A. No, I don't.
7    Q. Do you know if they received a copy of it at
8 the time?
9    A. I don't know that.
10    Q. Thank you. Now by early 1999 White Oak was
11 requesting that Millgard resume work on the project,
12 were they not?
13    A. I don't know specifically those dates or how
14 that came to pass.
15    Q. Well, was the Millgard Corporation willing
16 to go back on the job in early 1999?
17    A. It would seem to me if certain provisions
18 were worked out, an agreement in principal and a
19 method of payment to move forward.
20    Q. So until White Oak or the Department of
21 Transportation agreed on a payment plan, Millgard
22 was not going to be returning to the job? Is that
23 fair to say?
24    A. That's fair.

Page 89

1    Q. Did Mr. Busconi advise you or the Millgard
2 Corporation not to return to the job?
3    A. The majority of the discussions at that time
4 were between Dennis Millgard and the Gadsby Hannah
5 -- not just Mr. Busconi but a number of other people
6 within their office.
7    Q. Do you have any memory of Mr. Busconi or
8 anyone else at Gadsby & Hannah advising you not to
9 return to work on the Tomlinson Bridge project?
10    A. No, I can't say from my own personal
11 knowledge. No.
12    Q. Do you recall in March of 1999 that White
13 Oak advised Millgard that it was going to be
14 subcontracting the work to complete your job?
15    A. I guess I lose track. I guess I don't
16 recall that.
17    Q. I'll show you a fax dated -- a fax of a
18 letter of which is dated March 2, 1999 and ask you
19 if you recall seeing those documents?
20        (Pause.)
21    A. I may have seen it, but I don't recall
22 specifically.
23    Q. Let me show you another document dated March
24 3, 1999 which I believe was the cover note with that

23 (Pages 86 to 89)

C. Richard Millgard

Page 90

1  fax and ask you if you recall that document?
2      (Pause.)
3  A. No, I can't say that I do recall this.
4  Q. Let me have that back for a moment, please.
5  A. Sure.
6  Q. Excuse me for just one moment.
7      (Pause.)
8      MR. STONE: Why don't we mark these as
9  the next two exhibits in order?  The first is a fax
10 cover sheet with a March 2, 1999 letter from
11 Morrissey to Millgard.  The next one after that is a
12 letter of Dennis Millgard to Gadsby Hannah, Ron
13 Busconi dated March 3, 1999.
14      (Exhibit Nos. 10 and 11 marked
15      for identification.)
16 Q. In the letters of March 2 and March 3 which
17 are Exhibits 10 and 11 I believe -- in Exhibit 10
18 White Oak is saying we're going to get a
19 subcontractor, and in Exhibit number 11 Mr. Millgard
20 -- Mr. Dennis Millgard is asking Ron Busconi for
21 assistance in responding to Exhibit number 10.
22      Is that accurate?
23 A. That's what it appears, yes.
24 Q. Do you recall what assistance Mr. Busconi

Page 91

1  rendered in response to that?
2  A. I can't say.
3  Q. Were you -- did you participate in that at
4  all?
5  A. I don't believe so.
6  Q. Okay.  Early in April or sometime in April
7  there was a mediation that was overseen by Carmin
8  Riess.  Do you recall that?
9  A. I assume the date is correct 'cause I don't
10 recall what the date was.
11 Q. That was the mediation that you attended; is
12 that right?
13 A. I believe so.
14 Q. Did Mr. Busconi represent Millgard at that
15 mediation?
16 A. I believe he was there, yes.
17 Q. Well, did he represent Millgard?
18 A. Yes.
19 Q. And did he present information to the
20 mediation?  Did he present them with a position
21 paper on behalf of Millgard?
22 A. I don't recall a paper being presented.
23 Q. Did he make a presentation on behalf of
24 Millgard as to its position?

Page 92

1  A. I think to the White Oak attorneys and to
2  the State in a separate room outside of the actual
3  mediation, yes, and maybe even in the mediation he
4  had something to say.  I don't specifically recall.
5  Q. Do you recall as of the spring of 1999 that
6  in order for the state to pay Millgard that White
7  Oak first had to approve of the payment?
8  A. No, I guess I don't recall that.
9  Q. Are you familiar with something in
10 Connecticut called the pass-through rule?
11 A. No, and I believe that's why I initially
12 talked to Mr. Busconi because I was not familiar
13 with any of the legalities in the state.
14 Q. As we sit here today, are you familiar with
15 the pass-through requirements?
16 A. Not really.
17 Q. Okay.  Do you know who Peter Huntsman is?
18 A. I recall the name.  I believe he's with the
19 State of Connecticut.  But beyond that, I don't
20 know.
21 Q. Let me show you a copy of a letter dated
22 April 13, 1999 and ask you if you're familiar with
23 that letter?
24      (Pause.)

