UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                              Plaintiff

v.

GADSBY HANNAH, LLP,
                    Defendant

## AFFIDAVIT OF TERRI L. PASTORI IN SUPPORT OF DEFENDANT, GADSBY HANNAH'S MOTION FOR RECONSIDERATION

I, Terri L. Pastori, hereby depose under oath and state as follows:

1.      I am an attorney in good standing, and admitted to practice before the Bar of the Commonwealth of Massachusetts and the United States District Court for the District of Massachusetts, among other courts.

2.      I am partner in the law firm of Peabody & Arnold LLP, and I am an attorney for the Defendant, Gadsby Hannah LLP in this matter.

3.      Attached hereto as Exhibit A is true and accurate copies of excerpts from Dennis Millgard's Deposition Transcript.

4.      Attached hereto as Exhibit B is a true and accurate copy of the Plaintiff's Complaint.

5.      Attached hereto as Exhibit C is a true and accurate copy of John Morrissey's letter to Dennis Millgard dated May 21, 1999 (Deposition Exhibit 65).

6.      Attached hereto as Exhibit D is a true and accurate copy of Dennis Millgard's letter to Jack Morrissey dated September 11, 1998 (Deposition Exhibit 20).

7.      Attached hereto as Exhibit E is a true and accurate copy of a letter from The Millgard Corporation to John Morrissey dated February 4, 1999, which was obtained in discovery.

8.      Attached hereto as Exhibit F is a true and accurate copy of the Subcontract between White Oak and the Millgard Corporation (Deposition Exhibit 14).

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24TH DAY JULY 2006.

/s/ Terri L. Pastori
Terri L. Pastori

## <u>CERTIFICATE OF SERVICE</u>

       I, Terri L. Pastori, hereby certify that on July 24, 2006, the foregoing document was served upon counsel for the plaintiff, John S. Davagian, Esquire, by electronic mail at jsdavagian@jsdlawgroup.com.

                               /s/ Terri L. Pastori
                               Terri L. Pastori

# EXHIBIT A

# The Millgard Corporation
## vs.
## Gadsby Hannah, LLP

## V. Dennis Millgard

Volume 1

September 21, 2005
pp 1-145

# Jones Reporting
## COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

V. Dennis Millgard

Page 138

1    phone conversation with Ron like I think it was
2    around the middle of June, and he talked to Lassman,
3    and Lassman told him the guy's name in ConnDOT who
4    would approve this.
5         Q. I take it those conversations continued over
6    a period of time with promises being made that you
7    were going to be --
8         A. Well, May 21st I get a fax from Jack
9    Morrissey terminating us. So I called Jack and I
10   said what's going on, and he said forget that,
11   that's AIG. So I said what do you mean forget it?
12   You just terminated us. He said forget it. He said
13   we're going to continue on this. Now what we have
14   to do is we have to figure out what the second phase
15   is going to cost. And there's plenty of paperwork
16   that shows all of that.
17        Q. What did Mr. Morrissey mean that it was from
18   AIG -- that it was --
19        A. It was their bonding company.
20        Q. And their bonding company was making them
21   send a termination letter to you?
22        A. Yeah, but he said don't worry about it; it's
23   garbage.
24        Q. Okay.

Page 139

1         A. Over the next month or so Jack and I were
2    having conversations and paperwork going back and
3    forth. I said on the second phase now, the other 80
4    percent, give us a schedule. Are we going to need
5    one rig, two rigs, three rigs -- you know, four
6    barges, five barges, six barges, so on. It came
7    back. He got a schedule from Peter Huntsman, and
8    that's what we worked our numbers out on.
9         Q. Now at some point --
10        A. So now -- not only did we think we were
11   going to get the million one, but we thought we were
12   going to get another 7 and a half million bucks to
13   finish the darn thing.
14        Q. And at some point it became apparent to you
15   that that was not going to occur?
16        A. Well, somewhere after we got the May 21st
17   termination letter from AIG, I had more
18   conversations with Jack Morrissey. I said what do
19   you mean AIG. What's AIG got to do with this? We
20   did find out later on that right about that time is
21   when AIG stepped in and took over White Oak. They
22   were calling the shots.
23        Somewhere around the end of July or
24   August of '99 Jack said I can't negotiate with you

Page 140

1    anymore. I've been told we have to do this job
2    ourselves. I said by who. He said AIG.
3         And he said might as well move your
4    equipment off. So we moved our equipment off
5    sometime in September of '99.
6         Q. Between September of '98 and September of
7    '99 did you do any work on the project?
8         A. No.
9         Q. And some time in September of '99 you moved
10   your material off the site?
11        A. Yeah, September 10th or 15th. Somewhere in
12   there. Somewhere around the middle of September.
13        Q. What's the next step that you took with
14   respect to this project, if any?
15        A. Well, we had conversations about what to do
16   here. We're sitting. There was some meetings and
17   discussions generated with AIG. We did find out
18   that somewhere around that time frame that AIG had
19   taken over White Oak; that a guy by the name of
20   Teflon who owned White Oak and some other companies
21   had signed off and that it was all being handled by
22   AIG.
23        Q. How did you find that out?
24        A. Probably Jack Morrissey.

