UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE MILLGARD CORPORATION,<br>     Plaintiff<br><br>v.<br><br>GADSBY HANNAH, LLP<br>     Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 04-12388-RWZ |

**AFFIDAVIT OF JOHN S. DAVAGIAN, II
IN SUPPORT OF OPPOSITION TO
DEFENDANT'S MOTION FOR RECONSIDERATION**

Upon oath I, <u>John S. Davagian, II</u>, depose and say as follows:

1. I am an attorney duly licensed to practice law in the Commonwealth of Massachusetts and before the United States District Court of Massachusetts.

2. I am the principal in the law firm of Davagian & Associates, 365 Boston Post Road, Suite 200, Sudbury, Massachusetts 01776.

3. Davagian & Associates is counsel for the Plaintiff, The Millgard Corporation ("TMC"), in this action.

4. I have personal knowledge of the facts contained herein and if called as a witness could competently testify thereto.

5. Attached hereto as Exhibit A is a true and correct copy of excerpts from the deposition transcript of V. Dennis Millgard.

6. Attached hereto as Exhibit B is a true and correct copy of excerpts from the deposition transcript of Ronald G. Busconi.

1

7. Attached hereto as Exhibit C is a true and correct copy of deposition exhibit no. 69 (Ron Busconi's handwritten notes dated July 27, 1999).

WHEREFORE, I have read the foregoing and state under the penalties of perjury that the information contained herein is true and accurate to the best of my knowledge.


Dated: 8/1/2006                                     /s/ John S. Davagian, II
                                                    John S. Davagian, II


## CERTIFICATE OF SERVICE

I, John S. Davagian, II, hereby certify that on August 1, 2006 I served a copy of the foregoing document upon counsel for the Defendant, Terri L. Pastori, Esquire, by electronic mail at tpastori@peabodyarnold.com.

/s/ John S. Davagian, II

John S. Davagian, II, Esq.

# Exhibit "A"

```
                                                     Page 1
 1                                  Volume:   I
 2                                  Pages:    1-145
 3                                  Exhibits: 18-21
 4          UNITED STATES DISTRICT COURT
 5            DISTRICT OF MASSACHUSETTS
 6               C.A. No. 04-12388-RWZ
 7
 8   ------------------------------------
 9   THE MILLGARD CORPORATION,
10              Plaintiff,
11      v.
12   GADSBY HANNAH, LLP,
13              Defendant.
14   ------------------------------------
15
16
17        DEPOSITION of V. DENNIS MILLGARD
18      Wednesday, September 21, 2005, 10:25 a.m.
19           PEABODY & ARNOLD, LLP
20              30 Rowes Wharf
21            Boston, Massachusetts
22
23
24      Court Reporter:  Paulette Cook, RPR/RMR
```

Page 138

1  phone conversation with Ron like I think it was
2  around the middle of June, and he talked to Lassman,
3  and Lassman told him the guy's name in ConnDOT who
4  would approve this.
5      Q. I take it those conversations continued over
6  a period of time with promises being made that you
7  were going to be --
8      A. Well, May 21st I get a fax from Jack
9  Morrissey terminating us. So I called Jack and I
10 said what's going on, and he said forget that,
11 that's AIG. So I said what do you mean forget it?
12 You just terminated us. He said forget it. He said
13 we're going to continue on this. Now what we have
14 to do is we have to figure out what the second phase
15 is going to cost. And there's plenty of paperwork
16 that shows all of that.
17     Q. What did Mr. Morrissey mean that it was from
18 AIG -- that it was --
19     A. It was their bonding company.
20     Q. And their bonding company was making them
21 send a termination letter to you?
22     A. Yeah, but he said don't worry about it; it's
23 garbage.
24     Q. Okay.

