UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                              Plaintiff

v.

GADSBY HANNAH, LLP,
                    Defendant

**AFFIDAVIT OF TERRI L. PASTORI IN SUPPORT OF DEFENDANT,
GADSBY HANNAH LLP'S MOTION IN LIMINE TO EXCLUDE EVIDENCE
RELATING TO ITS CONDUCT AFTER MARCH 15, 1999**

I, Terri L. Pastori, hereby depose under oath and state as follows:

1.      I am an attorney in good standing, and admitted to practice before the Bar of the

Commonwealth of Massachusetts and the United States District Court for the District of

Massachusetts, among other courts.

2.      I am partner in the law firm of Peabody & Arnold LLP, and I am an attorney for

the Defendant, Gadsby Hannah LLP in this matter.

3.      Attached hereto as Exhibit A is a true and accurate copy of the Subcontract

between White Oak and the Millgard Corporation, which was part of Deposition Exhibit 14.

4.      Attached hereto as Exhibit B is a true and accurate copy of Deposition Exhibit 20,

Dennis Millgard's Letter to Jack Morrissey of White Oak dated September 11, 1998.

5.      Attached hereto as Exhibit C is a true and accurate copy of an excerpt from

Dennis Millgard's deposition transcript in this case.

6.      Attached hereto as Exhibit D is a true and accurate copy of the complaint in this

case.

7.      Attached hereto as Exhibit E are true and accurate copies of two of the Superintendent Daily reports produced by TMC in this case.

8.      Attached hereto as Exhibit F is a true and accurate copy of Deposition Exhibit 28, a letter from John Giffune to National Union, dated April 7, 2000.

9.      Attached hereto as Exhibit G is a true and accurate copy the Complaint in the TMC v. White Oak case, which was produced in discovery.

10.     Attached hereto as Exhibit H is a true and accurate copy of a letter from Dennis Millgard to John Morrissey dated October 29, 1998, which was produced in discovery.

11.     Attached hereto as Exhibit I is a true and accurate copy of excerpts from a deposition transcript of Dennis Millgard in the White Oak case, which was produced in discovery in this case.

12.     Attached hereto as Exhibit J is a true and accurate copy of Dennis Millgard's affidavit dated August 1, 2006 filed in this case.

13.     Attached hereto as Exhibit K is a true and accurate copy of the State of Connecticut, Department of Transportation Specifications (Form 814), Section 9.75.

14.     Attached hereto as Exhibit L is a true and accurate copy of the Superintendent's Daily Reports, which was provided in discovery in this case.

15.     Attached hereto as Exhibit M is a true and accurate copy of a document captioned "Subcontractor's Invoice," which was Exhibit 34 at Dennis Millgard's deposition in the White Oak case and was produced in discovery in this case.

16.     Attached hereto as Exhibit N is a true and accurate copy of a page of notes produced in discovery in this case.

17.    Documents with the MK bates designation were produced by the attorney who represented TMC in the <u>White Oak</u> litigation.  Documents with the bates designation GH were produced by Gadsby Hannah.  Documents with no letter designation or an M designation were produced by TMC.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 12th DAY OF JANUARY 2007.

/s/ Terri L. Pastori
Terri L. Pastori

## <u>CERTIFICATE OF SERVICE</u>

I, Terri L. Pastori, hereby certify that on January 12, 2007, the foregoing document was served upon counsel for the plaintiff, John S. Davagian, Esquire, by electronic mail at jsdavagian@jsdlawgroup.com.

/s/ Terri L. Pastori
Terri L. Pastori

**EXHIBIT A**

7 pgs

C-1955
CON Tk

RECEIVED

## AGREEMENT

THIS AGREEMENT made and entered into this 22nd day of March, 1996, by and between WHITE OAK CORPORATION, of the Town of Plainville, County of Hartford, State of Connecticut, hereinafter referred to as "CONTRACTOR" and MILLGARD CORPORATION, 12822 STARK ROAD, P.O. BOX 2248, LIVONIA, MICHIGAN 48151, hereinafter referred to as "SUBCONTRACTOR":

## WITNESSETH

WHEREAS, Contractor is engaged in the performance of a contract with the Connecticut Department of Transportation, Bureau of Highways (Department), Wethersfield, Connecticut, for construction of a Project known as

### PROJECT 92-435, NEW HAVEN

and is desirous of subletting certain items of said project, as more specifically set forth on Schedule "A" attached hereto, and

WHEREAS, Subcontractor is willing to perform said work as a legal Sub-contractor in accordance with the terms and conditions as hereinafter set forth,

NOW THEREFORE, in consideration of the mutual promises of the parties hereto, it is agreed as follows:

1.  Subcontractor agrees that all work performed by him shall be in accordance with all the contract plans, special provisions, general conditions, required provisions, drawings, addenda, specifications, required contract provisions of federal aid construction contracts, and any and all documents forming part of said contract between Contractor and said Department for said project, all of which Subcontractor has read and fully understands, and which are hereby made a part of this contract and are incorporated herein by reference.

2.  Subcontractor agrees to provide all labor, tools, forms, equipment, and material necessary to perform the work as more specifically designated on Schedule "A" attached hereto. The quantities listed on Schedule "A" are merely estimates of the work to be performed if this is a unit price contract. Sub-contractor agrees that in the event actual quantities are different from those listed on Schedule "A", or in the event revisions of the plans and/or speci-fications result in an increase or decrease in such quantities, Subcontractor shall nevertheless complete the work in the same manner and for the same unit prices as if the work had been originally contained in Schedule "A".

3.  In consideration of the work to be performed, Contractor agrees to pay and Subcontractor hereby accepts the schedule of unit prices as listed in Schedule "A" attached hereto.

4.  Subcontractor agrees to commence the work as outlined upon five (5) days notice from Contractor and to perform the work in a diligent and workmanlike manner and with sufficient and competent men in order to complete the same in accordance with the time schedule as shown on Schedule "A", if any, or within a reasonable time.

M 00429

-2-

5.    This agreement provides for partial payments by the Contractor to the Sub-contractor as provided herein.  It is understood, however, that no payment made to the Subcontractor shall operate or be construed as an admission by the Contractor or the Department that the Subcontractor's work or material supplied is accepted or that it's contract has been fully complied with.  Contractor reserves the right to demand full compliance notwithstanding payment to the Subcontractor.

6.    Subcontractor shall not assign or transfer this contract without written consent of the Contractor.

7.    Subcontractor agrees to save the Contractor harmless and defend from any and all claims whatsoever arising as a result of Subcontractor's operations.  The Subcontractor shall obtain and maintain, at its own expense, the following insurance in a company or companies approved by the Contractor and/or Owner:

   (a)  Worker's Compensation Insurance in accordance with the provisions of the Principal Contract and applicable law.

   (b)  Public Liability Insurance (including Contractor's Protective Insurance) in the amount of not less than $1,000,000 for injury to each person and $2,000,000 for injury to any number of persons in one accident; and property damage of not less than $500,000 for one accident and $1,000,000 to cover more than one accident.

   (c)  Automobile comprehensive liability covering its own, hired and non-owned vehicles in the amount of $1,000,000 for injury to each person and $2,000,000 for injury to any number of persons in one accident and property damage liability of at least $500,000 for each accident.

   (d)  Liability Insurance naming Contractor as an additional insured against claims by Subcontractor and its employees for injuries or damages sustained by such employees or agents of Subcontractor in amounts consistent with those provided in Subparagraph (b) above.

The policies (a) shall contain a provision that they may not be cancelled, terminated, or modified without fifteen (15) days written notice sent to the Contractor by registered mail and (b) shall not contain any exclusions from liability other than those forming part of the standard basic unamended and unendorsed form of policy.  Prior to commencement of work hereunder, the Sub-contractor shall furnish to the Contractor and the Owner, certificates or copies of the policies showing that such insurance is in force.  If the Subcontractor shall fail to procure the above insurance, the Contractor may do so in the Sub-contractor's name and may charge the cost thereof to the Subcontractor, or the Contractor may, at his option, terminate this Subcontract.  The Subcontractor agrees to supply the Contractor the information required to procure such insurance.

8.    Subcontractor agrees to pay his employees wages in compliance with the union wage scale applicable to said project, and further, to comply with all labor union rules, conditions, regulations, and wage scales the Contractor is subject to under Contractor's agreement with any of the labor unions, including health, welfare, pension, and training fund contributions.

9.    Subcontractor agrees to observe all federal, state, and local laws, rules and regulations, and to make himself familiar with such laws, rules and regulations particularly as they pertain to said project.

M 00430

-3-

10.    Subcontractor agrees to furnish Contractor with a daily time slip indicating production quantities and a certified copy of its weekly payroll, payroll affidavits, and material samples and certificates, as may be required.

11.    Subcontractor shall make no claim for additional work unless done in pursuance of written order from Contractor, and notice of all such claims shall be given to Contractor in writing before the next ensuing payment or shall be considered as abandoned.

12.    Department and/or Contractor may make changes in the work covered by this subcontract including additions and elimination of portions of the work to be performed.  Subcontractor shall perform the work as changed without delay.

13.    Subcontractor shall submit, in writing, any claims for adjustment in price, for changes directed by the Department, or as a result of deficiencies or discrepancies in the contract documents, to Contractor in time to allow Contractor to comply with the applicable provisions of the contract documents.

   (a)    Contractor shall process said claims in the manner provided by and according to the provisions of the contract documents. Subcontractor adjustments shall be made only to the extent that Contractor is entitled to relief from the Department or must grant relief to the Department.

   (b)    For changes ordered by Contractor, independent of Department or contract documents, Subcontractor shall be entitled to an equitable adjustment in the subcontract price.

14.    In the case of any dispute between Contractor and Subcontractor, due to any action of the Department or involving the contract documents, Subcontractor agrees to be bound to Contractor to the same extent that Contractor is bound to the Department by the terms of the contract documents, and by any and all preliminary and final decisions or determinations made thereunder.

   (a)    With respect to any controversy between Contractor and Subcontractor not involving Department or the contract documents, Contractor shall issue a decision which shall be followed by Subcontractor.  If the Subcontractor is correct as to the controversy, Subcontractor shall be entitled to an equitable adjustment in the contract price as its sole remedy.

15.    Subcontractor shall warrant and guarantee his full performance, including labor and materials, until final acceptance by the Department, without cost to the Contractor.

16.    No verbal order, objection, claim, or notice by either party to the other shall be of effect or binding, and no evidence of such order, objection, claim, or notice shall be introduced in any suit-of-law or equity wherein the parties are involved.

17.    Subcontractor shall execute such lien waivers for materials and labor as the Contractor shall desire, the failure of which by Subcontractor shall be grounds for immediate termination of this agreement by Contractor.

M 00431

-4-

18.  Subcontractor agrees to clean up all debris from his work as the job progresses and to dispose of same and not to allow any accumulation to occur.

19.  Contractor agrees to pay Subcontractor monthly, in accordance with quantities approved for payment by the Department on State Estimate Sheets for work performed the previous month, when the Contractor is paid by the State for same, providing, however, that Subcontractor complies with requirements of all clauses contained herein.

20.  Subcontractor shall, simultaneously, with the execution of this contract, provide and furnish to the Contractor, a performance and payment bond running to the Contractor is a sum equal to the total price of this contract with corporate sureties satisfactory to the Contractor, conditioned upon the faithful performance by the Subcontractor of this Contract in each and every of its particulars, as it may be from time to time modified by Change Orders or Construction Orders, such bond to be in a form and otherwise to contain such provisions as are reasonably satisfactory to the Contractor.

21.  Subcontractor agrees that should he fail at any time to provide such labor, materials, and equipment as contractor shall deem adequate to perform said work promptly and efficiently, or fail to carry out any order of the Contractor, or fail to prosecute said work with promptness and diligence, or fail to perform any of the agreements contained herein, then and in that event, Contractor shall have the right forthwith to provide such labor, materials, and equipment or to subcontract the same as it shall deem necessary to perform said work and the cost thereof shall be paid by the Subcontractor to the Contractor, and Contractor may apply in payment thereof any payments then due or thereafter to become due to Subcontractor under this agreement.

22.  Subcontractor hereby certifies that he has read and understood and shall abide by the required contract provisions of this contract as it relates to Equal Employment Opportunity responsibilities.

23.  Subcontractor, for itself and all persons claiming through or under it, hereby acknowledges that this agreement constitutes a commercial transaction as such term is used and defined in Public Act #431 of the Connecticut General Statutes, Revision of 1973, and hereby expressly waives any and all rights which are or may be conferred upon the Subcontractor by said Act or to any notice of hearing prior to a prejudgment remedy.

24.  In the event Contractor is required to engage the services of an attorney-at-law to enforce its rights under this agreement, Subcontractor shall be liable for Contractor's reasonable expenses for it's attorney's fees.