Page 93

1  Q. Do you recall seeing that letter, sir?
2  A. I'm sure I did.
3  Q. Okay.
4      MR. STONE: Let's have that marked as
5  the next exhibit in order if we can, please.
6      (Exhibit No. 12 marked
7      for identification.)
8  Q. If I may, in the letter of April 13, 1999
9  Mr. Huntsman writes that, since Millgard is
10 conferring with an attorney, I want to talk to the
11 attorney rather than you.
12      Do you recall seeing that -- that
13 segment of his letter?  The last paragraph.
14 A. That's what it says.
15 Q. Now had Millgard retained Mr. Busconi to act
16 on its behalf in dealing with the State of
17 Connecticut Department of Transportation?
18 A. Certainly.
19 Q. And Mr. Huntsman was himself an assistant
20 attorney general with the State of Connecticut; is
21 that right?
22 A. That's what it says.  As I said, I wasn't
23 familiar with his specific role.
24 Q. And he wanted to talk to another attorney

24 (Pages 90 to 93)

C. Richard Millgard

Page 94

1  and not to the principal; isn't that right?
2    A.  That's what it says.
3    Q.  All right.  Let me show you a letter dated
4  April 16, 1999 and ask you if you're familiar with
5  that letter?
6        (Pause.)
7    A.  Yes.
8        MR. STONE:  Why don't we mark that as
9  Exhibit 13, and then we can address it, please.
10       (Exhibit No. 13 marked
11        for identification.)
12   Q.  Can you tell me whether you've seen Exhibit
13  number 13 before?
14   A.  Yeah.  The reason that this one kind of
15  stands out was I'm sure Denny talked to me about it,
16  and this letter here I think was basically drafted
17  by Mr. Busconi.  It was Mr. Busconi's suggestion
18  that this letter be sent in this manner to the State
19  of Connecticut with respect to our involvement with
20  Gadsby Hannah.
21   Q.  Did you have a conversation with Mr. Busconi
22  about Exhibit 13?
23   A.  No, I did not.
24   Q.  And the information that you've just recited

Page 95

1  comes from a conversation with your brother, Dennis
2  Millgard?
3    A.  That's correct.
4    Q.  Do you have any other information about this
5  letter?
6    A.  No, I don't.
7    Q.  And this is a letter of your brother Dennis
8  Millgard to Peter Huntsman in which he advises
9  Mr. Huntsman that Mr. Busconi has not been formally
10  retained to represent him in this matter?
11   A.  That's what it says.  As I said, it was --
12  according to my information, that was a letter that
13  was basically drafted by Mr. Busconi passed on to
14  Dennis and Dennis signed it.
15   Q.  Why did Mr. Busconi suggest this letter?
16   A.  I'm not sure.  I don't recall the specifics.
17   Q.  Why did --
18   A.  Something to do with the legal and the
19  contact with the state and Millgard.
20   Q.  Okay.
21       MR. STONE:  Why don't we go off for a
22  minute?
23       (Off the record.)
24       (A lunch recess was taken.)

Page 96

1  BY MR. STONE:
2    Q.  Mr. Millgard, in June of 1999 do you recall
3  having discussions with an Attorney Giffune from
4  Gadsby & Hannah?
5    A.  I know I talked to that gentleman on the
6  phone.  I can't tell you specifically which dates.
7    Q.  Do you recall why you were speaking with him
8  at that time?
9    A.  It was ongoing for Gadsby Hannah over the
10  course of time.  As I said earlier, I talked to
11  either Mr. Busconi or his associates.  So they were
12  working on the same case.
13   Q.  Do you recall what the subject matter was or
14  what the purpose of the contacts were?
15   A.  Not specifically, no.
16   Q.  Okay.  I'll show you a series of faxes from
17  you to Mr. Giffune dated June 14, 1999, June 17,
18  1999, and July 27th and ask you if you -- Well,
19  let's start with the June 14, 1999 which is an
20  eight-page fax and ask if you're familiar with that?
21   A.  Yes.
22   Q.  Can you tell us what that is?
23   A.  Appears to be the contract between the
24  Millgard Corporation and White Oak.