Page 141

1         Q. Was that the subject of meetings that you
2    had with Gadsby & Hannah after September of '99?
3         A. I don't recall for sure. I know there were
4    discussions -- when I say ongoing discussions, I
5    don't know if we talked once a month or -- or we
6    didn't talk for two months about that particular
7    project.
8         Q. Okay.
9         A. But we had this money laying out there and
10   we had to do something about it. So then -- then I
11   know there was discussions about filing a suit.
12        Q. Okay. And --
13        A. Why we didn't file suit, I don't know.
14        Q. When were those discussions about filing
15   suit?
16        A. Well, I am certain they happened at the time
17   we were told to move off the job.
18        Q. In September of 1999?
19        A. Yeah.
20        Q. Well, at that point did you advise Gadsby &
21   Hannah and request that they commence a lawsuit?
22        A. I don't recall. The next thing I do recall
23   though is them making notice to AIG in April or May
24   or something like that of 2000.

36 (Pages 138 to 141)

The Millgard Corporation
vs.
Gadsby Hannah, LLP

V. Dennis Millgard

Volume 2

November 9, 2005
pp 146-246

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

V. Dennis Millgard

Page 179

1  it, which we did. But we also believed Ed Lassman
2  that somebody was going to give us a call in the
3  next few days and say hey, this has been settled, we
4  are writing a change order and so on and so forth.
5      Q. Mr. Lassman was an attorney in Connecticut?
6      A. Yes.
7      Q. And he had previously been in the state
8  legislature; is that correct?
9      A. I believe so, yes.
10     Q. Was it your understanding that he knew the
11 right people within the state government in
12 Connecticut to achieve the goal that you were
13 seeking?
14     A. Yes.
15     Q. And he advised you that that was in fact
16 going to happen?
17     A. Yes, most certainly. He said it's been
18 approved and it's going to happen.
19     Q. So, from May of 1998 through May of 1999 it
20 was your understanding of the position of White Oak
21 and the other people involved that your work would
22 be paid for and the changed condition approved?
23     A. Yeah. We felt very strongly of that on May
24 19th.

Page 180

1      Q. Of 1999?
2      A. Yes.
3      Q. But from May of 1998 through May of 1999,
4  did anyone at any point give you the impression that
5  that would not be done?
6      A. No. That's typical.
7      Q. And prior to May of 1999 did you authorize
8  or instruct Gadsby & Hannah to commence a lawsuit or
9  any other claim to seek redress from a legal
10 standpoint?
11     A. From what dates now?
12     Q. From May of 1998 through May of 1999.
13     A. There was discussions of it in December of
14 1998, January, February.
15     Q. I'm not asking about discussions, sir. What
16 I'm asking is whether at some point before May of
17 1999 you said to Gadsby & Hannah look, I'm tired of
18 waiting, I'm concerned about things, I want you to
19 start a claim today? Did you say that to them at
20 any point prior to May of 1999?
21     A. Did I tell Gadsby & Hannah to file -- I
22 don't care what's going on, file a lawsuit?
23     Q. File a claim, file a lawsuit?
24     A. Well, we already filed a claim.

Page 181

1      Q. File a law site?
2      A. I guess I didn't because they didn't.
3      Q. At some point did you authorize Gadsby &
4  Hannah to proceed with a suit against White Oak or
5  ConnDOT?
6      A. Well, we asked them on numerous occasions to
7  go ahead and file suit.
8      Q. When was the first time that you did so?
9      A. Probably January of 1999. And Ron said
10 look, I don't think it's a good move, I think as
11 long as we have this mediation coming. Bear in mind
12 I did not know our rights were going to run out in
13 middle of March. Our notification rights.
14     Q. Perhaps you can explain that to me.
15     A. The state statute regarding notification of
16 bonding companies gives you 180 days. We shut down
17 September 15th of '98, so therefore it would have
18 been March 15th of '99. Notification should have
19 been filed before then. Notification wasn't filed
20 until a year later.
21     Q. Okay. At some point did you request that
22 Gadsby & Hannah make a claim against the bond?
23     A. I don't know if we specifically -- I mean,
24 with all the other projects that Gadsby & Hannah was

Page 182

1  representing us on, that's one of the first things
2  you do is you check the statute for notification of
3  the bonding company.
4      Q. Okay. Did you provide Gadsby & Hannah with
5  the payment bonds for the Tomlinson project or the
6  Bridgeport project so they could ascertain what the
7  timing was?
8      A. I don't recall.
9      Q. Did anyone within Millgard Corporation check
10 the bonds to determine what the timing --
11     A. The timing wouldn't have been in the bonds.
12 The timing is a state statute.
13     Q. You are familiar with payment bonds? You've
14 dealt with them over your 40 years?
15     A. Absolutely, yes.
16     Q. Isn't it true, sir, that within the payment
17 bond itself there is a time limitation set forth as
18 to when notification must be made to the bonding
19 company?
20     A. Does that circumvent state law? I don't
21 know.
22     Q. Try my question.
23     A. I don't recall if it was in there or not.
24     Q. So it's your testimony that you don't recall

JONES REPORTING COMPANY
617-451-8900

# EXHIBIT B

RECEIPT #_____
AMOUNT $ _150___
SUMMONS ISSUED _Y-1_
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK. _M_
DATE_____11-13-54____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

2004 NOV 10 P 3: 12

DISTRICT COURT
DISTRICT OF MASS

|                                   |     |                          |
|-----------------------------------|-----|--------------------------|
| THE MILLGARD CORPORATION,<br>Plaintiff | ) ) ) |                          |
| v.                                | )   | **COMPLAINT**            |
| GADSBY HANNAH, LLP<br>Defendant   | ) ) ) | **04 CV 12388 RWZ**      |

MAGISTRATE JUDGE _Collings_

## PARTIES AND JURISDICTIONAL STATEMENT

1. The Plaintiff, The Millgard Corporation ("Millgard"), is a corporation organized under the laws of the State of Michigan having its principal place of business in Livonia, Wayne County, Michigan.