Page 139

1      A. Over the next month or so Jack and I were
2  having conversations and paperwork going back and
3  forth. I said on the second phase now, the other 80
4  percent, give us a schedule. Are we going to need
5  one rig, two rigs, three rigs -- you know, four
6  barges, five barges, six barges, so on. It came
7  back. He got a schedule from Peter Huntsman, and
8  that's what we worked our numbers out on.
9      Q. Now at some point --
10     A. So now -- not only did we think we were
11 going to get the million one, but we thought we were
12 going to get another 7 and a half million bucks to
13 finish the darn thing.
14     Q. And at some point it became apparent to you
15 that that was not going to occur?
16     A. Well, somewhere after we got the May 21st
17 termination letter from AIG, I had more
18 conversations with Jack Morrissey. I said what do
19 you mean AIG. What's AIG got to do with this? We
20 did find out later on that right about that time is
21 when AIG stepped in and took over White Oak. They
22 were calling the shots.
23         Somewhere around the end of July or
24 August of '99 Jack said I can't negotiate with you

Page 140

1  anymore. I've been told we have to do this job
2  ourselves. I said by who. He said AIG.
3          And he said might as well move your
4  equipment off. So we moved our equipment off
5  sometime in September of '99.
6      Q. Between September of '98 and September of
7  '99 did you do any work on the project?
8      A. No.
9      Q. And some time in September of '99 you moved
10 your material off the site?
11     A. Yeah, September 10th or 15th. Somewhere in
12 there. Somewhere around the middle of September.
13     Q. What's the next step that you took with
14 respect to this project, if any?
15     A. Well, we had conversations about what to do
16 here. We're sitting. There was some meetings and
17 discussions generated with AIG. We did find out
18 that somewhere around that time frame that AIG had
19 taken over White Oak; that a guy by the name of
20 Teflon who owned White Oak and some other companies
21 had signed off and that it was all being handled by
22 AIG.
23     Q. How did you find that out?
24     A. Probably Jack Morrissey.

Page 141

1      Q. Was that the subject of meetings that you
2  had with Gadsby & Hannah after September of '99?
3      A. I don't recall for sure. I know there were
4  discussions -- when I say ongoing discussions, I
5  don't know if we talked once a month or -- or we
6  didn't talk for two months about that particular
7  project.
8      Q. Okay.
9      A. But we had this money laying out there and
10 we had to do something about it. So then -- then I
11 know there was discussions about filing a suit.
12     Q. Okay. And --
13     A. Why we didn't file suit, I don't know.
14     Q. When were those discussions about filing
15 suit?
16     A. Well, I am certain they happened at the time
17 we were told to move off the job.
18     Q. In September of 1999?
19     A. Yeah.
20     Q. Well, at that point did you advise Gadsby &
21 Hannah and request that they commence a lawsuit?
22     A. I don't recall. The next thing I do recall
23 though is them making notice to AIG in April or May
24 or something like that of 2000.

36 (Pages 138 to 141)

# Exhibit "B"

```
                                                              Page 1
1                                      VOL. I
2                                      PAGES 1-111
3                                      EXHIBITS: 51-71
4              UNITED STATES DISTRICT COURT
5               DISTRICT OF MASSACHUSETTS
6
7    Civil Action No. 04-12388-RWZ
8    - - - - - - - - - - - - - - - - - - -
9    THE MILLGARD CORPORATION,
10              Plaintiff,
11   vs.
12   GADSBY & HANNAH, LLP,
13              Defendant.
14   - - - - - - - - - - - - - - - - - - -
15
16         DEPOSITION OF RONALD G. BUSCONI
17            Thursday, November 10, 2005
18               10:08 a.m. - 3:00 p.m.
19               Peabody & Arnold, LLP
20                  30 Rowes Wharf
21            Boston, Massachusetts 02110
22
23    Court Reporter:  Doris M. Jones, RPR
24
```