M 00432

-5-

IN WITNESS WHEREOF, the parties hereto have hereunto caused these presents to be signed in duplicate the day and year above first written.

SIGNED, SEALED, AND DELIVERED
IN THE PRESENCE OF:

WHITE OAK CORPORATION

BY: _____
JOHN F. MORRISSEY, JR.
Vice President

MILLGARD CORPORATION

BY: _____

M 00433

MILLGARD CORPORATION
PROJECT 92-435

SCHEDULE "A"

| ITEM NO. | DESCRIPTION | QTY. & UNIT | | UNIT PRICE | TOTAL AMT. |
|---|---|---|---|---|---|
| 702804A | FURNISH/INSTALL 30" DIA. CAISSON | 10,600 | LF | $ 100.00 | $ 1,060,000.00 |
| 702833A | TEST SHAFT 30" CAISSON | 465 | LF | 350.00 | 162,750.00 |
| 702930A | DRILL ROCK SOCKET 30" CAISSON | 3,550 | LF | 260.00 | 923,000.00 |
| | MOBILIZATION | LS | | 150,000.00 | 150,000.00 |

THE FOLLOWING IS INCLUDED IN BASE PRICE:
1. Caisson shaft excavation
2. Utilizing operated service crane furnished by others.
3. Placing permanent casing furnished by others.
4. One (1) mobilization.

THE FOLLOWING IS NOT INCLUDED AND SHALL BE PERFORMED BY OTHERS:
1. Engineering layout including center stakes & cutoff elevations for each caisson location.
2. Furnishing/placing of all reinforcing steel and/or anchor bolts & furnishing and placing templets.
3. Removing & disposing of caisson spoil.
4. Providing clearance & suitable all-weather access to each caisson location.
5. Forming for caissons that extend above working grade.
6. Concrete mix/design or testing.
7. Soil testing services.
8. Providing necessary electrical power and water adjacent to the caisson work.
9. Relocating & protecting all utilities and adjoining structures which may be affected by the caisson work.
10. Purging of gas from caisson excavation (if gas is encountered, absolutely no entry will be permitted).
11. Where contaminated and/or hazardous waste materials are encountered, Millgard Corporation shall be entitled to all added costs for delays, excavation and any other associated extra costs.
12. Venting of caisson excavations.
13. It is assumed that no hazardous waste materials will be encountered.
14. Miscellaneous:  Providing watchmen, flagmen, traffic control or barricades, fences, street cleaning services, sanitation services, building permits, notifications to adjacent property owners or utility companies.
15. Furnish/placing concrete.
16. Furnish permanent casing.
17. Soil borings with rock cores.
18. - Drilling barge
    - Service barge
    - Materials barge
    - Operated tug & transportation/safety boats (specific barge requirements should be discussed).
19. Turbidity controls/pollution liability insurance.
20. Cut-off of permanent casing at proper elevation.
21. Mechanical connectors for resteel hook bars.
22. Furnish permanent casing shoes.
23. Adequate onshore laydown for welding casing.
24. Integrity testing.
25. Furnishing operated service crane for TMC use.

M 00434

MILLGARD CORPORATION       SCHEDULE "A" CONTINUED
PROJECT 92-435

CLARIFICATIONS:

1.  Drilling barge to be of sufficient size to accommodate 150T crane plus
    drill unit & assorted tools.
2.  Mobilization unit price will be paid in full at completion of mobilization.
    This is an exception to project requirements.

SPECIAL CONDITIONS:

1.  The work covered by this proposal may, by its nature, cause some unavoidable
    earth movement that could damage adjoining utilities, structures or pavement.
    The Millgard Corporation shall have no responsibility whatsoever for earth
    movement which is not directly caused by its negligence, failure to follow
    applicable plans and specifications, or failure to follow generally accepted
    construction procedures of the shaft drilling industry.

2.  White Oak Corporation shall defend, indemnify and hold harmless The Millgard
    Corporation and its officers, agents and employees from any injury or damage
    arising out of or in any way relating to any discovery of hazardous materials
    or suspected hazardous materials.  The Millgard Corporation shall have no
    liability for any type of hazardous or toxic waste, material, chemical,
    compound or substance, or any other type of environmental hazard, contamination,
    or pollution, whether latent or patent, or the release thereof or the violation
    of any law or regulation relating thereto and White Oak Corporation shall
    indemnify The Millgard Corporation for any and all loss, cost, or damage
    actually sustained or incurred by The Millgard Corporation in connection
    therewith.

M 00435

VIA FACSIMILE - (860) 793-2119

# The MILLGARD Corporation

**TMC**

SEPTEMBER 11, 1998

RECEIVED

SEP 15 1998

White Oak Corporation

WHITE OAK CORPORATION
7 West Main Street
Plainville, CT 06062

ATTENTION:    MR. JACK MORRISSEY, JR.

SUBJECT:    TOMLINSON BRIDGE
NEW HAVEN, CONNECTICUT
TMC JOB NO. C-1955

Dear Jack:

We are in receipt of the State of Connecticut's letter you faxed us just recently. We have continued to work on this project for the past nine months in good faith that the obvious change of condition situation would be quite apparent to everyone connected with this project.

For whatever reason, as explained in the referenced letter, the State has denied any responsibility for existance of a differing site condition. We take exception to this determination as it is more than obvious it was decided only on the basis of what is in the best interest for the State of Connecticut in the short run and not based on getting the job done.

We feel we have been lead on by the State for the past several months, and therefore, it is in our best interest to discontinue work on this project as of Monday, September 14, 1998.

This was a unilateral decision by the State without any discussion with White Oak, TMC or our consultant. We are willing to attend any meeting any time to discuss our and the State actions in this matter.

We cannot and will not work for a owner who has so irresponsibly made such a major decision without even discussing the matter with the contractors of the project.

Sincerely,

THE MILLGARD CORPORATION

V. Dennis Millard
President

VDM:DMMLTR911M.WOC

EXHIBIT
D. Millgard
20
TMC 9-21-05

  12822 Stark Road • P.O. Box 510027 • Livonia, Michigan 48151 • (734) 425-8550 / FAX 425-0624  

MK - 01424

Page 146

1                                          VOL. 2

2                                          PAGES:  146-246

3                                          EXHIBITS:  37-50

4                UNITED STATES DISTRICT COURT

5                DISTRICT OF MASSACHUSETTS

6

7    Civil Action No. 04-12388-RWZ

8    - - - - - - - - - - - - - - - - - - -

9    THE MILLGARD CORPORATION,

10              Plaintiff,

11   vs.

12   GADSBY & HANNAH, LLP,

3               Defendant.

14   - - - - - - - - - - - - - - - - - - -

15

16       CONTINUED DEPOSITION OF V. DENNIS MILLGARD

17            Wednesday, November 9, 2005

18                 10:00 a.m.

19            Peabody & Arnold, LLP

20               30 Rowes Wharf

21        Boston, Massachusetts 02110

22

23       Court Reporter:  Doris M. Jones, RPR

24

V. Dennis Millgard

181

1    Q.   File a law site?

2    A.   I guess I didn't because they didn't.

3    Q.   At some point did you authorize Gadsby &

4    Hannah to proceed with a suit against White Oak or

5    ConnDOT?

6    A.   Well, we asked them on numerous occasions to

7    go ahead and file suit.

8    Q.   When was the first time that you did so?

9    A.   Probably January of 1999.  And Ron said

10   look, I don't think it's a good move, I think as

11   long as we have this mediation coming.  Bear in mind

12   I did not know our rights were going to run out the

13   middle of March.  Our notification rights.

14   Q.   Perhaps you can explain that to me.

15   A.   The state statute regarding notification of

16   bonding companies gives you 180 days.  We shut down

17   September 15th of '98, so therefore it would have

18   been March 15th of '99.  Notification should have

19   been filed before then.  Notification wasn't filed

20   until a year later.

21   Q.   Okay.  At some point did you request that

22   Gadsby & Hannah make a claim against the bond?

23   A.   I don't know if we specifically  -- I mean,

24   with all the other projects that Gadsby & Hannah was

EXHIBIT D
9 pages

RECEIPT #_____
AMOUNT $ _150⁰⁰_____
SUMMONS ISSUED _Y-1_
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._M_____
DATE_____11-13-04_____

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO.

2004 NOV 10  P 3:12

DISTRICT COURT
DISTRICT OF MASS

THE MILLGARD CORPORATION,        )
        Plaintiff        )
        )
v.        )        **COMPLAINT**
        )
GADSBY HANNAH, LLP        )
        Defendant        )
        )

**04 ᶜᵛ 1 2 3 8 8 RWZ**

MAGISTRATE JUDGE _Collings_

## PARTIES AND JURISDICTIONAL STATEMENT

1. The Plaintiff, The Millgard Corporation ("Millgard"), is a corporation organized under the laws of the State of Michigan having its principal place of business in Livonia, Wayne County, Michigan.

2. The Defendant, Gadsby Hannah, LLP ("Gadsby Hannah"), is a law firm operating as a limited liability partnership organized under the laws of the Commonwealth of Massachusetts having its principal place of business in Boston, Suffolk County, Massachusetts.

3. Millgard is currently operating under a Plan of Liquidation under Chapter 11 of the Bankruptcy Code approved by the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division. (Case No. 03-49710-R).

4. White Oak Corporation ("White Oak") is a corporation organized and existing under the laws of the State of Connecticut, having its principal place of business in Plainville, Connecticut.

5. National Union Fire Insurance Company of Pittsburgh, PA ("National Union") is an insurance corporation organized and existing under the laws of the State of Pennsylvania, having its principal place of business in New York, New York.

1

6.  This matter arises out of the negligent representation of and for erroneous legal advice provided to Millgard by Gadsby Hannah relative to claims made by Millgard against White Oak and its surety, National Union, with respect to specific facts and circumstances presented in a civil action brought in United States District Court for the District Court of Connecticut. [3:00CV1685(CFD)].

7.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.  This Court has original jurisdiction over the above-captioned action because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

8.  Pursuant to 28 U.S.C. § 1391(a), venue is appropriate in the Commonwealth of Massachusetts because it is the principal place of business of the Defendant.

## COUNT I

9.  Millgard re-alleges paragraphs one through eight above as if fully restated herein.

10. White Oak was the general contractor on a construction project owned by the State of Connecticut Department of Transportation (the "DOT") located in New Haven, Connecticut, and identified as "Replacement of Bridge No. 00337 (Tomlinson Bridge), U.S. Route 1 over the Quinnipiac River in the Town of New Haven" (the "Project").

11. On or about June 6, 1994, National Union, as surety, and White Oak, as principal, issued a Payment Bond (the "Bond"), identified as Bond No. 12-33-87, for the protection of all persons supplying labor, materials, and equipment used or reasonably required for use in connection with the project.

12. The Bond was issued pursuant to the requirements of section 49-41 of the Connecticut General Statutes and White Oak's contract with the DOT.

2

13. On or about March 22, 1996, Millgard entered into an agreement with White Oak, wherein Millgard, as a subcontractor to White Oak, agreed to provide labor, materials and equipment relating to certain excavation and foundation work on the project (the "Subcontract")..

14. Millgard began providing labor, materials and equipment to the project on or about October 31, 1997.

15. Beginning in early 1998, Millgard encountered quartz and granite boulders within the rock strata that obstructed its work.

16. The subsurface conditions encountered by Millgard differed materially from those indicated in the subsurface borings and soils report provided by the DOT and made a part of the subcontract.

17. As a result of the differing subsurface conditions, Millgard experienced significant time and cost overruns in the performance of its work.

18. Simultaneously with the discovery of the differing subsurface conditions, Millgard began consulting with Gadsby Hannah , at all times relevant to this litigation Millgard's counsel for matters located in the northeastern United States, as to its appropriate course of action and legal rights with respect to problems encountered on the project.

19. Millgard promptly notified White Oak of the problems it had encountered, and Millgard requested an equitable increase to its contract price as a result of the differing site conditions.

20. However, Gadsby Hannah neglected to inform Millgard of the effect of Connecticut General Statutes Section 4-61 which negatively impacted Millgard's rights to recovery for the differing subsurface conditions.

21. Upon information and belief, White Oak submitted a claim to the DOT for an increase in its contract price as a result of differing site conditions, which claim subsumed Millgard's

3

claim.

22. Millgard 's last day of contract drilling was September 15,1998.

23. On September 25, 1998, Millgard met with both White Oak and the DOT to discuss the differing site conditions encountered on the project.

24. Relying upon the advice provided by Gadsby Hannah, Millgard advised both White Oak and the DOT that the subsurface conditions constituted a cardinal change to its contract entitling Millgard to suspend its work on the Project until its issues were resolved.

25. Over the course of several months, White Oak and the DOT engaged in mediation to address White Oak's claim and the differing site conditions.