Page 97

1    Q.  Do you recall sending that to Mr. Giffune?
2    A.  Not specifically, but obviously, according
3  to this, I did.
4    Q.  Do you recall why he was requesting it in
5  June of 1999?
6    A.  We had sent information earlier.  I don't
7  know if this was a duplication or if -- but, anyway,
8  it was obviously pertaining to the project.
9        MR. STONE:  Let's have that marked as
10  the next exhibit.  As long as we're stopping for a
11  minute, why don't you mark these in the order I give
12  them to you, and we can discuss this.
13       (Exhibit Nos. 14 through 17 marked
14        for identification.)
15   Q.  Let's start with the first one, if you
16  would, Mr. Millgard.  That's Exhibit number --
17   A.  -- 14.
18   Q.  And that's a copy of the contract between
19  Millgard and White Oak?
20   A.  That's correct.
21   Q.  And the contract is dated sometime in 1996?
22  It's on the first page of the contract, I believe.
23   A.  Twenty-second day of March 1996.
24   Q.  Thank you.  And you don't have any present

25 (Pages 94 to 97)

C. Richard Millgard

Page 98

1  recollection as to why you were sending him a copy
2  of the contract in June of 1999?
3      A.  They may have had a previous copy or
4  something.  I'm not sure.
5      Q.  Okay.  Do you recall --
6      A.  Obviously Mr. Giffune may have requested it.
7  That's what he said.
8      Q.  Do you have any recollection as to any
9  conversations about the contract thought with
10  Mr. Giffune?
11      A.  Not specifically, no.
12      Q.  Okay.  Did Mr. Giffune provide you with any
13  written documentation in response to the fax,
14  Exhibit number 14?
15      A.  I don't recall.
16      Q.  All right.  Let's take a look at Exhibit
17  number 15.  That's a three-page document.
18          Do you have any memory of that one?
19      A.  No.  I think I had suggested earlier today
20  that I knew there was a number of pieces of paper,
21  documents that I had folded on at different times --
22      Q.  You have no memory as to what the subject
23  matter --
24      A.  I assume it's Tomlinson and information on

Page 99

1  it, specifications.
2      Q.  Okay.  Exhibit number 15 contains spec
3  information from the State of Connecticut; is that
4  right?
5      A.  I believe that's correct.
6      Q.  Do you have any memory as to why that was
7  being requested or why you were transmitting it to
8  him at that time?
9      A.  He may have requested it himself.
10      Q.  But you don't have any present memory one
11  way or the other?
12      A.  No, sir.
13      Q.  All right.  Next one is Exhibit 16.  Can you
14  tell us what that is?
15      A.  Part of this is the same as that one.
16      Q.  All right.  Exhibit 16 is a fax dated June
17  17, 1999?
18      A.  That's correct.
19      Q.  Consisting of seven pages?
20      A.  Hm Hm.
21      Q.  And can you help us with why you were faxing
22  Mr. Giffune that information as of June of 1999?
23      A.  I don't know if we received this or got this
24  -- I don't -- I don't know if this was part of the

Page 100

1  mediation or when this document was prepared, but
2  Parsons Brinkerhoff is on the bottom of it.  So they
3  may have prepared the document.
4      Q.  Parsons Brinkerhoff was an expert witness
5  for some party in the mediation?
6      A.  They were like the construction manager for
7  the State of Connecticut on the project.
8      Q.  Okay.  Again, you can't assist us in
9  understanding why this material was being
10  transmitted to Mr. Giffune at this particular time?
11      A.  No.
12      Q.  All right.  Let's pass on to Exhibit number
13  17.  That's a fax dated July twenty --
14      A.  -- 27th.
15      Q.  -- 27th, three pages consisting of some
16  more spec information?
17      A.  Yes.  This appears to be like out of their
18  general conditions, the State of Connecticut.
19      Q.  Again, you can't help us with why you were
20  transmitting this material to Mr. Giffune in the
21  summer of 1999?
22      A.  Again, we were -- I think we were still
23  pursuing on a continual basis, and John may have
24  made a request.