2. The Defendant, Gadsby Hannah, LLP ("Gadsby Hannah"), is a law firm operating as a limited liability partnership organized under the laws of the Commonwealth of Massachusetts having its principal place of business in Boston, Suffolk County, Massachusetts.

3. Millgard is currently operating under a Plan of Liquidation under Chapter 11 of the Bankruptcy Code approved by the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division. (Case No. 03-49710-R).

4. White Oak Corporation ("White Oak") is a corporation organized and existing under the laws of the State of Connecticut, having its principal place of business in Plainville, Connecticut.

5. National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is an insurance corporation organized and existing under the laws of the State of Pennsylvania, having its principal place of business in New York, New York.

1

6. This matter arises out of the negligent representation of and for erroneous legal advice provided to Millgard by Gadsby Hannah relative to claims made by Millgard against White Oak and its surety, National Union, with respect to specific facts and circumstances presented in a civil action brought in United States District Court for the District Court of Connecticut. [3:00CV1685(CFD)].

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332. This Court has original jurisdiction over the above-captioned action because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

8. Pursuant to 28 U.S.C. § 1391(a), venue is appropriate in the Commonwealth of Massachusetts because it is the principal place of business of the Defendant.


## COUNT I

9. Millgard re-alleges paragraphs one through eight above as if fully restated herein.

10. White Oak was the general contractor on a construction project owned by the State of Connecticut Department of Transportation (the "DOT") located in New Haven, Connecticut, and identified as "Replacement of Bridge No. 00337 (Tomlinson Bridge), U.S. Route 1 over the Quinnipiac River in the Town of New Haven" (the "Project").

11. On or about June 6, 1994, National Union, as surety, and White Oak, as principal, issued a Payment Bond (the "Bond"), identified as Bond No. 12-33-87, for the protection of all persons supplying labor, materials, and equipment used or reasonably required for use in connection with the project.

12. The Bond was issued pursuant to the requirements of section 49-41 of the Connecticut General Statutes and White Oak's contract with the DOT.

2

13. On or about March 22, 1996, Millgard entered into an agreement with White Oak, wherein Millgard, as a subcontractor to White Oak, agreed to provide labor, materials and equipment relating to certain excavation and foundation work on the project (the "Subcontract")..

14. Millgard began providing labor, materials and equipment to the project on or about October 31, 1997.

15. Beginning in early 1998, Millgard encountered quartz and granite boulders within the rock strata that obstructed its work.

16. The subsurface conditions encountered by Millgard differed materially from those indicated in the subsurface borings and soils report provided by the DOT and made a part of the subcontract.

17. As a result of the differing subsurface conditions, Millgard experienced significant time and cost overruns in the performance of its work.

18. Simultaneously with the discovery of the differing subsurface conditions, Millgard began consulting with Gadsby Hannah , at all times relevant to this litigation Millgard's counsel for matters located in the northeastern United States, as to its appropriate course of action and legal rights with respect to problems encountered on the project.

19. Millgard promptly notified White Oak of the problems it had encountered, and Millgard requested an equitable increase to its contract price as a result of the differing site conditions.

20. However, Gadsby Hannah neglected to inform Millgard of the effect of Connecticut General Statutes Section 4-61 which negatively impacted Millgard's rights to recovery for the differing subsurface conditions.

21. Upon information and belief, White Oak submitted a claim to the DOT for an increase in its contract price as a result of differing site conditions, which claim subsumed Millgard's

3

claim.

22. Millgard 's last day of contract drilling was September 15,1998.

23. On September 25, 1998, Millgard met with both White Oak and the DOT to discuss the differing site conditions encountered on the project.

24. Relying upon the advice provided by Gadsby Hannah, Millgard advised both White Oak and the DOT that the subsurface conditions constituted a cardinal change to its contract entitling Millgard to suspend its work on the Project until its issues were resolved.

25. Over the course of several months, White Oak and the DOT engaged in mediation to address White Oak's claim and the differing site conditions.

26. While Millgard was not a formal party to the mediation, Millgard participated in the mediation and was at all times represented by Gadsby Hannah.

27. Millgard was repeatedly assured by White Oak that its claim would soon be resolved with the DOT and that Millgard would be able to complete its work on the Project.

28. Millgard's involvement in the mediation between White Oak and the DOT concluded on or about May 19, 1999.

29. By letter dated May 21, 1999, White Oak wrongfully terminated Millgard's subcontract.

30. Upon receipt of the termination letter, Millgard immediately contacted White Oak to inquire as to the reasoning behind the termination.

31. White Oak advised Millgard that it was just protecting its legal rights and that White Oak intended to arbitrate its claims, which subsumed Millgard's claim, against the DOT.

32. At the same time, White Oak advised Millgard that it still expected Millgard to return to work on the project and began negotiating Millgard's return to work on a cost plus basis.