Page 86

1  you're in control of the case.
2      Q. When you say control, what -- doesn't the
3  final resolution of -- strike that.
4          When you say control, doesn't the client
5  always have the final say?
6      A. The client has the final say and the
7  ultimate disposition of the case but when you're
8  officially retained on the matter you assume control
9  of the case, subject to decisionmaking in
10 conjunction with the client on that matter. But
11 you're in control as opposed to just rendering
12 advice based on a fact pattern given to you by the
13 client.
14     Q. How does the nature of the work differ?
15     A. You supply an answer given to you based on
16 the fact pattern presented by the client.
17     Q. Well, we have discussed a number of exhibits
18 to this point in time. Chronologically we're in May
19 of 1999, shortly after the second mediation session,
20 and there's been an exchange of documents back and
21 forth between Millgard and Gadsby Hannah.
22     A. Yes.
23     Q. How does that situation differ? I'm trying
24 to understand.

Page 87

1      A. Dennis Millgard controlled the situation and
2  Dennis Millgard set up the mediation. Dennis
3  Millgard did the negotiation with White Oak, Dennis
4  Millgard did the negotiation with Carmen Reese.
5  Dennis sent papers on to me and said what do you
6  think of my presentation, what do you think of this,
7  what do you think of that. Based on the papers he
8  sent to me, I gave him advice.
9      Q. And how did that change in March of 2000?
10     A. Because when they came in in March of 2000
11 we said we've got to see all the documents involved
12 in Tomlinson and in particular get us the bonds as
13 soon as possible. Now that the deal has fallen
14 through, we have to look into the bonds as soon as
15 possible.
16         Up until that time everything was coming
17 up roses for Millgard Corporation. They were always
18 going to go back to work and the State of
19 Connecticut had made an exception for them in the
20 mediation and the arbitration and they had a
21 concession from Connecticut and White Oak that they
22 would be able to participate in any arbitration
23 against the state. There was no -- and that was
24 different from what was presented to us in March of

Page 88

1  2000. Everything had gone awry by then. The wheels
2  had come off the wagon by that time.
3      Q. Well, we've talked about several letters
4  that Millgard received and passed along to you from
5  late February of '99 through May of '99, which you
6  yourself have described during your testimony as
7  presenting serious issues. Is that fair? Is that a
8  fair characterization on my part?
9      A. Yes.
10     Q. Did you during that time frame ever express
11 to Millgard concern to the level of look, this is so
12 serious that you really ought to get me copies of
13 the contract and the bonds and all of the pertinent
14 information because this is really getting to be a
15 serious problem?
16     A. On the occasion of the two letters,
17 particularly the one on termination, I said to you
18 earlier I called Dennis and I said Dennis, this is
19 serious. That's when he said to me Jack Morrissey
20 said the surety told me to send this letter out and
21 don't worry about anything, everything is under
22 control. Dennis was in control of this situation
23 and led me, led Gadsby to believe this matter would
24 be resolved. He was in negotiations with the state,

Page 89

1  he was in negotiations with White Oak.
2      Q. Did you ever ask him or inquire of him that
3  since he felt that everything was so much under
4  control why do you need my advice?
5      A. No, I didn't say that to him. I went -- if
6  you recall the correspondence, I went down to --
7          MR. STONE: Ron, answer the question.
8      A. No, I did not.
9      Q. Subsequent to --
10     A. Are we finished with this exhibit?
11     Q. Yes.
12         Subsequent to the May mediation session
13 and the letters that we were just discussing, did
14 you ever speak directly with White Oak's attorney?
15     A. Yes. Dennis called me and asked me to call
16 Ed Lassman. There was some problem about someone
17 using Millgard's equipment or they wanted to get
18 equipment off the site or something. And he asked
19 me to call Ed Lassman. So I called Ed Lassman and
20 had a conversation with him and reported the results
21 to Dennis.
22     Q. Okay. Exhibit 38 from yesterday. Exhibit
23 38 is a memo from Dennis Millgard to his own file
24 recording or noting comments you made during a