26. While Millgard was not a formal party to the mediation, Millgard participated in the mediation and was at all times represented by Gadsby Hannah.

27. Millgard was repeatedly assured by White Oak that its claim would soon be resolved with the DOT and that Millgard would be able to complete its work on the Project.

28. Millgard's involvement in the mediation between White Oak and the DOT concluded on or about May 19, 1999.

29. By letter dated May 21, 1999, White Oak wrongfully terminated Millgard's subcontract.

30. Upon receipt of the termination letter, Millgard immediately contacted White Oak to inquire as to the reasoning behind the termination.

31. White Oak advised Millgard that it was just protecting its legal rights and that White Oak intended to arbitrate its claims, which subsumed Millgard's claim, against the DOT.

32. At the same time, White Oak advised Millgard that it still expected Millgard to return to work on the project and began negotiating Millgard's return to work on a cost plus basis.

33. Based on White Oak's representations, Millgard remained on stand-by to complete its work

4

on the Project.

34. At the end of August 1999, White Oak contacted Millgard and directed Millgard to

    demobilize from the project.

35. During the week ending September 7, 1999, Millgard demobilized from the project.

36. Millgard last furnished labor and/or equipment to the project on September 7, 1999.

37. Although Millgard performed its obligations under the subcontract with White Oak, White

    Oak refused and failed to pay Millgard in accordance with the terms of the subcontract and

    section 49-41a of the Connecticut General Statutes.

38. White Oak's failure to pay Millgard the subcontract balance of $70,730.00, as well as

    $1,083,585.06 for additional work performed by Millgard as the result of the differing site

    conditions constituted a material breach of its subcontract with Millgard.

39. Connecticut General Statutes Section 49-42 (the payment bond statute) contains stringent

    requirements for notice of claims and commencement of lawsuits. (See Exh. "A" attached.)

40. For payment bonds issued prior to October 1994, the statute provided that notice of the claim

    must be provided to both the surety and the principal within 180 days of the claimant's last

    day of work on the job and a lawsuit must be commenced within one year of that date.

41. Beginning in September of 1998 Gadsby Hannah recommended to Millgard that it forbear

    providing notice of claim under the payment bond to White Oak and National Union and

    erroneously advised Millgard that notice to the surety and principal need not be made until

    within 210 days of payment by DOT to White Oak and a lawsuit commenced within one year

    of that date. (The language of the post October 1994 revision of C.G.S. § 49-42.)

42. On April 7, 2000 Gadsby Hannah sent a letter to National Union on behalf of Millgard

    asserting a claim against the payment bond.

5

43. Subsequently realizing that its April 7, 2000 letter was technically deficient, on May 5, 2000
    Gadsby Hannah sent another demand letter to National Union on behalf of Millgard asserting
    a claim against the payment bond.

44. National Union denied the claim on the basis that notice was untimely and that Millgard
    failed to file suit within the time required under C.G.S. § 49-42.

45. In July of 2000 Millgard retained the law firm of Michelson, Kane Royster & Barger, P.C. to
    review the denial by National Union.

46. On August 31, 2000 Millgard filed a civil action brought in United States District Court for
    the District Court of Connecticut [3:00CV1685(CFD)] against White Oak and National
    Union.

47. On September 30, 2002 the claims against National Union in that action were dismissed by
    the Court because Gadsby Hannah failed to provide timely notice of Millgard's bond claim
    or to file suit in accordance with the time requirements of C.G.S. § 49-42.

48. Based upon disclosure of White Oak's assets in that lawsuit, which indicate that White Oak
    is judgment proof, Millgard voluntarily dismissed its case against White Oak prior to trial
    because its assets appeared to be fully encumbered by secured debts to National Union and
    other secured creditors.

49. Millgard has been damaged by the erroneous legal advice and negligent representation
    provided by Gadsby Hannah in the amount of the subcontract balance of $70,730.00, as well
    as $1,083,585.06 for additional work performed by Millgard as the result of the differing site
    conditions plus other consequential damages sustained by Millgard as the result of Gadsby
    Hannah's negligent representation and erroneous legal advice.

    WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the

Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

## COUNT II

50. Millgard re-alleges paragraphs one through forty nine above as if fully restated herein.

51. While the mediation process was ongoing, Millgard also participated in negotiations with White Oak and the DOT for additional work required on account of the differing site conditions and reached agreement to perform that work for $6,130,296.00.

52. Included in that amount was $1,485,625.00 for Millgard's anticipated overhead and profit.

53. When Millgard was subsequently wrongfully terminated by White Oak, unknown to Millgard, National Union had taken over the management of White Oak.

54. Further, when White Oak terminated Millgard, National Union was aware that Millgard's period to provide notice of a bond claim and file suit on same had lapsed by statute.

55. Millgard has been damaged by the erroneous legal advice and negligent representation provided by Gadsby Hannah in that it suffered the loss of $1,485,625.00 in anticipated overhead and profit for the additional work required to overcome the differing subsurface conditions plus other consequential damages sustained by Millgard as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

7

## COUNT III

56. Millgard re-alleges paragraphs one through fifty five above as if fully restated herein.

57. At all times relevant to this lawsuit, Millgard consulted with Gadsby Hannah concerning the damages it had incurred in attempting to perform its obligations under its Subcontract with White Oak.

58. Gadsby Hannah provided to Millgard legal advice relative to the problems with the Subcontract and charged Millgard for its services.

59. Millgard has paid Gadsby Hannah $19,010.03 in legal fees with respect to its disputes with White Oak and National Union.

60. Gadsby Hannah undertook to do so, and was obliged to exercise care, skill and diligence but failed in all requisites to advise Millgard of the consequences of C.G.S. § 4-61 and failed to give notice to National Union within the time as required by C.G.S. §49-42, as a condition precedent to the bringing of an action against White Oak and National Union.

61. By reason of the fault and neglect of Gadsby Hannah, Millgard was unable to recover against National Union, has lost all claims for the recovery of damages against White Oak because of its financial condition and has been obligated to expend additional funds for legal advice, the costs of this action and suffered other consequential damages as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

WHEREFORE, the Plaintiff, The Millgard Corporation, demands judgment against the Defendant, Gadsby Hannah, LLP, in an amount to be determined at trial plus interest, costs, attorneys fees and such other relief at law or equity as this Court deems just and proper.

The Plaintiff demands a trial by jury on all counts contained in this complaint.

P:\data\active\Millgard\1269\pld00001.doc

The Millgard Corporation
By its Attorney,

John S. Davagian, II
BBO # 114740
Davagian & Associates
365 Boston Post Road, Ste. 200
Sudbury, MA 01776-3023
978-443-3443

9

EXHIBIT E
2 pages

# SUPERINTENDENT DAILY REPORT

**THE MILLGARD CORPORATION**
12822 STARK ROAD; P.O. BOX 510027
LIVONIA, MI 48151
PHONE: (734) 425-8550 / FAX: (734) 425-0624

**MILLGARD**

| | | NO.: | C-1955 |
|---|---|---|---|
| **JOB:** | TOMLINSON BRIDGE | **LOCATION:** | NEW HAVEN, CT |
| **DATE:** | SEPT 14TH 1998 | **WEATHER:** | CLOUDY - MILD. |

**REMARKS:**

PREPARED TO SHUT THE JOB DOWN AGAIN.

TOOK THE REVERSE CIRCULATION TOOL APART AND LAID IT DOWN ONTO THE
MATERIAL BARGE.

PREPARED THE RENTAL EQUIPMENT TO SHIP BACK.

6 MEN 1 AT 9HRS 5 AT 8HRS.

**SUPERINTENDENT**

**DATE** 9-14-98

M 00850

FILE:C19SSDLY.WK3

# SUPERINTENDENT DAILY REPORT

**THE MILLGARD CORPORATION**
12822 STARK ROAD; P.O. BOX 510027
LIVONIA, MI 48151
PHONE: (734) 425-8550 / FAX: (734) 425-0624

**MILLGARD**

| | | | |
|---|---|---|---|
| | | NO.: | #C-1955 |
| JOB: | TOMLINSON BRIDGE | LOCATION: | NEW HAVEN, CT |
| DATE: | SEPT. 15TH 1998 | WEATHER: | SUNNY - WARM |

## REMARKS:

PERFORMED A GENERAL CLEAN UP OF THE DRILLING BARGE.

HAD ALL RENTED EQUIPMENT PICKED UP.

PREMIER TOOL AND EQUIPMENT:

1-3" HYDRAULIC PUMP WITH HOSES

1-4" PUMP

1-6" PUMP WITH HOSES.

WELDER REPAIR AND RENTAL SERVICE:

1-MILLER BIG 50 WELDING MACHINE WITH LEADS.

HOCON INDUSTRIAL GAS:

6-OXYGEN BOTTLES

4-ACETYLENE BOTTLES

2-100LB. PROPANE

1-20LB. PROPANE.

TIED THE DRILL RIG DOWN AND SECURED ALL OF THE EQUIPMENT

ALL LOCAL HELP LAID-OFF

6 MEN 5 AT 8HRS.

_A. B. Mull_
SUPERINTENDENT

9-15-98
DATE

FILE:C1955DLY.WK3

M 00851

**EXHIBIT F**
1 page


GADSBY HANNAH LLP

John P. Giffune
*une@ghlaw.com
Tel (617) 345-7004

April 7, 2000

**VIA FAX & MAIL**
Attn: Claims Department
National Union Fire Insurance Co.
 of Pittsburg, PA
625 Liberty Ave
1700 CNG Tower
Pittsburg, PA 15222

225 Franklin Street
Boston MA 02110

Tel  617 345 7000
Fax  617 345 7050
www.ghlaw.com

Re:    Tomlinson Bridge
       Project No. 92-435, New Haven
       F.A.P. No. BRF-DPI-0198(3)
       Bond No. 12-33-97

Dear Sir or Madam:

    This firm represents the Millgard Corporation, White Oak Corp.'s drilled shaft foundation subcontractor on this project. White Oak is the principal on Bond No. 12-33-97 issued by your company and attached hereto.

    Millgard's contract balance of $70,730 and amounts due for extra work in the amount $1,083,585 remain unpaid without justification, despite repeated demands for payment. It is Millgard's hope that the disagreements between the parties can be resolved before Millgard is forced to take legal action.

    Please call to discuss this matter at your earliest convenience in order to forestall legal action by this firm. Thank you for your immediate attention to this matter.

Very truly yours,

John P. Giffune

JPG/dj
Enclosure
Cc:    Mr. David Coleman (via fax)
       Mr. Paul H. Breen, CONNDOT

**EXHIBIT**
28
9-22-05
PENGAD 800-631-6989

BOSTON

WASHINGTON DC

«B0129181.DOC;1»

000267

EXHIBIT G
11 pages

Aug 31   1 48 PM '00

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------

THE MILLGARD CORPORATION        )        CIVIL ACTION NO.
                                )
v.                              )
                                )
WHITE OAK CORPORATION and       )
NATIONAL UNION FIRE INSURANCE    )
COMPANY OF PITTSBURGH, PA        )        AUGUST 31, 2000

------------------------------

COMPLAINT

I.    JURISDICTION

1.    The Plaintiff, The Millgard Corporation, brings this

action against the Defendants, White Oak Corporation and National

Union Fire Insurance Company of Pittsburgh, PA, alleging breach

of contract, unjust enrichment, and a violation of section 49-42

of the Connecticut General Statutes.  The Plaintiff brings this

action to recover monies due for work performed by the Plaintiff

on a state construction project.

2.    The jurisdiction of this Court is invoked pursuant to

28 U.S.C. § 1332.  This Court has original jurisdiction over the

GH 0329

above-captioned action because there is complete diversity

between the parties and the amount in controversy exceeds

$75,000.00.

    3.    Pursuant to 28 U.S.C. § 1391, venue is appropriate in

the District of Connecticut because the events and omissions

giving rise to the claim occurred in the State of Connecticut.


II.  <u>PARTIES</u>

    1.    The Plaintiff, The Millgard Corporation ("Millgard"),

is a corporation organized and existing under the laws of the

State of Michigan, having its principal place of business in

Livonia, Michigan.

    2.    The Defendant White Oak Corporation ("White Oak") is a

corporation organized and existing under the laws of the State of

Connecticut, having its principal place of business in

Plainville, Connecticut.

    3.    The Defendant National Union Fire Insurance Company of

Pittsburgh, PA ("National Union") is an insurance corporation

GH 0330

organized and existing under the laws of the State of

Pennsylania, having its principal place of business in New York,

New York.


III. <u>STATEMENT OF THE CLAIMS</u>

<u>FIRST COUNT</u> (As to White Oak Corporation)

1.    White Oak was the general contractor on a construction

project owned by the State of Connecticut Department of

Transportation (the "DOT"), located in New Haven, Connecticut,

and identified as "Replacement of Bridge No. 00337 (Tomlinson

Bridge), U.S. Route 1 over the Quinnipiac River in the Town of

New Haven" (the "project").