Page 101

1      Q.  Okay.  Do you know what Mr. Giffune was
2  doing for you in the summer of 1999, what his task
3  was?
4      A.  Other than working on the Tomlinson project
5  for us, I can't specifically say what his specific
6  duties were because I had understood he was working
7  for our -- an associate with Mr. Busconi.
8      Q.  All right.  What was Mr. Busconi doing for
9  you during the summer of 1999 with respect to the
10  Tomlinson Bridge project?
11      A.  The majority of the contact with Mr. Busconi
12  at that time was with my brother Dennis.  I had very
13  little, if any, contact -- I was passing
14  information, but I really didn't have any contact
15  with Mr. Busconi at that time.
16      Q.  Do you have any recollection of any
17  conversations with your brother at that period of
18  time during which he told you what Mr. Busconi was
19  engaged to do?
20      A.  Not specifically, no.
21      Q.  Well, was he engaged to bring a lawsuit
22  against White Oak in the summer of 1999?
23      A.  That was probably discussed.
24      Q.  But was he engaged to bring a lawsuit during

26 (Pages 98 to 101)

C. Richard Millgard

Page 102

1  the summer --
2    A. I know that that was -- that item was
3  obviously -- or had been discussed for quite some
4  time.
5    Q. Was there a determination to either sue or
6  to not sue White Oak?
7    A. At some point in time I believe that came to
8  pass.
9    Q. Well, who made that decision?
10   A. Dennis Millgard.
11   Q. When was it that he made that decision?
12   A. I don't specifically remember had that
13 decision was made.
14   Q. What was the decision that he made?
15   A. To sue I'm guessing -- file suit.
16   Q. Prior to that time did he make a decision
17 not to sue White Oak?
18   A. I can't say what the reasons were or were
19 not.
20   Q. Do you know what the reason was for the
21 timing on when to bring suit against White Oak?
22   A. No, I don't.
23   Q. Were there ongoing discussions with the
24 principals of White Oak and the Connecticut

Page 103

1  Department of Transportation during the 1999 time
2  frame?
3    A. I don't know that.
4    Q. Okay. Earlier you testified that you made
5  some inquiry of Mr. Busconi about notification
6  requirements under the bond. Do you recall that
7  testimony?
8    A. Yes.
9    Q. What information did Mr. Busconi provide to
10 you about that?
11   A. Basically, as I recall, he was going to be
12 looking into that and get back to us. It was
13 something that he would take care of. When it was
14 appropriate, he would let us know.
15   Q. Do you recall any information that
16 Mr. Busconi provided to you about the requirements
17 for notification on a payment bond for the Tomlinson
18 project?
19   A. I can't specifically recall.
20   Q. Well, did you do any followup inquiry either
21 by phone or letter or other means in which you
22 sought further information about that?
23   A. It may have been discussed briefly at some
24 other occasion, but I'm not -- I can't specifically

Page 104

1  say yes or no.
2    Q. As you sit here today, you don't have any
3  memory of that?
4    A. Not specifically.
5    Q. All right.
6    A. There was a lot of conversation.
7    Q. What I'm trying to do is to find out what
8  conversations you took part in and what
9  conversations you have a memory of.
10   A. Hm Hm.
11   Q. Do you have any specifics of a memory of
12 discussions about the bond for payment by White Oak?
13   A. No. The only discussion that I would
14 possibly could say was because we filed at the
15 direction of Gadsby Hannah on the other White Oak
16 job I believe at some point in time. There was a
17 separate project, totally separate issue, but I know
18 that both projects were being discussed at the same
19 time.
20   Q. Okay.
21   A. But I don't have any specific to say, yes,
22 on this date or that date or this date or --
23   Q. What other project are you referring to?
24   A. The White Oak job in Bridgeport,

Page 105

1  Connecticut.
2    Q. You say you filed what?
3    A. I believe there was a filing made against
4  the bond on that job because of lack of payment. So
5  both of those jobs were sort of being discussed at
6  the same time on occasion.
7    Q. Okay. Who was it that filed on the bond on
8  the White Oak job in Bridgeport?
9    A. I presume that was Gadsby & Hannah.
10   Q. Okay. Do you know why there was a bond
11 filing on the Bridgeport job but not on the
12 Tomlinson Bridge job?
13   A. No, I don't.
14   Q. Do you know who made that determination?
15   A. I presumed it was Gadsby & Hannah.
16   Q. Okay. In the fall of 1999 there was a
17 demobilization from the project. Do you recall
18 that?
19   A. I know that we eventually moved off the job,
20 yes.
21   Q. And essentially what that meant is you sent
22 some folks in to pull all your equipment out to
23 either return it or take it elsewhere?
24   A. Yes. That's what we normally do in a

27 (Pages 102 to 105)