33. Based on White Oak's representations, Millgard remained on stand-by to complete its work

4

on the Project.

34. At the end of August 1999, White Oak contacted Millgard and directed Millgard to demobilize from the project.

35. During the week ending September 7, 1999, Millgard demobilized from the project.

36. Millgard last furnished labor and/or equipment to the project on September 7, 1999.

37. Although Millgard performed its obligations under the subcontract with White Oak, White Oak refused and failed to pay Millgard in accordance with the terms of the subcontract and section 49-41a of the Connecticut General Statutes.

38. White Oak's failure to pay Millgard the subcontract balance of $70,730.00, as well as $1,083,585.06 for additional work performed by Millgard as the result of the differing site conditions constituted a material breach of its subcontract with Millgard.

39. Connecticut General Statutes Section 49-42 (the payment bond statute) contains stringent requirements for notice of claims and commencement of lawsuits. (See Exh. "A" attached.)

40. For payment bonds issued prior to October 1994, the statute provided that notice of the claim must be provided to both the surety and the principal within 180 days of the claimant's last day of work on the job and a lawsuit must be commenced within one year of that date.

41. Beginning in September of 1998 Gadsby Hannah recommended to Millgard that it forbear providing notice of claim under the payment bond to White Oak and National Union and erroneously advised Millgard that notice to the surety and principal need not be made until within 210 days of payment by DOT to White Oak and a lawsuit commenced within one year of that date. (The language of the post October 1994 revision of C.G.S. § 49-42.)

42. On April 7, 2000 Gadsby Hannah sent a letter to National Union on behalf of Millgard asserting a claim against the payment bond.

5

43. Subsequently realizing that its April 7, 2000 letter was technically deficient, on May 5, 2000 Gadsby Hannah sent another demand letter to National Union on behalf of Millgard asserting a claim against the payment bond.

44. National Union denied the claim on the basis that notice was untimely and that Millgard failed to file suit within the time required under C.G.S. § 49-42.

45. In July of 2000 Millgard retained the law firm of Michelson, Kane Royster & Barger, P.C. to review the denial by National Union.

46. On August 31, 2000 Millgard filed a civil action brought in United States District Court for the District Court of Connecticut [3:00CV1685(CFD)] against White Oak and National Union.

47. On September 30, 2002 the claims against National Union in that action were dismissed by the Court because Gadsby Hannah failed to provide timely notice of Millgard's bond claim or to file suit in accordance with the time requirements of C.G.S. § 49-42.

48. Based upon disclosure of White Oak's assets in that lawsuit, which indicate that White Oak is judgment proof, Millgard voluntarily dismissed its case against White Oak prior to trial because its assets appeared to be fully encumbered by secured debts to National Union and other secured creditors.

49. Millgard has been damaged by the erroneous legal advice and negligent representation provided by Gadsby Hannah in the amount of the subcontract balance of $70,730.00, as well as $1,083,585.06 for additional work performed by Millgard as the result of the differing site conditions plus other consequential damages sustained by Millgard as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the

6

Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

## COUNT II

50. Millgard re-alleges paragraphs one through forty nine above as if fully restated herein.

51. While the mediation process was ongoing, Millgard also participated in negotiations with White Oak and the DOT for additional work required on account of the differing site conditions and reached agreement to perform that work for $6,130,296.00.

52. Included in that amount was $1,485,625.00 for Millgard's anticipated overhead and profit.

53. When Millgard was subsequently wrongfully terminated by White Oak, unknown to Millgard, National Union had taken over the management of White Oak.

54. Further, when White Oak terminated Millgard, National Union was aware that Millgard's period to provide notice of a bond claim and file suit on same had lapsed by statute.

55. Millgard has been damaged by the erroneous legal advice and negligent representation provided by Gadsby Hannah in that it suffered the loss of $1,485,625.00 in anticipated overhead and profit for the additional work required to overcome the differing subsurface conditions plus other consequential damages sustained by Millgard as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

7

## COUNT III

56. Millgard re-alleges paragraphs one through fifty five above as if fully restated herein.

57. At all times relevant to this lawsuit, Millgard consulted with Gadsby Hannah concerning the damages it had incurred in attempting to perform its obligations under its Subcontract with White Oak.

58. Gadsby Hannah provided to Millgard legal advice relative to the problems with the Subcontract and charged Millgard for its services.

59. Millgard has paid Gadsby Hannah $19,010.03 in legal fees with respect to its disputes with White Oak and National Union.

60. Gadsby Hannah undertook to do so, and was obliged to exercise care, skill and diligence but failed in all requisites to advise Millgard of the consequences of C.G.S. § 4-61 and failed to give notice to National Union within the time as required by C.G.S. §49-42, as a condition precedent to the bringing of an action against White Oak and National Union.

61. By reason of the fault and neglect of Gadsby Hannah, Millgard was unable to recover against National Union, has lost all claims for the recovery of damages against White Oak because of its financial condition and has been obligated to expend additional funds for legal advice, the costs of this action and suffered other consequential damages as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

The Plaintiff demands a trial by jury on all counts contained in this complaint.