Page 90

1  conversation. Does that memo refresh your
2  recollection?
3    A. This was an an earlier conversation I had
4  with Ed Lassman, I believe. Dennis asked me to call
5  Lassman and see if I could get an update of what was
6  going on with respect to the negotiations between
7  White Oak and the State of Connecticut.
8    Q. And is the end result of this that it
9  appears that the mediation had fallen apart?
10   A. Well, in number 3 there was -- White Oak
11 said that they were going to go to arbitration and
12 they would make Millgard part of the arbitration.
13 The Millgard portion would be part of the
14 arbitration. I don't recall what happened with
15 respect to the mediation, but the next matter would
16 be an arbitration in which Millgard would be made a
17 part.
18   Q. As a result of your conversation or
19 conversations with Mr. Lassman did you make any kind
20 of recommendations to Millgard?
21   A. I don't recall.
22   Q. Exhibit 23. This is an exhibit previously
23 identified as Exhibit 23, which is a memo from John
24 Giffune to you with regard to wrongful termination.

Page 91

1  June 14th of 1999. And Mr. Giffune at his
2  deposition identified some of the handwriting on
3  this as belonging to Mr. Allen?
4    A. Yes, that's correct.
5    Q. Is all of this Mr. Allen's handwritten
6  comments?
7    A. It appears to be, yes.
8    Q. Did you have a discussion with Mr. Allen and
9  Mr. Giffune relative to the subject matter of this
10 memo?
11   A. I believe we had a discussion about this but
12 I have no specific recollection of it.
13   Q. Do you have any recollection of making any
14 recommendations to Millgard as a result of this
15 memorandum?
16   A. I have no recollection of talking to
17 Millgard.
18   Q. With regard to this --
19   A. With regard to this particular memo.
20   Q. This is again handwritten notes dated July
21 27th, '99. Is this your handwriting?
22   A. Yes, it is.
23      MR. DAVAGIAN: Would you mark this as
24 the next exhibit.

Page 92

1       (Exhibit No. 69 marked
2       for identification.)
3  BY MR. DAVAGIAN:
4    Q. Are these notes you made as a result of a
5  conversation with Mr. Lassman?
6    A. Yes. This was the conversation I made
7  reference to earlier with respect to use of
8  equipment by White Oak.
9    Q. And what did he say about that?
10   A. He said, according to the notes here, "Okay
11 to remove equipment, Millgard can remove its
12 equipment, relayed information to Dennis Millgard.
13 Dennis Millgard to cooperate with White Oak in the
14 arbitration."
15   Q. Does it also say here that the mediation is
16 over?
17   A. Yes.
18   Q. Did he tell you what the result of the
19 mediation was?
20   A. I have no recollection of that, no.
21   Q. Do you recall whether or not you asked him
22 what the outcome of the mediation was?
23   A. I have no recollection of it.
24   Q. Did you have a conversation with

Page 93

1  Mr. Millgard or anyone from Millgard after this
2  conversation with Mr. Lassman?
3    A. Well, it says on here I relayed the
4  information to Dennis Millgard. Dennis Millgard to
5  cooperate with White Oak in arbitration.
6    Q. Did you make any other -- did you offer any
7  other advice as a result of this conversation?
8    A. I have no recollection.
9       MR. DAVAGIAN: Would you mark this
10 please.
11      (Exhibit No. 70 marked
12      for identification.)
13      (Discussion off the record.)
14 BY MR. DAVAGIAN:
15   Q. This document that we have just marked as
16 Exhibit 70 is dated August 25th, '99 and again is
17 this your handwriting?
18   A. Yes, it is.
19   Q. And your notes relate to what?
20   A. I can't recall what this relates to. I
21 suspect it may have been a conversation with Lassman
22 because I remember Lassman at this point calling
23 Millgard bums to walk off the job. And I see here
24 "bums to walk off."