2.    On or about June 6, 1994, National Union, as surety,

and White Oak, as principal, issued a Payment Bond (the "Bond"),

identified as Bond No. 12-33-87, for the protection of all

persons supplying labor, materials, and equipment used or

reasonably required for use in connection with the project.

GH 0331

3.    The Bond was issued pursuant to the requirements of section 49-41 of the Connecticut General Statutes and White Oak's contract with the DOT.  A copy of the Bond is attached hereto as Exhibit A and incorporated herein as if fully set forth herein.

4.    On or about March 22, 1996, Millgard entered into an agreement with White Oak, wherein Millgard, as a subcontractor to White Oak, agreed to provide labor, materials and equipment relating to certain excavation work on the project (the "subcontract").

5.    Millgard began providing labor, materials and equipment to the project on or about October 31, 1997.

6.    During the progress of its work, Millgard encountered quartz and granite boulders within the rock strata that obstructed its work.

7.    These subsurface conditions encountered by Millgard differed materially from those indicated in the subcontract.

4

GH 0332

8.    The subsurface borings and soils report provided by the DOT and made a part of the subcontract did not accurately reflect the extent of the obstructions encountered by Millgard.

9.    As a result of the changed conditions, Millgard experienced significant time and cost overruns in the performance of its work.

10.    Millgard promptly notified White Oak of the problems it had encountered, and Millgard requested an equitable increase to its contract price as a result of the differing site conditions.

11.    Upon information and belief, White Oak submitted a claim to the DOT for an increase in its contract price as a result of differing site conditions, which claim subsumed Millgard's claim.

12.    On September 25, 1998, Millgard met with both White Oak and the DOT to discuss the differing site conditions encountered on the project.

13.    Millgard advised both parties that the subsurface conditions constituted a cardinal change to its contract,

5

GH 0333

therefore entitling Millgard to suspend its work on the project until its issues were resolved.

14.    Over the course of several months, White Oak and the DOT engaged in mediation to address White Oak's claim and the differing site conditions.

15.    While Millgard was not a formal party to the mediation, Millgard participated in the mediation and was repeatedly assured by White Oak that its claim would soon be resolved with the DOT and that Millgard would be able to complete its work on the project.

16.    Millgard's involvement in the mediation between White Oak and the DOT concluded on or about May 19, 1999.

17.    By letter dated May 21, 1999, White Oak wrongfully terminated Millgard's subcontract on the alleged grounds that Millgard failed to settle its claim with the DOT and refused to return to work.

18.    Upon receipt of the termination letter, Millgard immediately contacted White Oak to inquire as to the reasoning

6

GH 0334

behind the termination since Millgard's subcontract was with White Oak, not the DOT.  Therefore, Millgard's claim for additional compensation was properly directed to White Oak.

19.   White Oak advised Millgard that it was just protecting its legal rights and that White Oak intended to arbitrate its claims, which subsumed Millgard's claim, against the DOT.

20.   At the same time, White Oak advised Millgard that it still expected Millgard to return to work on the project and began negotiating Millgard's return to work on a cost plus basis.

21.   Based on White Oak's representations, Millgard remained on stand-by to complete its work on the project.

22.   At the end of August 1999, White Oak contacted Millgard and directed Millgard to demobilize from the project.

23.   During the week ending September 7, 1999, Millgard demobilized from the project.

24.   Millgard last furnished labor and/or equipment to the project on September 7, 1999.

GH 0335

25.  Although Millgard performed its obligations under the subcontract with White Oak, White Oak refused and failed to pay Millgard in accordance with the terms of the subcontract and section 49-41a of the Connecticut General Statutes.

26.  White Oak's failure to pay Millgard constitutes a material breach of its subcontract with Millgard.

27.  As of the date of this Complaint, White Oak owes Millgard the subcontract balance of $70,730.00, as well as $1,083,585.06 for additional work performed by Millgard as the result of the differing site conditions.

SECOND COUNT:  (As to White Oak Corporation)

1-24. The allegations contained in paragraphs 1 through 24 of the First Count are hereby incorporated herein as paragraphs 1 through 24 of this Second Count as if fully set forth herein.

25.  White Oak's actions effectuated a rescission of the written agreement between White Oak and Millgard.

8

GH 0336

26.  Millgard has provided labor, material and equipment which have a reasonable value of $1,792,945.06, for which it has only been paid $638,630.31.

27.  Based upon the foregoing, White Oak has been unjustly enriched in the amount of $1,154,315.06, which amount should be paid to Millgard.

THIRD COUNT:   (As to National Union Insurance Company)

1-27.  The allegations contained in paragraphs 1 through 27 of the First Count are hereby incorporated herein as if fully set forth herein.

28. The allegation contained in paragraph 26 of the Second Count is hereby incorporated herein as paragraph 28 of this Third Count as if fully set forth herein.

29.  Despite the obligations imposed upon National Union under both the terms of the Bond and section 49-42 of the Connecticut General Statutes, as well as repeated demands by Millgard, the Defendant National Union has wrongfully failed and

GH 0337

refused to pay Millgard either the amount due under its subcontract with White Oak, or the reasonable value of the labor, material and equipment provided by Millgard.

30. As a result of the foregoing conduct by National Union, Millgard has suffered damages.

IV.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff requests the following relief:

1.  Money damages;

2.  Interest;

3.  Attorney's fees and costs;

4.  An order from this Court compelling National Union to honor the Bond; and

5.  Such further relief at law or equity as this Court deems just and proper.

10

**GH 0338**

THE PLAINTIFF,
THE MILLGARD CORPORATION


By: _____
        Christopher W. Huck
        Federal Bar # CT15219
        Michelson, Kane, Royster &
            Barger, P.C.
        93 Oak Street
        Hartford, CT 06106
        Tel:    (860)522-1243
        Fax:    (860)548-0194
        Email: cwhuck@snet.net

11

GH 0339

EXHIBIT H
9 pages

# The MILLGARD Corporation

OCTOBER 29, 1998

**WHITE OAK CORPORATION**
7 West Main Street
Plainville, CT  06062

ATTENTION:    Mr. John F. Morrissey, Jr.

RE:    **TOMLINSON BRIDGE REPLACEMENT**
       **NEW HAVEN, CONNECTICUT**
       **CAISSON FOUNDATIONS**
       **TMC JOB C-1955**

Gentlemen:

The following is an explanation of what we believe transpired to generate the situation that exists concerning the caisson installation at the referenced project.

These set of circumstances we believe began at the design conception stages for this project.

It appears that the initial design concepts (1992) for the foundation design was decided to be Piling.  The only question that remained was whether the piling foundations would be friction or end-bearing.  This is verified in Page 2, last paragraph, of the Foundation Investigation Report dated August 1993 which reads as follows:

> "THE PROJECT DESIGN PHILOSOPHY HAS REMAINED ESSENTIALLY UNCHANGED SINCE THE DECISION
>
> TO USE PILE FOUNDATIONS BEARING ON BEDROCK WAS MADE IN OCTOBER 1992 FOR THE 40%
>
> SUBMISSION."

Based on the design philosophy, if you plan to drive piles to rock you only need to know if the pile is on rock and not on boulders or cobbles.  Therefore, the necessity to explain the characteristics of the rock would most likely not be necessary.

000286

12822 Stark Road • P.O. Box 510027 • Livonia, Michigan 48151 • (734) 425-8550 / FAX 425-0624



WHITE OAK CORPORATION
OCTOBER 29, 1998
PAGE TWO

MILLGARD

All 28 of the 44 Borings that penetrated the rock strata consistently classified the rock as "red sandstone" or "red/brown sandstone", only one made mention of quartz.  Generally, it is the responsibility of the Geotechnical Engineers to clearly identify the type and characteristics of the soils and rock profiles.  If it were known that socketed caissons were to be the foundation of choice, a more elaborate explanation of the rock would be necessary to confirm the quality of rock, hardness, R.Q.D.'s, soft lenses, quartz, etc. for at least the full depth of the caisson socket, and preferably 20 feet below the tip elevation as described in Section Four, "Foundations", of the AASHTO requirements.  We feel that the lack in description of the rock strata had to do with the anticipated type of foundation that was being considered for this project.

When we were putting our proposals together, we did have a representative look at the cores in the District's storage facility in Westbrook, Connecticut.  He brought back several samples of the red sandstone so we could make a determination about our production rates.

Specifically addressing the East half of the project, a red sandstone with R.Q.D.'s in the lower range indicated to us a fairly poor quality of rock that should not present any particular problem in removing.  (The R.Q.D.'s averaged 15%.)  We had no reason to believe this was erroneous or would change for the full depth of the rock socket.

Of the original 44 borings installed at the project, 8 are in the areas of the locations described above.

| LOCATION | RECOVERY | LENGTH | R.Q.D.'s |
|----------|----------|--------|----------|
| DNR - 9  | 98%      | 5'     | 24%      |
| DNR - 28 | 64%      | 3'     | 0%       |
|          | 79%      | 2'     | 17%      |
| DNR - 29 | 81%      | 3'     | 31%      |
|          | 92%      | 2'     | 19%      |
| DAR - 30 | 44%      | 5'     | 0%       |
|          | 100%     | 5'     | 14%      |
| DAR - 11 | 96%      | 5'     | 14%      |
| DNR - 12 | --       | 5'     | --       |
| DNR - 13 | --       | 14.5'  | --       |
| DAR - 14 | --       | 13.5'  | --       |

■    SEE ATTACHED SKETCH I

000287

WHITE OAK CORPORATION
OCTOBER 29, 1998
PAGE THREE

MILLGARD

As you can see by the above information, three of the eight cores did not even give Core Recovery or R.Q.D. information.  We could only assume it would have been consistent with the other five borings.
We determined that we would be able to core and remove the fairly broken and fractured sandstone with relative ease using conventional tools.  We also determined that we would be able to increase our production rates by using reverse circulation equipment.

Once we started the actual work, we found a rock profile much different than we had anticipated.  The character of the work changed dramatically.  We could not drive the casings into the rock because of exceptional hardness, and our rock penetrations (sockets) took much longer than anticipated because of the high amounts of quartz and granite, quite often in the form of cobbles and boulders.

On Monday, October 5, 1998, Bryan Sweeney, Ph.D. and Vice President of Haley Aldrich and Ed Cardoza, Vice President of The Millgard Corporation, visited the New Haven area to again analyze the following core samples.

    1.   THE ORIGINAL 28 CORE BORINGS TAKEN IN 1992 & 1993 THAT WERE PART OF THE BID

    DOCUMENT.

    2.  THE THREE POST BID CORE BORINGS AT THE N.E. LIFT PIER TAKEN IN NOVEMBER 1998.

    3.  THE FOUR POST BID CORE BORINGS AT PIER 2E TAKEN IN JUNE 1998.

    4.  THE ACTUAL 24 INCH DIAMETER CORES TAKEN OUT OF THE N.E. LIFT PIER EARLIER THIS YEAR

    BY MILLGARD.

Unfortunately all the original borings taken on the East half and a portion of the West half of the project were misplaced, and have been for some time.  So they were only able to examine a portion of the cores for the project, plus those in categories 2, 3 and 4 listed above.

The seven post bid borings taken in 1997 and 1998 at N.E. Lift Pier and Pier 2 give a much different picture of the rock profiles - some with R.Q.D.'s in excess of 90%, and a much harder rock character than originally indicated.  Inspection of the 24" diameter cores verified the presence of quartz and granite cobbles/boulder (photographs attached), (H-A correspondence of 5/22/98, 6/24/98 and 10/29/98 attached).

000288

WHITE OAK CORPORATION
OCTOBER 29, 1998
PAGE FOUR

MILLGARD

Our review indicates there are several areas of inadequate or inaccurate information.

- **VERY LOW R.Q.D.'S THAT WERE NOT REFLECTIVE OF THE ACTUAL CONDITIONS.**

- **FIVE FOOT LONG BX CORES ARE NOT REPRESENTATIVE OF THE ACTUAL CONDITIONS, TOO SMALL AND NOT DEEP ENOUGH.**

- **INADEQUATE CLASSIFICATION OF ROCK STRATA.**

It is our opinion that the mind-set of the Design Engineers and the Geotechnical firm was pre-determined that the foundation choice for the referenced project would be piling, either friction or end-bearing.

We believe, with this in mind, the borings were installed. It was only some time after the fourth set of borings were installed in June and July 1993 that piling for this project was a major risk. This decision is explained on pages 3 & 4 Section 1-d DESIGN PHASE PILE DRIVING AND LOAD TESTING PROGRAM, and in Section 2 STRUCTURE FOUNDATION RECOMMENDATIONS starting on page 9 of the FOUNDATION INVESTIGATION REPORT dated August 1993.