8

The Millgard Corporation
By its Attorney,

John S. Davagian, II
BBO # 114740
Davagian & Associates
365 Boston Post Road, Ste. 200
Sudbury, MA 01776-3023
978-443-3443

9

# EXHIBIT C

05/24/99  16:50  FAX 7344250624          MILLGARD CORP.  →→→ GADSBY          002/002

# white oak
### C O R P O R A T I O N

May 21, 1999

The Millgard Corporation
12822 Stark Road
P.O. Box 510027
Livonia, Michigan 48151

CERTIFIED RRR
#Z-277-666-203

Attention:  Dennis Millgard

RE:  PROJECT 92-435, NEW HAVEN

Gentlemen:

In view of the fact you were not successful in settling your
claim with the Connecticut DOT during the mediation session
held on May 19, 1999 and you personally informed the under-
signed, the Mediator, and our Attorney that you were not
returning to work, White Oak Corporation has no alternative
but to terminate your contract and to complete the work in
some other manner.  According to White Oak's contract with
the CT. DOT which was incorporated in your subcontract, in
the event of a dispute, you are nevertheless required to
complete your work and seek redress at that time.  By your
refusal to complete your work, you have breached your
contract with White Oak.  In addition to the damages in-
curred in finishing the contract items included in your
contract, White Oak will seek damages suffered by it on
account of your delay even up to this date.

Also, we would remind you that our letter of February 22,
1999 directed you to resume work on March 1, 1999.  You
chose not to comply with our directive and on March 2, 1999
we sent you, by certified mail, a Notice of Cancellation.
This letter is considered an affirmation of that notice.

Very truly yours,

WHITE OAK CORPORATION

JOHN F. MORRISSEY, JR.
President

JFM:jms

EXHIBIT
_Swann_
65
_MAR 6 2002_

GH 0705

05/24/99  16:50 FAX 7344250624      MILLGARD CORP.   →→→ GADSBY              ☑001/002

# The MILLGARD Corporation



*"A TOTAL COMMITMENT TO ACHIEVE EXCELLENCE."*

# FAX TRANSMITTAL SHEET

**DATE:** MAY 24, 1999

**TO:** GADSBY & HANNAH

**ATTENTION:** RON BUSCONI

**FAX #:**

**FROM:** DENNIS MILLGARD

**# OF PAGES:** 2                    (INCLUDING THIS PAGE)

**COMMENTS:**

JUST RECEIVED THIS VIA FAX.  HAVE NOT RECEIVED CERTIFIED COPY YET.

**N O T E :**

IF YOU DO NOT RECEIVE ALL PAGES OR HAVE ANY
PROBLEMS WITH THIS TRANSMITTAL, PLEASE CALL
CARRIE AT (734) 425-8550.

12822 Stark Road · P.O. Box 510027 · Livonia, Michigan 48151 · (734) 425-8550 / FAX 425-0624

GH 0706

# EXHIBIT D

**VIA FACSIMILE - (860) 793-2119**

# The MILLGARD Corporation

**MC**

SEPTEMBER 11, 1998

RECEIVED
SEP 1 5 1998
White Oak Corporation

WHITE OAK CORPORATION
7 West Main Street
Plainville, CT 06062

ATTENTION:    MR. JACK MORRISSEY, JR.

SUBJECT:    TOMLINSON BRIDGE
NEW HAVEN, CONNECTICUT
TMC JOB NO. C-1955

Dear Jack:

We are in receipt of the State of Connecticut's letter you faxed us just recently. We have continued to work on this project for the past nine months in good faith that the obvious change of condition situation would be quite apparent to everyone connected with this project.

For whatever reason, as explained in the referenced letter, the State has denied any responsibility for existence of a differing site condition. We take exception to this determination as it is more than obvious it was decided only on the basis of what is in the best interest for the State of Connecticut in the short run and not based on getting the job done.

We feel we have been lead on by the State for the past several months, and therefore, it is in our best interest to discontinue work on this project as of Monday, September 14, 1998.

This was a unilateral decision by the State without any discussion with White Oak, TMC or our consultant. We are willing to attend any meeting any time to discuss our and the State actions in this matter.

We cannot and will not work for a owner who has so irresponsibly made such a major decision without even discussing the matter with the contractors of the project.

Sincerely,

THE MILLGARD CORPORATION

V. Dennis Millgard
President

VDM:DMM/LTR91198.WOC

EXHIBIT
D. Millgard
20
AMR 9-21-05

 12822 Stark Road • P.O. Box 510027 • Livonia, Michigan 48151 • (734) 425-8550 / FAX 425-0624 

MK - 01424

# EXHIBIT E

Corporation

CONTINUE FROM PREVIOUS PAGE    001

FEBRUARY 4, 1999

**WHITE OAK CORPORATION**
7 West Main Street
Plainville, CT 06062

ATTENTION:   Mr. John F. Morrissey, Jr.

PROJECT:   TOMLINSON BRIDGE REPLACEMENT
NEW HAVEN, CONNECTICUT
CAISSON FOUNDATIONS
TMC JOB C-1955

RE:   W.O.C. LETTER 1/27/99

Gentlemen:

We are in receipt of your letter dated 1/27/99 wherein you request that we remobilize our operations for the caissons on the subject project. Please be advised that the new contract required borings performed in these areas indicate a change in the character of the rock from that shown in the bid borings.

On the basis of this information and prior to any remobilization, we request that a meeting be held as soon as possible to discuss the caisson installation procedures and payment for the added work that will be required. As previously discussed, the payment for the added work performed to date on the project has not been resolved, and in fact mediation is ongoing in an effort to bring about a resolution.