Page 94

1  Q. He called who bums?
2  A. Millgard to walk off.
3     And apart from that, that's the only
4  piece of this that brings any recollection to my
5  mind at all.
6  Q. At the top of the page it says, appears to
7  say, "Statute of limitations for contracts in
8  Connecticut."
9  A. Yes.
10 Q. What's that reference to, do you recall?
11 A. I don't recall.
12 Q. And you advised Dennis Millgard -- what did
13 you advise him of?
14 A. I remember telling Dennis about Lassman
15 calling Millgard bums to walk off the job.
16 Q. At this point in time were you simply a
17 conduit for information between Lassman and
18 Millgard?
19 A. Dennis would call up and ask me to call
20 Lassman and get certain information. I would call
21 Lassman, get the information and relay it back to
22 Dennis.
23 Q. Did you offer advice based upon your
24 conversations with Lassman?

Page 95

1  A. I have no recollection.
2  Q. Now the statute of limitations that's
3  referred to there, the statute of limitations in
4  relation to what?
5  A. Contracts. Statute of limitations for
6  contracts in Connecticut.
7  Q. Okay. What about bond issues?
8  A. What about bond issues?
9  Q. Is there a statute of limitations relative
10 to bond claims?
11 A. There's a statute in Connecticut which
12 relates to claim notification for bond claims.
13 Q. Do you know if you had investigated that at
14 the time of this -- during the summer of '99?
15 A. No, I had not.
16 Q. You had not?
17 A. No.
18 Q. Do you know why not?
19 A. We had not looked into bond claims?
20 Q. Yes.
21 A. Because from '98 through the summer of '99
22 Dennis Millgard felt that they were going to go back
23 to work and work something out. Even when the
24 mediation failed in the summer of '99, White Oak and

Page 96

1  Millgard were going to go to arbitration with
2  Connecticut and include Millgard's claim in the
3  arbitration. So no one had any concern with respect
4  to notification of bonds under those circumstances.
5  Q. Well, the fact that Millgard could have
6  filed a bond claim at that time would have no impact
7  on the rest of the mediation, arbitration or
8  litigation process, would it?
9  A. That's your conclusion. This matter was
10 under the control of Dennis Millgard and he felt
11 there was always going to be a resolution of this.
12 And even when the mediation fell through, he had the
13 arbitration on the horizon.
14 Q. So it was his reluctance to either provide
15 notice to the surety or to commence suit is the
16 reason why that didn't happen?
17 A. That's a question you'd have to ask Dennis
18 Millgard. I can't get into Dennis Millgard's mind
19 and know what was going on.
20 Q. Was that your view of the situation at that
21 time? That your hands were tied?
22 A. Dennis Millgard felt he was going to go back
23 to work and -- and under those circumstances the
24 question of notification to the bonds under those

Page 97

1  circumstances was not in anyone's mind at that time.
2  Q. This is a facsimile transmittal from Ed
3  Cardoza to David Coleman which apparently is a
4  memorandum of a phone call to you.
5  A. Yes.
6  Q. On January 12th, 2000. Down at the bottom
7  of that document there's a reference to Tomlinson.
8  A. Yes.
9     MR. DAVAGIAN: Could we mark this as
10 Exhibit 71.
11    (Exhibit No. 71 marked
12    for identification.)
13 BY MR. DAVAGIAN:
14 Q. The first sentence of that comment is "He's
15 reluctant to start a lawsuit due to the possibility
16 of a countersuit." Do you recall making that
17 comment to Mr. Coleman?
18 A. I don't have a specific recollection of
19 that. But I can't deny making it if he has said it
20 here.
21 Q. "He recommends that we continue to monitor
22 the work to be sure White Oak is performing our work
23 and no one else." What would be the relevance or
24 impact if a third party was performing the work?

25 (Pages 94 to 97)

# Exhibit "C"

7-27-99   Millgard / Conv.

- equipment being used by w/ock
  Edwin Lassman
             800-278-7480

- Mediation over

- includes us in arbitration

- M wants to remove equipment

Ed Lassman
    - Mediation over

    - arbitration underway/
well present Millgard claim to the extent
he is able under Peabody

        - OK to remove equipment
        - Millgard can remove
          its equipment

- relayed info to Dennis M.
        - DM to cooperate w/ WO in
          arbitration

GH 0794