We believe that it would have been in the best interest of the project, once it was decided to use sockets into rock, that a fifth set of borings should have been installed, with much deeper penetration into the rock and much more specific information.

We also believe that if you design for end-bearing piles on rock or drilled caissons with sockets 16 foot into rock, (average 2' penetration of casing), there are two major differences in the requirements for soil and rock information. Once the pile is driven to refusal, it is either on the rock or just into it a short distance. The type and quality of the rock does not make much difference.

Using socketed caisson into rock, a considerable distance is an all together different situation. It is very important to have as much information as possible in determining the strength and character of the rock. It is also very important to have cores installed a considerable distance below the tip elevation to verify the quality and bearing capacity (absence of voids or soft seams, especially in sedimentary rock).

We believe that the subsurface exploration and testing program was inadequate for a caisson solution. The rock penetrations did not go deep enough, and the classification, identification and quality descriptions of the rock were insufficient and not extensive enough to give a comprehensive picture of the character of the rock. The rock is much harder and more inconsistent than indicated by the borings as evidenced by the subsequent requirement to twist casing into the rock because the driving method bounced the casing off the rock.

**WHITE OAK CORPORATION**
**OCTOBER 29, 1998**
**PAGE FIVE**

**MILLGARD**

During the bidding process, we estimated productivity that was in the range we achieved on four locations, Caissons J-1 through M-1 in the N.E. Lift Pier (Attachment A).  However, for pricing purposes, we took a more conservative approach which is represented by the attached As-Bid Schedule (Attachment B).  The As-Built Schedule (Attachment B), indicates the impact to this portion of the project due to changes in the character of the work discussed earlier.

Attachment C expands upon this impact and expresses it in time differences.  The rate sheet which has been included (Attachment D), establishes the value of the labor and equipment furnished by The Millgard Corporation for this project in accordance with contract documents.

Therefore, the total value of the impact due to the reasons previously discussed become the multiplication of the added time and the hourly rate resulting in $1,023,174.00.  As in the past, we are prepared to meet and work out a settlement agreeable to all of the parties.

Sincerely,

**THE MILLGARD CORPORATION**

**V. Dennis Millgard**
**President**

CP:DMLT1029.WHI

**VIA UPS OVERNIGHT**

# NORTHEAST LIFT PIER

## TOMLINSON BRIDGE
## NEW HAVEN, CONNECTICUT

### TMC JOB NO. C-1955

Cuttings indicate mostly sandstone along 1 line.

| LOCATION | FOOTAGE | DURATION (hours) |
|---|---|---|
| J-1 | 16.28 | 2.75 |
| K-1 | 15.99 | 3.25 |
| L-1 | 15.33 | 2.49 |
| M-1 | 18.06 | 2.08 |
| TOTALS: | 65.66 | 10.57 |

Average Penetration Rate:   6.2 Feet Per Hour

JEL:DMM.C1955RCK.TBL

000291

ATTACHMENT B

## Northeast Lift Pier AS-BID SCHEDULE Caisson foundations

| ID | PROJECT | DURATION | START |
|----|---------|----------|-------|
| 1 | Set Template | 3d | 11/17/97 |
| 2 | Set Casing | 5d | 11/20/97 |
| 3 | Install Test Caisson | 1d | 12/1/97 |
| 4 | Install Caissons | 18d | 12/2/97 |

## Northeast Lift Pier AS-BUILT SCHEDULE Caisson foundations

| ID | PROJECT | DURATION | START |
|----|---------|----------|-------|
| 1 | Set Template | 3d | 11/17/97 |
| 2 | Set Casing | 5d | 11/20/97 |
| 3 | Install Caissons | 0d | 12/1/97 |
| 4 | Test Caisson | 2d | 12/3/97 |
| 5 | Wait on ConnDot da | 10d | 12/5/97 |
| 6 | Test casing rework | 2d | 12/19/97 |
| 7 | Test continuation | 1d | 12/22/97 |
| 8 | Await owner decision | 17d | 12/23/97 |
| 9 | Rework casing | 20d | 1/19/98 |
| 10 | Caisson installation | 96d | 2/17/98 |

Critical    Noncritical    Progress    Milestone    Summary

Project: Tomlinson Bridge
Date: 9/20/98

THE MILLGAARD CORPORATION

000292

ATTACHMENT C

**TOMLINSON BRIDGE**
**NEW HAVEN, CONNECTICUT**
**TMC JOB NO. C-1955**

| AS-BUILT DESCRIPTION | START | COMPLETE | DURATION (8 HR. DAYS) | REMARKS | HOURS |
|---|---|---|---|---|---|
| MOBILIZE | 10/31/97 | 11/14/97 | 11 DAYS | | -- |
| SET TEMPLATE | 11/17/97 | 11/19/97 | 3 DAYS | | -- |
| SET CASING | 11/21/97 | 12/01/97 | 5 DAYS * | | -- |
| WEATHER | 12/01/97 | 12/01/97 | 1 DAY | | -- |
| TEST CAISSON | 12/03/97 | 12/04/97 | 2 DAYS | | 16.00 |
| WAIT ON CT DOT DECISION | 12/05/97 | 12/18/97 | 10 DAYS | SENT CREW HOME | 80.00 |
| REMOVE TEST CASING & WELD TEETH | 12/19/97 | 12/20/97 | 2 DAYS | | 16.00 |
| COMPLETE TEST CAISSON | 12/22/97 | 12/22/97 | 1 DAY | | 8.00 |
| AWAIT OWNER DECISION | 12/23/97 | 1/18/98 | 12 DAYS ** | SENT CREW HOME | 96.00 |
| REWORK CASING | 1/19/98 | 2/17/98 | 20 DAYS | | 160.00 |
| INSTALL CAISSONS | 2/18/98 | 7/01/98 | 81 DAYS *** | | 648.00 |
| TOTAL: | | | | | 1,024.00 |

| AS-BID DESCRIPTION | START | COMPLETE | DURATION (8 HR. DAYS) | REMARKS | EXTENSION |
|---|---|---|---|---|---|
| TEST CAISSON | | | 1 DAY | | 8.00 |
| INSTALL CAISSONS | | | 19 DAYS | | 152.00 |
| TOTAL: | | | | | 160.00 |

**DIFFERENCE:** 864.00

* HOLIDAY NOT INCLUDED
** HOLIDAYS NOT INCLUDED
*** NOT INCLUDED -- WEATHER: 3/09/98; HOLIDAYS: 4/10/98 & 5/25/98; MECHANICAL: 3/27, 3/31, 4/1, 4/2, 4/4, 4/21, 4/22, 4/23, 5/20, 5/21, 5/22 & 6/15/98

JEL:DMM/A-1955DT.WK3

000293

ACHMENT D

# TOMLINSON BRIDGE PROJECT
# NEW HAVEN, CT

## LABOR

| CLASSIFICATION | BASE RATE | VAC. | TAXABLE RATE | FRINGES | SUBTOTAL | MARKUP (0.20) | TAXES (0.1535) | INS. (0.08) | LONGSHORE (0.2250) | MARKUP (0.06) | SUBTOTAL | NO. | EXT. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Foreman | $28.95 | $1.40 | $30.35 | $7.63 | $37.98 | $7.60 | $4.66 | $2.43 | $10.02 | $1.03 | $63.70 | 1 | $63.70 |
| P.D. Foreman | $20.50 | $0.00 | $20.50 | $6.05 | $26.55 | $5.31 | $3.15 | $1.64 | $6.77 | $0.69 | $44.10 | 1 | $44.10 |
| Pile Driver | $18.50 | $0.00 | $18.50 | $6.05 | $24.55 | $4.91 | $2.84 | $1.48 | $6.11 | $0.63 | $40.51 | 2 | $81.02 |
| Driller | $23.27 | $3.49 | $26.76 | $8.70 | $35.46 | $7.09 | $4.11 | $2.14 | $8.83 | $0.90 | $58.54 | 1 | $58.54 |
| Mechanic | $20.83 | $0.00 | $20.83 | $7.95 | $28.78 | $5.76 | $3.20 | $1.67 | $6.87 | $0.70 | $46.98 | 1 | $46.98 |
| | | | | 36.38 | 30.66 | 17.95 | 9.36 | 38.59 | 3.95 | | Hourly Labor | | $294.34 |

## TRAVEL & SUBSTANCE

| | | | |
|---|---|---|---|
| SUB | 2@ | $10.00/HR | Sub | $20.00 |
| AIRFARE | 2@ | $7.50/HR | Air | $15.00 |

## EQUIPMENT

| EQUIPMENT | BARE RATE | OP COSTS | SUBTOTAL |
|---|---|---|---|
| VIBRO HAMMER | $54.20 | $44.65 | $98.85 |
| 4000W CRANE | $150.00 | $43.00 | $193.00 |
| EXT. DRILL UNIT | $3.78 | $5.00 | $8.78 |
| WELDER | $3.78 | $5.00 | $8.78 |
| WELDER | $100.00 | $0.00 | $100.00 |
| TOOLS | $170.00 | $17.50 | $187.50 |
| REV. CIRCULATION | $23.40 | $24.00 | $47.40 |
| 1400 COMPRESSOR | $100.00 | $0.00 | $100.00 |
| BIT WEAR | $61.78 | $30.00 | $91.78 |
| PUMPS | | | |
|  - 6" W/SUCTION HOSE | | | |
|  - 3" W/POWER PACK | | | |
|  - 4" | | | |
| PICKUP | $8.00 | $4.80 | $12.80 |
| TRAILERS | $5.00 | $1.00 | $6.00 |
| | 679.94 | 174.95 | |
| | EQUIP | | $854.89 |

Equipment  $854.89

**TOTAL - LABOR & EQUIPMENT:  $1,184.23**

FILE: TOMLNY2.WK3

000294

22-Oct-98

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

No. 3:00 CV 1685 (CFD)

THE MILLGARD CORPORATION
        Plaintiff

VS

WHITE OAK CORPORATION, et al                COPY
        Defendants

Deposition of: **V. DENNIS MILLGARD**, taken

pursuant to the Federal Rules of Civil

Procedure before Barbara L. Murphy, Licensed

Shorthand Reporter, License No. 305 and Notary

Public within and for the State of

Connecticut, held at the offices of Michelson,

Kane, Royster & Barger, 93 Oak Street,

Hartford, Connecticut on March 19, 2003

commencing at 10:00 a.m.

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS

117 RANDI DRIVE                100 PEARL STREET
Madison, CT 06443              HARTFORD, CT 06106
203-245-9583                   800-839-6867

MK - 00241

1      THE WITNESS:  The problem is the first

2   cost program that was submitted to White Oak in

3   October of '98 was according to plans and

4   specifications.

5      Subsequent to that Millgard was

6   requested on a number of occasions to put the cost of

7   the northeast pier together based on different

8   methods.

9      White Oak asked for another way of

10  doing it, Peter, what's his name, the secretary.

11      MR. HUCK:  Huntsman.

12      THE WITNESS:  Huntsman, asked for

13  another way to do it.  You're giving me documents that

14  have no dates on them.  I don't know what the

15  correlation is.  I don't know if this is before or

16  after.

17      MR. HUCK:  I think if I can just

18  clarify --

19      MR. HEDBERG:  I want to say, Chris,

20  that this was what was produced to me --

21      MR. HUCK:  This is --

22      MR. HEDBERG:   -- by your attorney.

23      MR. HUCK:  He's just asking for the --

24  on the damages analysis that the company prepared.

25  He's just basically looking for how the line items

MK - 00388

1   this document was requested by White Oak back in April

2   of 1999.  There was about four or five different

3   documents that were put together at that time so they

4   could present it to ConnDOT in order to get the

5   changeorder approved.

6           ConnDOT was explaining it would be easier

7   to do it this way or it would be easier to do it that

8   way.  We were asked to put it together this way.

9       Q.   Is Millgard relying on this document for its

10  damages in this lawsuit?

11      A.   Certainly we are.

12      Q.   Is there any other documents that --

13      A.   Yes.  There is one of October 25, 19 -- they

14  are all about the same.

15      Q.   The damage analysis includes more than just

16  what was transmitted to me?

17          MR. HUCK:  No.  You know, just -- as

18  you know early on they were negotiating both -- they

19  were negotiating this from several different

20  standpoints.

21          The DOT requested him to compute his

22  damages in the form of a unit price, they requested he

23  compute it in accordance with the damage analysis we

24  gave you.

25          There are multiple different versions

MK - 00396

1    floating around.  Obviously in the context of

2    discovery we produced all of the documents that were

3    earlier transmitted between the parties and those

4    documents contained several different versions of

5    damages calculations.

6              The one that we're relying on and was

7    disclosed to you is the one in evidence right now that

8    you're questioning my client about.  That was the

9    damages disclosure made to you last week.