With regard to the requested meeting, there are numerous issues to be resolved such as:

1.   Safety (stability) of the cofferdam sheeting.

2.   Mutual agreement by all parties on the required revisions to the caisson installation procedures due to changes in the character of the work (i.e., quartz and granite inclusions). The affect of the sloping rock is magnified by the quartz and granite inclusions.

3.   Payment for additional work due to the aforementioned changes.



12922 Stark Road • P.O. Box 510027 • Livonia, Michigan 48151 • (734) 425-8550 / FAX 425-0624

01/23/01  15:01 FAX 860 278 2179      ROGIN NASSAU                    ☑002

MILLGARD

White Oak Corporation
February 4, 1999
Page 2

4.    Resolution of the financial impact due to equipment standby since September 15, 1998.

5.    The basis of the 30% increase in the socket length on the N.W. lift pier.

6.    Questionable backcharges from White Oak Corporation on the I-95 project in Bridgeport, Connecticut.

Sincerely,

THE MILLGARD CORPORATION

John E. Luebbe
Vice President

DMW:JLLT0281.WHT

MK - 01429

# EXHIBIT F

# The MILLGARD Corporation



*"A TOTAL COMMITMENT TO ACHIEVE EXCELLENCE."*

## FAX TRANSMITTAL SHEET

**DATE:** 6-14-99

**TO:** GADSBY & HANNAH

**ATTENTION:** MR. JOHN P. GIFFUNE, ESQ.

**FAX #:** 617-345-7050

**FROM:** RICHARD MILLGARD

**# OF PAGES:** 8 (INCLUDING THIS PAGE)

**COMMENTS:**

PLEASE CALL IF ANY ADDITIONAL INFO IS REQD.

HAVE A GREAT DAY

RICN

**N O T E :**

IF YOU DO NOT RECEIVE ALL PAGES OR HAVE ANY PROBLEMS WITH THIS TRANSMITTAL, PLEASE CALL CARRIE AT (734) 425-8550.



12822 Stark Road • P.O. Box 510027 • Livonia, Michigan 48151 • (734) 425-8550 / FAX 425-0624



M 00428

C-1955
CONTR

## AGREEMENT

THIS AGREEMENT made and entered into this 22nd day of March, 1996 by and between WHITE OAK CORPORATION, of the Town of Plainville, County of Hartford, State of Connecticut, hereinafter referred to as "CONTRACTOR" and MILLGARD CORPORATION, 12822 STARK ROAD, P.O. BOX 2248, LIVONIA, MICHIGAN 48151, hereinafter referred to as "SUBCONTRACTOR":

## WITNESSETH

WHEREAS, Contractor is engaged in the performance of a contract with the Connecticut Department of Transportation, Bureau of Highways (Department), Wethersfield, Connecticut, for construction of a Project known as

PROJECT 92-435, NEW HAVEN

and is desirous of subletting certain items of said project, as more specifically set forth on Schedule "A" attached hereto, and

WHEREAS, Subcontractor is willing to perform said work as a legal Sub-contractor in accordance with the terms and conditions as hereinafter set forth,

NOW THEREFORE, in consideration of the mutual promises of the parties hereto, it is agreed as follows:

1.  Subcontractor agrees that all work performed by him shall be in accordance with all the contract plans, special provisions, general conditions, required provisions, drawings, addenda, specifications, required contract provisions of federal aid construction contracts, and any and all documents forming part of said contract between Contractor and said Department for said project, all of which Subcontractor has read and fully understands, and which are hereby made a part of this contract and are incorporated herein by reference.

2.  Subcontractor agrees to provide all labor, tools, forms, equipment, and material necessary to perform the work as more specifically designated on Schedule "A" attached hereto.  The quantities listed on Schedule "A" are merely estimates of the work to be performed if this is a unit price contract.  Sub-contractor agrees that in the event actual quantities are different from those listed on Schedule "A", or in the event revisions of the plans and/or speci-fications result in an increase or decrease in such quantities, Subcontractor shall nevertheless complete the work in the same manner and for the same unit prices as if the work had been originally contained in Schedule "A".

3.  In consideration of the work to be performed, Contractor agrees to pay and Subcontractor hereby accepts the schedule of unit prices as listed in Schedule "A" attached hereto.

4.  Subcontractor agrees to commence the work as outlined upon five (5) days notice from Contractor and to perform the work in a diligent and workmanlike manner and with sufficient and competent men in order to complete the same in accordance with the time schedule as shown on Schedule "A", if any, or within a reasonable time.

M 00429

-2-

5.  This agreement provides for partial payments by the Contractor to the Sub-contractor as provided herein.  It is understood, however, that no payment made to the Subcontractor shall operate or be construed as an admission by the Contractor or the Department that the Subcontractor's work or material supplied is accepted or that it's contract has been fully complied with.  Contractor reserves the right to demand full compliance notwithstanding payment to the Subcontractor.

6.  Subcontractor shall not assign or transfer this contract without written consent of the Contractor.

7.  Subcontractor agrees to save the Contractor harmless and defend from any and all claims whatsoever arising as a result of Subcontractor's operations.  The Subcontractor shall obtain and maintain, at its own expense, the following insurance in a company or companies approved by the Contractor and/or Owner:

(a)  Worker's Compensation Insurance in accordance with the provisions of the Principal Contract and applicable law.