10             It does get confusing because there

11   were calculations done multiple different ways.  They

12   all came out to approximately the same figures.

13        Q.   (By Mr. Hedberg)  Looking at schedule C do

14   you know on expected return on investment if you look

15   at the number, do you know how that number was

16   derived?

17        A.   Looks like 10 percent.

18        Q.   Do you know where that 10 percent came from?

19        A.   Either White Oak or ConnDOT.

20        Q.   Not Millgard?

21        A.   We put the document together on the basis of

22   how we were directed to put it together.

23        Q.   Understood.

24        A.   Dennis Millgard was not interested -- made

25   no difference to him whether he was going to get a

MK - 00397

1   million and forty-two thousand dollars, a million and

2   eighty-three thousand dollars or a million and sixty

3   thousand dollars.

4          All the different ways it was put

5   together was all within about $50,000 of each other.

6   The other ones outside of the one we put together on

7   the basis of the specifications, we were directed to

8   put together by somebody else.

9       Q.   So somebody at White Oak or ConnDOT directed

10  somebody at Millgard --

11      A.   Told to us put it together.

12      Q.   -- directed somebody a Millgard --

13      A.   Right.   There were -- a lot of them were put

14  together verbally also in phone conversations between

15  me and Peter Heinrich (phonetic) or whatever the heck

16  his name was.

17      Q.   Who put schedule C together for Millgard

18  based on the direction it received from White Oak or

19  ConnDOT?

20      A.   I probably did.

21      Q.   Do you recall who directed you to put

22  10 percent?

23      A.   No.

24      Q.   Total due on additional work, $1,083,585.06.

25  How is that number calculated?

MK - 00398

**EXHIBIT J**

2 pages

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE MILLGARD CORPORATION,<br>     Plaintiff<br><br>v.<br><br>GADSBY HANNAH, LLP<br>     Defendant | )<br>)<br>)<br>)<br>)     Civil Action No. 04-12388-RWZ<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF V. DENNIS MILLGARD

Upon oath I, V. Dennis Millgard, depose and say as follows:

1.  I reside at 54878 Grenelefe Circle East, South Lyon, Michigan 48178.

2.  I was employed by The Millgard Corporation ("TMC") from 1963 to 2003.

3.  My last job title with The Millgard Corporation was as its president.

4.  I have personal knowledge of the facts contained herein and if called as a witness could competently testify thereto.

5.  "Mobilization" refers to the work of transporting materials and equipment to the jobsite, the assembly of that equipment, and the mustering of the workforce necessary to complete the project as well as the reverse process that occurs upon project completion.

6.  When TMC stopped work on the Tomlinson Bridge Project on September 15, 1998, it only laid off its labor force but did not remove its equipment from the jobsite.

7.  TMC completed demobilizing from the Tomlinson Bridge Project jobsite in September of 1999.

1

P:\data\active\Millgard\1269\Affidavit of Dennis Millgard_2.doc

WHEREFORE, I have read the foregoing and state under the penalties of perjury that the information contained herein is true and accurate to the best of my knowledge.

Dated:
August 1, 2006

_____
V. Dennis Millgard

C:\Documents and Settings\DENNIS\Local Settings\Temporary Internet Files\Content.IE5\F6WRF18P\Affidavit of Dennis Millgard_2.doc

EXHIBIT K

3 pages

# STATE OF CONNECTICUT

# DEPARTMENT OF TRANSPORTATION

Standard Specifications

for

Roads, Bridges

and

Incidental Construction

FORM 814

1963

**9.74.03**

and bridge substructures, the removal of which is necessary to the final completion of the work.

**9.74.03—Construction Methods:** Existing masonry shall be removed to the lines shown on the plans or as ordered by the Engineer, due precaution being taken to avoid injury to new construction, public utility installations or abutting property. The material excavated shall be used in the embankment fill, or it shall be disposed of as directed by the Engineer.

**9.74.04—Method of Measurement:** Masonry removed under this item shall be measured for payment by the volume in cubic yards in place before removal.

Only individual masonry units of one cubic yard or more will be measured for payment.

The frequency of intermediate measurements to develop the approximate cross-section of a structure shall be at the discretion of the Engineer.

**9.74.05—Basis of Payment:** Payment for removing existing masonry will be made at the contract unit price per cubic yard for "Removal of Existing Masonry," which price shall include all equipment, tools and labor incidental to the removal of the material and the disposal thereof as directed by the Engineer.

| Pay Item | Pay Unit |
|---|---|
| Removal of Existing Masonry | C.Y. |

## SECTION 9.75

## MOBILIZATION

**9.75.01—Description:** This item shall consist of all work necessary for the movement of personnel and equipment to the project site, and for the establishment of all Contractor's field offices, buildings and other facilities necessary to the performance of the work.

**9.75.04—Method of Measurement:** This work will be measured for payment in the manner described hereinafter; however, the determination of the total contract price earned shall not include the amount of mobilization earned during the period covered by the current monthly estimate—but shall include amounts previously earned and certified for payment:

1. When the first payment estimate is paid, 50 percent of

442

**9.76.02**

lump sum bid price for this item or 5 percent of the total original contract price, whichever is less, will be certified for payment.

2. When ten percent of the original contract price is earned, 75 percent of the lump sum price of this item or 7.5 percent of the total original contract price, whichever is lesser, minus any previous payment, will be certified for payment.

3. When 30 percent of the total original contract price is earned, 100 percent of the lump sum price for this item or 10 percent of the total original contract price, whichever is lesser, minus any previous payment, will be certified for payment.

Upon completion of all work on the project, payment of any amount bid for mobilization in excess of 10 percent of the original contract amount will be paid.

Nothing herein shall be construed to limit or preclude partial payments otherwise provided for by the contract.

**9.75.05—Basis of Payment:**  This work will be paid for at the contract lump sum price for "Mobilization" which price shall include materials, equipment, tools, labor, transportation, operations and all work incidental thereto.

When no price for "Mobilization" is asked for on the proposal form, the cost of the work described above shall be included in the genereal cost of the contract, with no direct payment for the work.

| Pay Item | Pay Unit |
|---|---|
| Mobilization | L.S. |

## SECTION 9.76

### BARRICADE WARNING LIGHTS

**9.76.01—Description:**  This item shall include furnishing and maintaining designated type barricade warning lights on signs and barricades and elsewhere as ordered by the Engineer.

**9.76.02—Materials:**  Barricade warning lights are portable, lens-directed, enclosed lights. The color of the light emitted shall be yellow. They may be used in either a steady-burn or flashing mode. Barricade warning lights shall be in accordance with the requirements of the Institute of Traffic Engineers Standard for Flashing and Steady-Burn Barricade Warning Lights and the following table:

443

EXHIBIT L
11 pages

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: _TOMLINSON BRIDE_      NO.: _#C-1955_

DATE: _OCT 30th 1997_      LOCATION: _NEW HAVEN CT._

WEATHER: _SUNNY - WARM._

REMARKS:

_STARTED MOBILIZATION. 1 LOAD FROM THE YARD. LOAD_
_CONSISTED OF 20 H-BEAMS - 1 SET OF TRUNIONS._

_3 MEN - 14 HRS._

MK - 02893

BY: _B. Mull_      DATE: _10-30-97_

SUPERINTENDENT

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD: LIVONIA, MI 48150
(313) 425-8550

| | | |
|---|---|---|
| JOB: _TOMLINSON BRIDGE_ | NO.: | _#C-1955_ |
| DATE: _OCT 31ST 1997_ | LOCATION: | _NEW HAVEN CT._ |
| | WEATHER: | _SUNNY - COOL._ |

REMARKS:

_STARTED MOBILIZATION. HAD 1 LOAD FROM O.B. HILL. LOAD
CONSISTED OF - ① TOOL CONTAINER ① WELDING MACHINE -
① 24" CORE BUCKET ① 18" DIGGING BUCKET.
SIGNED UP 2 PILE DRIVERS - 1 MECHANIC WELDER._

_6 MEN 8HRS._

MK - 02894

BY: _B. Mull_

SUPERINTENDENT

DATE: _10-30-97_

# SUPERINTENDENT DAILY REPORT

**MILLGARD**

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: *TOMLINSON BRIDGE*    NO: *#C-1955*

DATE: *NOV. 3ᴿᴰ 1997*    LOCATION: *NEW HAVEN CT.*

WEATHER: *SUNNY - MILD.*

REMARKS:

*CONTINUED MOBILIZATION - CRANE FROM ESSEX (4000W)*
*STARTED ARRIVING, PARTS ON SITE - ② CRAWLERS - ① CARBODY*
*③ COUNTERWEIGHTS - ② 40ᶠᵗ SECTIONS OF BOOM - ① TIP SECTION*
*① HEEL SECTION - ① SPREADER BAR - ② BOOM STOPS - ① LOAD BLOCK*
*① HEADACHE BALL.*
*ASSEMBLED THE TRACKS & CARBODY.*

*7 MEN 8½ HRS.*

MK - 02895

BY: *H B. Mull*    DATE: *11-3-97*
SUPERINTENDENT

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: *TOMLINSON BRIDGE*

DATE: *NOV. 4th 1997*

NO.: *FC-1955*

LOCATION: *NEW HAVEN CT.*

WEATHER: *SUNNY-MILD.*

REMARKS:

*CONTINUED MOBILIZATION. THE HOUSE FOR THE 4000W (ESSEX) ARRIVED. SET THE HOUSE.*
*VIBRO HAMMER FROM ICE NORTHEAST ARRIVED. MODEL #4450*
*AS OF TODAY EQUIPMENT ON SITE:*

*1-4000 W. SERIAL # 4063-W*
*150 ft OF BOOM (ESSEX.)*
*1-4450 VIBRO HAMMER - POWER PACK + HOSE*
*(ICE NORTHEAST)*
*1- TOOL CONTAINER (MILLGARD)*
*1-24" CORE BUCKET (MILLGARD)*
*1-18" DIGGING BUCKET (MILLGARD)*
*1-LOAD -20 BEAMS (MILLGARD)*
*1- WELDING MACHINE (MILLGARD.)*
*6-BOTTLES OF OXYGEN (AIRGAS NORTH EAST)*
*4- BOTTLES OF ACETYLENE (AIRGAS NORTH EAST)*

*7-MEN - 10 HRS.*

MK - 02896

BY: *St. B. Mull*
SUPERINTENDENT

DATE: *11-4-97*

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI  48150
(313) 425-8550

JOB: _TOMLINSON BRIDGE_     NO.: _#C-1955_

DATE: _NOV. 5th 1997_     LOCATION: _NEW HAVEN  CT._

WEATHER: _SUNNY-COOL_

REMARKS:

_CONTINUED MOBILIZATION. FITTED AND WELDED TRUNIONS ON_
_THE 400 W._
_SET UP RENTED OFFICE TRAILER._
_TRIMMED BEAMS FOR THE TEMPLETE._

_7- MEN - 8 HRS._

MK - 02897

BY: _Stn B. Mall_     DATE: _11-5-97_

SUPERINTENDENT

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: _TOMLINSON BRIDGE_    NO: _# C-1955_
DATE: _NOV. 6th 1997_    LOCATION: _NEW HAVEN CT._
    WEATHER: _SUNNY - COOL._

REMARKS:

_CONTINUED MOBILIZATION, STARTED ASSEMBLING THE 4000 W_
_HAD TO CHANGE THE BOOM HOIST CABLE (SUPPLIED BY ESSEX)_
_STARTED SETTING UP THE BARGE._

_7-MEN 9HRS._

MK - 02898

BY: _St. B. Mall_    DATE: _11-6-97_
SUPERINTENDENT

## SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD, LIVONIA, MI 48150
(313) 425-8550

JOB: _TOMLINSON BRIDGE._    NO.: _#C-1955_

DATE: _NOV. 7th 1997_    LOCATION: _NEW HAVEN CT._

WEATHER: _CLOUDY - COOL._

REMARKS:

_CONTINUED MOBILIZATION. ATTACHMENT + FUEL TANK ARRIVED._
_FINISHED SETTING UP THE BARGE. WALKED THE 4000W ONTO_
_THE BARGE. CONTINUED ASSEMBLING THE 4000W._

_7 MEN - 8HRS._

MK - 02899

BY: _B. Mall_
SUPERINTENDENT

DATE: _11-7-97_

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI  48150
(313) 425-8550

JOB: *Tomlinson Bridge*          NO: *#C-1955*
DATE: *Nov. 10th 1997*          LOCATION: *New Haven Ct.*
                                 WEATHER: *Cloudy - Cool.*

REMARKS:

*Continued site mobilization. Finished assembling the 4000 W.*
*Laid 10 additional crane mats on the barge, mats provided by White Oak Corp.*

*8 - Men - 8 Hrs.*

MK - 02900

BY: _____          DATE: *11-10-97*
SUPERINTENDENT

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: TOMLINSON BRIDGE    NO.: C-1955    LOCATION: NEW HAVEN, CT.