(b)  Public Liability Insurance (including Contractor's Protective Insurance) in the amount of not less than $1,000,000 for injury to each person and $2,000,000 for injury to any number of persons in one accident; and property damage of not less than $500,000 for one accident and $1,000,000 to cover more than one accident.

(c)  Automobile comprehensive liability covering its own, hired and non-owned vehicles in the amount of $1,000,000 for injury to each person and $2,000,000 for injury to any number of persons in one accident and property damage liability of at least $500,000 for each accident.

(d)  Liability Insurance naming Contractor as an additional insured against claims by Subcontractor and its employees for injuries or damages sustained by such employees or agents of Subcontractor in amounts consistent with those provided in Subparagraph (b) above.

The policies (a) shall contain a provision that they may not be cancelled, terminated, or modified without fifteen (15) days written notice sent to the Contractor by registered mail and (b) shall not contain any exclusions from liability other than those forming part of the standard basic unamended and unendorsed form of policy.  Prior to commencement of work hereunder, the Sub-contractor shall furnish to the Contractor and the Owner, certificates or copies of the policies showing that such insurance is in force.  If the Subcontractor shall fail to procure the above insurance, the Contractor may do so in the Sub-contractor's name and may charge the cost thereof to the Subcontractor, or the Contractor may, at his option, terminate this Subcontract.  The Subcontractor agrees to supply the Contractor the information required to procure such insurance.

8.  Subcontractor agrees to pay his employees wages in compliance with the union wage scale applicable to said project, and further, to comply with all labor union rules, conditions, regulations, and wage scales the Contractor is subject to under Contractor's agreement with any of the labor unions, including health, welfare, pension, and training fund contributions.

9.  Subcontractor agrees to observe all federal, state, and local laws, rules and regulations, and to make himself familiar with such laws, rules and regulations particularly as they pertain to said project.

M 00430

-3-

10.    Subcontractor agrees to furnish Contractor with a daily time slip indicating production quantities and a certified copy of its weekly payroll, payroll affidavits, and material samples and certificates, as may be required.

11.    Subcontractor shall make no claim for additional work unless done in pursuance of written order from Contractor, and notice of all such claims shall be given to Contractor in writing before the next ensuing payment or shall be considered as abandoned.

12.    Department and/or Contractor may make changes in the work covered by this subcontract including additions and elimination of portions of the work to be performed.    Subcontractor shall perform the work as changed without delay.

13.    Subcontractor shall submit, in writing, any claims for adjustment in price, for changes directed by the Department, or as a result of deficiencies or dis-crepancies in the contract documents, to Contractor in time to allow Contractor to comply with the applicable provisions of the contract documents.

   (a)    Contractor shall process said claims in the manner provided by and according to the provisions of the contract documents. Subcontractor adjustments shall be made only to the extent that Contractor is entitled to relief from the Department or must grant relief to the Department.

   (b)    For changes ordered by Contractor, independent of Depart-ment or contract documents, Subcontractor shall be entitled to an equitable adjustment in the subcontract price.

14.    In the case of any dispute between Contractor and Subcontractor, due to any action of the Department or involving the contract documents, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to the Department by the terms of the contract documents, and by any and all preliminary and final decisions or determinations made thereunder.

   (a)    With respect to any controversy between Contractor and Subcontractor not involving Department or the contract documents, Contractor shall issue a decision which shall be followed by Subcontractor.  If the Subcontractor is correct as to the controversy, Subcontractor shall be entitled to an equitable adjustment in the contract price as its sole remedy.

15.    Subcontractor shall warrant and guarantee his full performance, including labor and materials, until final acceptance by the Department, without cost to the Contractor.

16.    No verbal order, objection, claim, or notice by either party to the other shall be of effect or binding, and no evidence of such order, objection, claim, or notice shall be introduced in any suit-of-law or equity wherein the parties are involved.

17.    Subcontractor shall execute such lien waivers for materials and labor as the Contractor shall desire, the failure of which by Subcontractor shall be grounds for immediate termination of this agreement by Contractor.

M 00431

-4-

18. Subcontractor agrees to clean up all debris from his work as the job progresses and to dispose of same and not to allow any accumulation to occur.

19. Contractor agrees to pay Subcontractor monthly, in accordance with quantities approved for payment by the Department on State Estimate Sheets for work performed the previous month, when the Contractor is paid by the State for same, providing, however, that Subcontractor complies with requirements of all clauses contained herein.

20. Subcontractor shall, simultaneously, with the execution of this contract, provide and furnish to the Contractor, a performance and payment bond running to the Contractor is a sum equal to the total price of this contract with corporate sureties satisfactory to the Contractor, conditioned upon the faithful performance by the Subcontractor of this Contract in each and every of its particulars, as it may be from time to time modified by Change Orders or Construction Orders, such bond to be in a form and otherwise to contain such provisions as are reasonably satisfactory to the Contractor.

21. Subcontractor agrees that should he fail at any time to provide such labor, materials, and equipment as contractor shall deem adequate to perform said work promptly and efficiently, or fail to carry out any order of the Contractor, or fail to prosecute said work with promptness and diligence, or fail to perform any of the agreements contained herein, then and in that event, Contractor shall have the right forthwith to provide such labor, materials, and equipment or to subcontract the same as it shall deem necessary to perform said work and the cost thereof shall be paid by the Subcontractor to the Contractor, and Contractor may apply in payment thereof any payments then due or thereafter to become due to Subcontractor under this agreement.