DATE: NOV. 11th 1997    WEATHER: CLOUDY-COOL

**REMARKS:**

CONTINUED MOBILIZATION.
PUT KELLY CABLES ON THE 4000W. SPENT 2HRS WORKING
ON A PROBLEM WITH THE BRAKE ON THE LEFT DRUM OF
THE CRANE.
PUT THE ATTACHMENT AND STAND TOGETHER.
MOVED REMAINING EQUIPMENT ONTO THE BARGE.
FUELED THE 4000W AND FUEL TANK. RECEIVED FUEL FROM
WHITE OAK CORPORATION. (1010 GALS)

    8 MEN - 8½ HRS
    1010 GALS OF FUEL.

MK - 02901

BY: _____    DATE: 11-11-97
SUPERINTENDENT

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: *TOMLINSON BRIDGE*
DATE: *NOV. 12th 1997*

NO.: *#C-1955*
LOCATION: *NEW HAVEN CT.*
WEATHER: *CLOUDY - COOL*

REMARKS:

*CONTINUED SITE MOBILIZATION.*
*MOUNTED THE DRILL ATTACHMENT AND KELLY BAR. ADJUSTED*
*CONTROL CABLES FOR THE ATTACHMENT.*
*RECEIVED AND UNLOADED BEAMS FOR THE TEMPLATE FROM*
*MILLGARD'S YARD - 16 PIECES.*

*8 - MEN - 8½ HRS.*

MK - 02902

BY: *S.B. Mull*
SUPERINTENDENT

DATE: *11-12-97*

# SUPERINTENDENT DAILY REPORT

MILLGARD

THE MILLGARD CORPORATION
12822 STARK ROAD; LIVONIA, MI 48150
(313) 425-8550

JOB: _TOMLINSON BRIDGE_

DATE: _NOV 13th 1997_

NO.: _#C-1955_

LOCATION: _NEW HAVEN CT_

WEATHER: _SUNNY -COOL_

REMARKS:

CONTINUED MOBILIZATION.
WELDED HAND RAILS ON THE ATTACHMENT.
UNLOADED CASING SUPPLIED BY WHITE OAK CORP.
CASINGS ON SITE:

| | |
|---|---|
| #J1 - 83'6" | #K1 - 83'4" |
| #J2 - 79'2" | #K2 - 79'4" |
| #J3 - 74'4" | #K3 - 74'4" |
| #J4 - 74'3" | #K4 - 74'4" |
| #J5 - 74'4" | #K5 - 74'4" |
| #J6 - 74'3" | #K6 - 74'4" |
| #J7 - 74'3" | #K7 - 74'4" |
| #J8 - 74'4" | #K8 - 74'4" |
| #J9 - 74'3" | #K9 - 74'4" |

3 MEN - 3 HRS - 30 MINS  UNLOADING CASING

7 MEN - 8½ HRS.

MK - 02903

BY: _____
SUPERINTENDENT

DATE: _11-13-97_

EXHIBIT M
12 pages

# SUB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

5512

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062

Date: 11-5-97     Project: 92-435

Period: 11-5-97     Est. #: 1    WOX Project #: 74

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | | F+I 30" Dia. Caisson | | | | Lf | 100.— | |
| 702833A | | Test Shaft 30" Caisson | | | | Lf | 350.— | |
| 702930A | | Drill Rock socket 30" Caisson | | | | Lf | 260.— | |
| | | Mobilization | — | 100% | 100% | LS | 150,000.— | 150,000.— |

MK - 06219

**DEFENDANT'S EXHIBIT**
Millgard 34
3/19/03

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

PAID BY CHECK No. 448328
DATE 1/16  1/15/98
AMOUNT OF CHECK: 150,000.—

TOTAL AMOUNT EARNED $ 150,000.—
LESS 2.5 % RETAINED $ 3,750.—
BALANCE $ 146,250.—
LESS PREVIOUS PAID $

# SUB CONTRACTORS INVOICE

Page _____ of _____

*Millyard Corporation*

5512

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062
Date: 4-15-98    Project: 92-435
Period: 12-5-97    Est. #: 2    WOX Project #: 74
DOT EST #72

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | | 335.53 | 335.53 | Lf | 100.— | 33,553.— |
| 702833A | 05183 | Test Shaft 30" Caisson | | 12.75 | 12.75 | Lf | 350.— | 4462.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | | | | Lf | 260.— | |
| | 05633 | Mobilization | | | 100% | LS | 150,000.— | 150,000.— |
| 06AS001 | 10132 | Modify Caissons (VE Sill | | | | ea | 3250.— | |
| 06AS004 | 10133 | Caisson Seating | | | | Lf | 175.— | |

MK - 06220

*No Retainage*

QUANTITY CHECKED BY: _____
PRICES CHECKED BY: _____
EXTEN CHECKED BY: _____
PREVIOUS PAYMENT CHECKED: _____
APPROVED FOR PAYMENT BY: _____

PAID BY CHECK No. 449341
DATE 5/4  5/4/98
AMOUNT OF CHECK 37,065.11

TOTAL AMOUNT EARNED $ 188,015.50
LESS 2.5 % RETAINED $ 950.39
BALANCE $ 187,065.12
LESS PREVIOUS PAID $ 150,000.—

SUB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

512

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062
Inv. Date: 4-15-98    Project: 92-435
Period: 2-20-98    Est. #: 3    WOX Project #: 74
DOT EST # 74-75

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 335.53 | 155.73 | 491.26 | Lf | 100.— | 49,126.— |
| 702833A | 05483 | Test Shaft 30" Caisson | 12.75 | (12.75) | — | Lf | 350.— | |
| 702930A | 05484 | Drill Rock socket 30" Caisson | | | | Lf | 260.— | |
| | 05633 | Mobilization | | | 100% | LS | 150,000.— | 150,000.— * |
| 726AS001 | 10132 | Modify Caissons (NE Abt) | — | 36 | 36 | ea | 3250.— | 117,000.— |
| 726AS004 | 10133 | Caisson Seating | — | 50.53 | 50.53 | Lf | 175.— | 8842.75 |
| | 20100 | B/C Fwd. 8B7029 (12/31/97) | | (1463.21) | (1463.21) | | | (1463.21) * |

MK - 06221

* no Retainage

QUANTITY CHECKED BY: _____
PRICES CHECKED BY: _____
EXTEN CHECKED BY: _____
PREVIOUS PAYMENT CHECKED: ✓
APPROVED FOR PAYMENT BY: _____
FORM WO 105B

PAID BY CHECK No. 449341
DATE 5/4    5/4/98
AMOUNT OF CHECK: 132,066.20

| | |
|---|---|
| TOTAL AMOUNT EARNED | $ 323,505.54 |
| LESS 2.5 % RETAINED | $ 4374.22 |
| BALANCE | $ 319,131.32 |
| LESS PREVIOUS PAID | $ 187,065.12 |
| PAY THIS EST. | $ 132,066.20 |

# JOB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062

5512

Date: 4-21-98    Project: 92-435
Period: 4-5-98    Est. #: 4    WOX Project #: 74
not est #78

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 491.26 | 106.36 | 597.62 | Lf | 100.— | 59,762.— |
| 702833A | 05183 | Test Shaft 30" Caisson | — | 28.25 | 28.25 | Lf | 350.— | 9887.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | — | 24.63 | 24.63 | Lf | 260.— | 6403.80 |
| | 05633 | Mobilization | | | 100.70 | LS | 150,000.— | 150,000.—# |
| 06AS001 | 10137 | Modify Caissons INE bid | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Seating | 50.53 | 3.17 | 53.70 | Lf | 175.— | 9397.50 |
| | | | | | | | | |
| | 20100 | B/C Invoice 8B7029 | | | (1463.21) | | | (1463.21)# |
| | 20100 | B/C Invoice 8B7030 | — | (1294.94) | (1294.94) | | | (1294.94)# |
| | 20100 | B/C Invoice SC7012 | — | (1197.84) | (1197.84) | | | (1197.84)# |

MK - 06222

* no Retainage

QUANTITY CHECKED BY: _____
PRICES CHECKED BY: _____
EXTEN CHECKED BY: _____
PREVIOUS PAYMENT CHECKED: _____
APPROVED FOR PAYMENT BY: _____

PAID BY CHECK No. 449862
DATE 6/15    6/15/98
AMOUNT OF CHECK: 24,302.22

TOTAL AMOUNT EARNED    $ 348,494.81
LESS 2.5 % RETAINED    $ 5061.27
BALANCE    $ 343,433.54
LESS PREVIOUS PAID    $ 319,131.32
PAY THIS EST    $ 24,302.22

# SUB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062

5512

Date: _5-8-98_    Project: _92-435_

Period: _4-30-98_    Est. #: _5_    WOX Project #: _74_

DOT EST #79

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 597.62 | 73.04 | 670.66 | Lf | 100.— | 67,066.— |
| 702833A | 05183 | Test Shaft. 30" Caisson | 28.25 | — | 28.25 | Lf | 350.— | 9887.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | 24.63 | — | 24.63 | Lf | 260.— | 6403.80 |
| | 05633 | Mobilization | | | 100 70 | LS | 150,000.— | 150,000.— * |
| 06AS001 | 10132 | Modify caissons (NE Lift) | 36 | | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Seating | 53.70 | — | 53.70 | Lf | 175.— | 9397.50 |
| | 20100 | B/C Inv. 8B 7029 | | | (1463.21) | | | (1463.21) * |
| | 20100 | B/C Inv. 8B 7030 | | | (1294.94) | | | (1294.94) * |
| | 20100 | B/C Inv. 8C 7012 | | | (1197.84) | | | (1197.84) * |

MK - 06223

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

*+ no Retainage*

PAID BY CHECK No. _449862_

DATE _6/15_ _6/15/98_

AMOUNT OF CHECK: _7121.40_

TOTAL AMOUNT EARNED    $ 355,798.81

LESS _2.05_ % RETAINED    $ 5,243.87

BALANCE    $ 350,554.94

LESS PREVIOUS PAID    $ 343,433.54

PAY THIS EST.    7,121.40

CONTRACTORS INVOICE

*Millgard Corporation*

Page _____ of _____

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062

5512

Date: _6-1-98_   Project: _92-435_
Period: _5-5-98_   Est. #: _6_   WOX Project #: _74_
DOT EST # 80

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F&I 30" Dia. Caisson | 670.66 | 43.33 | 713.99 | Lf | 100.- | 71,399.- |
| 702833A | 05183 | Test Shaft 30" Caisson | 28.75 | — | 28.75 | Lf | 350.- | 9887.50 |
| 702930A | 05184 | Drill Rock socket 30" Caisson | 24.63 | 136.45 | 161.08 | Lf | 260.- | 41,880.80 |
| | 05633 | Mobilization | | | 100.70 | LS | 150,000.- | 150,000.- * |
| 26AS001 | 10132 | Modify Caissons NE Add | 36 | — | 36 | ea | 3250.- | 117,000.- |
| 06AS004 | 10133 | Caisson Seating | 53.70 | 16.51 | 70.21 | Lf | 175.- | 12,286.75 |
| | 20100 | B/C Inv. 8B 7029 | | | | | | (1463.21)* |
| | 20100 | B/C Inv. 8B 703 | | | | | | (1294.94)* |
| | 20100 | B/C Inv. 8C 7012 | | | | | | (1197.80)* |
| | 20100 | B/C Inv. 8D 7013 | | (2541.55) | (2541.55) | | | (2541.55)* |

*No Retainage

**MK - 06224**

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

FORM WO 105B

PAID BY CHECK No. _450296_
DATE _7/21/97_
AMOUNT OF CHECK: _39,090.22_

TOTAL AMOUNT EARNED   $ _395,956.51_
LESS _2.5_ % RETAINED   $ _6,311.35_
BALANCE   $ _389,645.16_
LESS PREVIOUS PAID   $ _350,534.94_
PAY THIS EST.   $ _39,090.22_

# SUB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

5512

**WHITE OAK CORPORATION**

7 West Main Street, Plainville, Conn. 06062

Date: 6-25-98    Project: 92-435

Period: 6-5-98    Est. #: 7    WOX Project #: 74

Pot 1st #2

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | Ext 30" Dia. Caisson | 713.99 | 76.74 | 790.73 | LF | 100.— | 79,073.— |
| 702833A | 05483 | Test Shaft 30" Caisson | 28.85 | — | 28.25 | LF | 350.— | 9887.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | 161.08 | 70.39 | 231.47 | LF | 260.— | 60,182.20 |
|  | 05633 | Mobilization |  |  | 100% | LS | 150,000.— | 150,000.— |
| 06AS001 | 10132 | Modify Caissons INE Abt | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Seating | 70.21 | 13.65 | 83.86 | LF | 175.— | 14,675.50 |
|  | 20100 | B/C Inv. 8B 7029 |  |  |  |  |  | (1463.21)* |
|  | 20100 | B/C Inv. 8B 7030 |  |  |  |  |  | (1294.94)* |
|  | 20100 | B/C Inv. 8C 7012 |  |  |  |  |  | (1,97.81)* |
|  | 20100 | B/C Inv. 8D 7013 |  |  |  |  |  | (2541.55)* |
|  | 20100 | B/C Inv. 8E 7030 |  | (1523.48) | (1523.48) |  |  | (1523.48)* |