22. Subcontractor hereby certifies that he has read and understood and shall abide by the required contract provisions of this contract as it relates to Equal Employment Opportunity responsibilities.

23. Subcontractor, for itself and all persons claiming through or under it, hereby acknowledges that this agreement constitutes a commercial transaction as such term is used and defined in Public Act #431 of the Connecticut General Statutes, Revision of 1973, and hereby expressly waives any and all rights which are or may be conferred upon the Subcontractor by said Act or to any notice of hearing prior to a prejudgment remedy.

24. In the event Contractor is required to engage the services of an attorney-at-law to enforce its rights under this agreement, Subcontractor shall be liable for Contractor's reasonable expenses for it's attorney's fees.

M 00432

-5-

IN WITNESS WHEREOF, the parties hereto have hereunto caused these presents to be signed in duplicate the day and year above first written.

SIGNED, SEALED, AND DELIVERED
IN THE PRESENCE OF:

WHITE OAK CORPORATION

BY: _____
JOHN F. MORRISSEY, JR.
Vice President

MILLGARD CORPORATION

BY: _____

M 00433

MILLGARD CORPORATION          SCHEDULE "A"
PROJECT 92-435

| ITEM NO. | DESCRIPTION | QTY. & UNIT | UNIT PRICE | TOTAL AMT. |
|----------|-------------|-------------|------------|------------|
| 702804A | FURNISH/INSTALL 30" DIA. CAISSON | 10,600  LF | $ 100.00 | $ 1,060,000.00 |
| 702833A | TEST SHAFT 30" CAISSON | 465  LF | 350.00 | 162,750.00 |
| 702930A | DRILL ROCK SOCKET 30" CAISSON | 3,550  LF | 260.00 | 923,000.00 |
|  | MOBILIZATION | LS | 150,000.00 | 150,000.00 |

THE FOLLOWING IS INCLUDED IN BASE PRICE:
1. Caisson shaft excavation
2. Utilizing operated service crane furnished by others.
3. Placing permanent casing furnished by others.
4. One (1) mobilization.

THE FOLLOWING IS NOT INCLUDED AND SHALL BE PERFORMED BY OTHERS:
1. Engineering layout including center stakes & cutoff elevations for each caisson location.
2. Furnishing/placing of all reinforcing steel and/or anchor bolts & furnishing and placing templets.
3. Removing & disposing of caisson spoil.
4. Providing clearance & suitable all-weather access to each caisson location.
5. Forming for caissons that extend above working grade.
6. Concrete mix/design or testing.
7. Soil testing services.
8. Providing necessary electrical power and water adjacent to the caisson work.
9. Relocating & protecting all utilities and adjoining structures which may be affected by the caisson work.
10. Purging of gas from caisson excavation (if gas is encountered, absolutely no entry will be permitted).
11. Where contaminated and/or hazardous waste materials are encountered, Millgard Corporation shall be entitled to all added costs for delays, excavation and any other associated extra costs.
12. Venting of caisson excavations.
13. It is assumed that no hazardous waste materials will be encountered.
14. Miscellaneous:  Providing watchmen, flagmen, traffic control or barricades, fences, street cleaning services, sanitation services, building permits, notifications to adjacent property owners or utility companies.
15. Furnish/placing concrete.
16. Furnish permanent casing.
17. Soil borings with rock cores.
18.  - Drilling barge
     - Service barge
     - Materials barge
     - Operated tug & transportation/safety boats (specific barge requirements should be discussed).
19. Turbidity controls/pollution liability insurance.
20. Cut-off of permanent casing at proper elevation.
21. Mechanical connectors for resteel hook bars.
22. Furnish permanent casing shoes.
23. Adequate onshore laydown for welding casing.
24. Integrity testing.
25. Furnishing operated service crane for TMC use.

M 00434

MILLGARD CORPORATION                SCHEDULE "A" CONTINUED
PROJECT 92-435

CLARIFICATIONS:

1.  Drilling barge to be of sufficient size to accommodate 150T crane plus
    drill unit & assorted tools.
2.  Mobilization unit price will be paid in full at completion of mobilization.
    This is an exception to project requirements.

SPECIAL CONDITIONS:

1.  The work covered by this proposal may, by its nature, cause some unavoidable
    earth movement that could damage adjoining utilities, structures or pavement.
    The Millgard Corporation shall have no responsibility whatsoever for earth
    movement which is not directly caused by its negligence, failure to follow
    applicable plans and specifications, or failure to follow generally accepted
    construction procedures of the shaft drilling industry.

2.  White Oak Corporation shall defend, indemnify and hold harmless The Millgard
    Corporation and its officers, agents and employees from any injury or damage
    arising out of or in any way relating to any discovery of hazardous materials
    or suspected hazardous materials.  The Millgard Corporation shall have no
    liability for any type of hazardous or toxic waste, material, chemical,
    compound or substance, or any other type of environmental hazard, contamination,
    or pollution, whether latent or patent, or the release thereof or the violation
    of any law or regulation relating thereto and White Oak Corporation shall
    indemnify The Millgard Corporation for any and all loss, cost, or damage
    actually sustained or incurred by The Millgard Corporation in connection
    therewith.