MK - 06225

* No Retainage

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

WO 105B

PAID BY CHECK No. 450296

DATE 7/21 98

AMOUNT OF CHECK $ 26,131.56

| | |
|---|---|
| TOTAL AMOUNT EARNED | $ 422,797.18 |
| LESS 2.5 % RETAINED | $ 7020.46 |
| BALANCE | $ 415,776.72 |
| LESS PREVIOUS PAID | $ 389,645.16 |
| PAY THIS EST. | 26,131.56 |

*Millgard Corporation*

Page _____ of _____

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062
Date: 7-27-98   Project: _____ 92-435
Period: 7-5-98   Est. #: 8   WOX Project #: 74
DOT EST #84

-512

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 02804A | 05633 | F+I 30" Dia. Caisson | 790.73 | 202.87 | 993.60 | Lf | 100.— | 99,360.— |
| 02833A | 05483 | Test Shaft 30" Caisson | 28.25 | — | 28.25 | Lf | 350.— | 9887.50 |
| 02930A | 05484 | Drill Rock socket 30" Caisson | 231.47 | 119.55 | 351.02 | Lf | 260.— | 91,265.20 |
| | 05633 | Mobilization | | | 100.70 | LS | 150,000.— | 150,000.— |
| 6AS001 | 10132 | Modify Caissons/N.E.bill | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 6AS004 | 10133 | Caisson Seating | 83.86 | 56.05 | 139.91 | Lf | 175.— | 24,484.25 |
| | 20100 | B/C Inv. 8B 7029 | | | | | | (1463.21)* |
| | 20100 | B/C Inv. 8B 7033 | | | | | | (1294.90)* |
| | 20100 | B/C Inv. 8C 7012 | | | | | | (1197.80)* |
| | 20100 | B/C Inv. 8D 7013 | | | | | | (2541.55)* |
| | 20100 | B/C Inv. 8E 7030 | | | | | | (1523.48)* |

MK - 06226

* No Retainage

QUANTITY CHECKED BY: _____
PRICES CHECKED BY: _____
EXTEN CHECKED BY: _____
PREVIOUS PAYMENT CHECKED: _____
APPROVED FOR PAYMENT BY: _____
FORM WO 105B

PAID BY CHECK No. 450651
DATE 8/27/98
AMOUNT OF CHECK: 18,999.51

| | | |
|---|---|---|
| TOTAL AMOUNT EARNED | $ | 483,975.93 |
| LESS 10 % RETAINED | $ | 49,199.70 |
| BALANCE | $ | 434,776.23 |
| LESS PREVIOUS PAID | $ | 415,776.72 |
| PAY THIS EST. | $ | 18,999.51 |

## CONTRACTORS INVOICE

*Millgard Corporation*

Page _____ of _____

**WHITE OAK CORPORATION**
7 West Main Street, Plainville, Conn. 06062

Date: 8-10-98    Project: 92-435
Period: 7-20-98    Est. #: 9    WOX Project #: 74
DOT EST # 85

5512

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 993.60 | 90.56 | 1084.16 | Lf | 100.— | 108416.— |
| 702833A | 05483 | Test Shaft 30" Caisson | 28.25 | — | 28.25 | Lf | 350.— | 9887.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | 351.02 | — | 351.02 | Lf | 260.— | 91,265.20 |
| | 05633 | Mobilization | | | 100.70 | LS | 150,000.— | 150,000.— |
| 26AS001 | 10132 | Modify Caissons NE Abut | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 26AS004 | 10133 | Caisson Seating | 139.91 | — | 139.91 | Lf | 175.— | 24,484.25 |
| | 20100 | B/C Inv. 8B 7029 | | | | | | (1463.71)* |
| | 20100 | B/C Inv. 8B 703 | | | | | | (1294.94)* |
| | 20100 | B/C Inv. 8C 7012 | | | | | | (1197.80)* |
| | 20100 | B/C Inv. 8D 7013 | | | | | | (2541.55)* |
| | 20100 | B/C Inv. 8E 7030 | | | | | | (523.48)* |

MK - 06227

*No Retainage

QUANTITY CHECKED BY: _____
PRICES CHECKED BY: _____
EXTEN CHECKED BY: _____
PREVIOUS PAYMENT CHECKED: _____
APPROVED FOR PAYMENT BY: _____
FORM WO 105B

PAID BY CHECK No. 450651
DATE 8/27/98
AMOUNT OF CHECK: 8150.40

| | | |
|---|---|---|
| TOTAL AMOUNT EARNED | $ | 493,031.93 |
| LESS 10 % RETAINED | $ | 50,105.30 |
| BALANCE | $ | 442,926.63 |
| LESS PREVIOUS PAID | $ | 434,776.23 |

*Millgard Corporation*

**WHITE OAK CORPORATION**

7 West Main Street, Plainville, Conn. 06062

Page \_\_\_\_\_ of \_\_\_\_\_

Date: 8-25-98    Project: 92-435

5512

Period: 8-5-98    Est. #: 10    WOX Project #: 74

DOT EST #86

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 1084.16 | 346.38 | 1430.54 | Lf | 100.— | 143,054.— |
| 702833A | 05483 | Test Shaft 30" Caisson | 28.25 | — | 28.25 | Lf | 350.— | 9887.50 |
| 702930A | 05484 | Drill Rock socket 30" Caisson | 351.02 | 150.66 | 501.68 | Lf | 260.— | 130,436.80 |
| | 05633 | Mobilization | — | — | 100% | LS | 150,000.— | 150,000.— |
| 06AS001 | 10132 | Modify Caissons (NE Ill) | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Sealing | 139.91 | — | 139.91 | Lf | 175.— | 24,484.25 |
| | 20100 | B/C Inv. 8B 7029 (1463.21) | | | | | | |
| | 20100 | B/C Inv. 8B 7031 (1294.90) | | | | | | |
| | 20100 | B/C Inv. 8C 7012 (1197.84) | | | | | | (8021.02) * |
| | 20100 | B/C Inv. 8D 7013 (2541.55) | | | | | | |
| | 20100 | B/C Inv. 8E7030 (1523.48) | | | | | | |

MK - 06228

*\* No Retainage*

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

FORM WO 105B

PAID BY CHECK No. 451957

DATE 10/7/98

AMOUNT OF CHECK: 66,428.65

| | |
|---|---|
| TOTAL AMOUNT EARNED | $ 566,841.53 |
| LESS 10% % RETAINED | $ 57,486.25 |
| BALANCE | $ 509,355.28 |
| LESS PREVIOUS PAID | $ 442,926.63 |
| PAY THIS EST. | $ 66,428.65 |

## SUB CONTRACTORS INVOICE

Page _____ of _____

*Millgard Corporation*

**WHITE OAK CORPORATION**

7 West Main Street, Plainville, Conn. 06062

Date: _9-22-98_    Project: _92-435_

Period: _8-30-98_    Est. #: _11_    WOX Project #: _74_

DOT EST #57

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 02804A | 05633 | F&I 30" Dia. Caisson | 1430.54 | 563.18 | 1993.72 | LF | 100.— | 199,372.— |
| 02833A | 05583 | Test Shaft 30" Caisson | 28.25 | — | 28.25 | LF | 350.— | 9887.50 |
| 02930A | 05484 | Drill Rock socket 30" Caisson | 501.68 | — | 501.68 | LF | 260.— | 130,436.80 |
| | 05633 | Mobilization | — | — | 100.90 | LS | 150,000.— | 150,000.— |
| 06AS001 | 10132 | Modify caissons (VE bid) | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Seating | 139.91 | — | 139.91 | LF | 175.— | 24,484.25 |
| | 20100 | B/C Inv. 8B 7029 (1463.21) | | | | | | |
| | 20100 | B/C Inv. 8B 703_ (1294.99) | | | | | | (8021.02) * |
| | 20100 | B/C Inv. 8C 7012 (1197.81) | | | | | | |
| | 20100 | B/C Inv. 8D 7013 (2541.55) | | | | | | |
| | 20100 | B/C Inv. 8E 7030 (1523.46) | | | | | | |

MK - 06229

* No Retainage

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

FORM WO 105B

PAID BY CHECK No. _451957_

DATE _12/17/98_

AMOUNT OF CHECK: _50,686.20_

TOTAL AMOUNT EARNED    $ _623,159.53_

LESS _10_ % RETAINED    $ _63,118.05_

BALANCE    $ _560,041.48_

LESS PREVIOUS PAID    $ _509,355.28_

PAY THIS EST.    $ _50,686.20_

# SUB CONTRACTORS INVOICE

8K1600

Page _____ of _____

Millgard Corporation

5512

## WHITE OAK CORPORATION
7 West Main Street, Plainville, Conn. 06062

Date: 9-30-98    Project: 92-435

Period: 9-5-98    Est. #: 12    WOX Project #: 74

DOT Est. # 88

| CONTRACT ITEM | COST ITEM | DESCRIPTION | PREVIOUS TOTAL | TOTAL THIS EST. | TOTAL TO DATE | UNIT | UNIT PRICE | TOTALS |
|---|---|---|---|---|---|---|---|---|
| 702804A | 05633 | F+I 30" Dia. Caisson | 1993.72 | 130.22 | 2123.94 | Lf | 100.— | 212,394.— |
| 702833A | 05483 | Test Shaft 30" Caisson | 28.25 | 83.64 | 111.89 | Lf | 350.— | 39,161.50 |
| 702930A | 05484 | Drill Rock Socket 30" Caisson | 501.68 | 27.05 | 528.73 | Lf | 260.— | 137,469.80 |
|  | 05633 | Mobilization | — | — | 100% | LS | 150,000.— | 150,000.— |
| 06AS001 | 10132 | Modify Caissons (N.E. Abil) | 36 | — | 36 | ea | 3250.— | 117,000.— |
| 06AS004 | 10133 | Caisson Seating | 139.91 | 54.02 | 193.93 | Lf | 175.— | 33,937.75 |
|  | 20100 | B/C Inv. 8B 7029 (1463.21) |  |  |  |  |  |  |
|  | 20100 | B/C Inv. 8B 703 (1294.99) |  |  |  |  |  |  |
|  | 20100 | B/C Inv. 8C 7012 (1197.84) |  |  |  |  |  | (8021.02) * |
|  | 20100 | B/C Inv. 8D 7013 (2541.55) |  |  |  |  |  |  |
|  | 20100 | B/C Inv. 8E 7030 (1523.43) |  |  |  |  |  |  |

MK - 06230

* No Retainage

QUANTITY CHECKED BY: _____

PRICES CHECKED BY: _____

EXTEN CHECKED BY: _____

PREVIOUS PAYMENT CHECKED: _____

APPROVED FOR PAYMENT BY: _____

PAID BY CHECK No. _____

DATE _____

AMOUNT OF CHECK: _____

TOTAL AMOUNT EARNED    $ 681,942.03

LESS 10% % RETAINED    $ 68,996.30

BALANCE    $ 612,945.73

LESS PREVIOUS PAID    $ 560,041.48

**SCHEDULE A:**

---

Backup is White Oak Pay Application to The Millgard Corporation through 8/05/98.  At this time, we completed the N/E Lift Pier.  Note on the White Oak Application:

1.    THE MOBILIZATION ITEM WAS PAID 100% BY WHITE OAK; HOWEVER, THE MILLGARD CORPORATION ONLY ALLOCATED $45,000.00 OF THE FULL $150,000.00 TO THE N/E LIFT PIER.  AT THE TIME WE PREPARED THE CLAIM, WE DID NOT KNOW THAT THE MILLGARD CORPORATION WOULD NOT BE COMPLETING THE JOB AND WE LEFT A BALANCE OUTSTANDING FOR MOVING TO THE OTHER LOCATIONS AND PROJECT DEMOBILIZATION.

2.    THE ($8,021.02) REPRESENTS FUEL PAID FOR BY WHITE OAK AND CHARGED TO THE MILLGARD CORPORATION.  IT IS NOT A CONTRACT ITEM   AND WE HAVE ACCOUNTED FOR IT BY INCLUDING IT AS PART OF THE "PAID-TO-DATE" FIGURE.

CP:CMTX0430.SCH

APRIL 30, 2003

MK - 06478