UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12388-RWZ

THE MILLGARD CORPORATION,
                              Plaintiff

v.

GADSBY HANNAH, LLP,
                   Defendant

## JOINT PRETRIAL MEMORANDUM

This litigation concerns a legal malpractice action against Gadsby Hannah LLP.  The case has been bifurcated with liability issues (*i.e.* duty and breach) adjudicated first, and if the claim survives, damage related issues (*i.e.* proximate cause and harm) second.  The case is schedule for trial on the liability issues beginning on March 5, 2007.

## I.     SUMMARY OF EVIDENCE

### A.     <u>Plaintiff</u>

(To avoid redundancy, Plaintiff has not repeated the facts
established by the pleadings, admissions or by stipulations, *supra*.)

In the early 1990's TMC began doing a considerable amount of work out of its Boston office and upon the consideration and recommendation of the key company personnel, the decision was made to engage a law firm in that area to provide TMC legal advice and to represent TMC's interests. Several representatives of TMC (Edmund Cardoza and David Coleman) interviewed representatives of Gadsby Hannah (Ronald Busconi and Jim Myers).

Attorneys Busconi and Myers represented that Gadsby Hannah was a larger firm that had a practice section specializing in construction law. During the interview process Gadsby Hannah told the TMC representatives why TMC should hire them and not some other firm: they were the

best; they had the reputation and knew most of the "handshakes" that are important in local politics; their construction group was second to none; and they could handle what ever came up.

During the summer of 1993, Dennis Millgard made the decision to engage the services of Gadsby Hannah to represent TMC in the northeastern part of the United States.

**The Relationship between Gadsby Hannah and The Millgard Corporation**

There was never any written agreement between TMC and Gadsby Hannah. During the entire duration of the relationship between the two firms from 1993 into 2001, no one at Gadsby Hannah ever explained to the principals at TMC that Gadsby Hannah provided different levels or types of service to their clients or that the degree of responsibility for their services differed depending on the level or type of service.

From mid 1993 until late May 1998 Gadsby Hannah handled many and very diverse matters for TMC in the Northeast. Some only required the answer to a specific question or two and while others were very involved. No one at TMC ever noticed a difference between the service or response that they received based upon the complexity of the advice or service that was requested.

Over that five year period of time, the management personnel at TMC and the attorneys at Gadsby Hannah got to know each other very well. Gadsby Hannah came to know how TMC would respond to problem situations and what TMC expected from their attorneys. There certainly was no understanding on the part of the principals at TMC that when it had a question or encountered a problem that required legal advice or participation, TMC was supposed to make a list of what TMC needed, instruct their attorneys how far they should go and then tell them when to stop work.

TMC relied on Gadsby Hannah for advice on how to handle any situation in which TMC might be involved.  What local idiosyncrasies to be aware of in relation to the business of both

public and private construction. What notices to file. What statutes were peculiar to the area, and so on. Over time TMC came to rely on Gadsby Hannah to alert TMC to what the pitfalls were in certain circumstances.

An example of that reliance and the typical Gadsby Hannah response occurred when TMC requested Gadsby Hannah to assist in drafting the subcontract agreement for the Flushing Bay Project. Richard Allen not only drafted the document but alerted TMC to related issues on which TMC should seek additional advice from Gadsby Hannah. Subsequently, when TMC was terminated on the Flushing Bay project in January of 1998, Ron Busconi wrote TMC a three page letter explaining what his legal interpretation of TMC's rights and problems in relation to the project.

It was a simple relationship. TMC was good at putting holes in the ground and the attorneys at Gadsby Hannah were suppose to be good at the law. The attorneys within the construction group at Gadsby Hannah sold themselves as experts and that's what TMC bought and paid very handsomely for.

**The Tomlinson Bridge Project**

The commencement of TMC's work on the Project was delayed approximately three years because White Oak encountered a pre-existing bridge which had not been called out in the plans and specifications. Upon commencing work on the Project in late 1997, TMC encountered a differing subsurface condition which made its work of installing casings more difficult and costly to perform. Specifically, the rock encountered was harder than originally anticipated from the bid documents. TMC provided White Oak with written notice of the differing subsurface condition.

Subsequently White Oak filed a claim with ConnDOT on account of the differing

subsurface condition and ConnDOT agreed to a change order to compensate White Oak and

TMC for the extra work involved changing the method of installation of the casings into the

harder rock.

However, once that problem was resolved, TMC began encountering "skulls of quartz

and granite in the sandstone" while attempting to drill its shafts into the rock. Again, TMC

provided White Oak with written notice of this newly discovered differing subsurface condition

but ConnDOT would not acknowledge that TMC and White Oak were entitled to payment for

the additional work required to drill the shafts for the caissons on account of this condition.

In July of 1998 White Oak, at the direction of ConnDOT, directed TMC to stop work on

the project because the cofferdam in which TMC was to begin work became unstable and was

moving. After a three (3) week delay, TMC returned to work on the Project. On September 15,

1998 TMC stopped work on the Project because it had completed all of its work in the area

provided by White Oak and ConnDOT had failed to provide direction as to how to proceed to

overcome the differing subsurface conditions.

### TMC's Consultation with Gadsby Hannah with Respect to Tomlinson

On May 28, 29 and June 1, 1998 Richard Millgard had telephone conversations with

Attorney Busconi and specifically inquired as to bond notification requirements and other notice

requirements with respect to Connecticut law. Attorney Busconi does not recall requesting a

copy of the Subcontract from Richard Millgard at that time. As a consequence of his

conversation with Richard Millgard, Attorney Busconi consulted with his partner, Richard Allen,

and had their associate perform some research of Connecticut law.

On September 25, 1998, TMC met with both White Oak and the DOT to discuss the

differing site conditions encountered on the project. Relying upon the advice provided by

Gadsby Hannah, TMC advised both White Oak and the DOT that the subsurface conditions constituted a cardinal change to its contract entitling TMC to suspend its work on the Project until its issues were resolved.

TMC communicated with Gadsby Hannah during the fall of 1998 and winter of 1999 with respect to the status of the Project including a face to face meeting and luncheon in early December of 1998. At that meeting and subsequent luncheon Richard Allen and Ronald Busconi were present from Gadsby Hannah and Dennis Millgard, David Coleman and Ed Cardoza of TMC.

One of the subjects discussed at that meeting was whether or not to initiate litigation with respect to the Tomlinson project. Richard Allen advocated for litigation but Ronald Busconi counseled against it preferring to see if mediation would resolve the issues.

During late February and early March of 1999 Dennis Millgard communicated and consulted with Ron Busconi with respect to drafting a response to directive from White Oak dated February 22, 1999 to return to work.

### The Mediation

Dennis Millgard requested Attorney Busconi's assistance in the preparation of the TMC presentation at the mediation. TMC consulted with Gadsby Hannah with respect to legal issues related to the mediation.

Attorney Busconi attended both mediation sessions at the ConnDOT offices on April 26, 1999 and May 19, 1999 during which TMC's claim of a differing subsurface condition was discussed. Attorney Busconi was present in both the mediation sessions and in the private meetings when settlement discussions took place with representatives of ConnDOT and White Oak.

Over the course of the several months during which TMC, White Oak and the DOT engaged in mediation to address White Oak's claim and the differing site conditions. TMC was repeatedly assured by White Oak that its claim would soon be resolved with the DOT and that Millgard would be able to complete its work on the Project.

**Post Mediation**

On May 21, 1999, just two days after the second mediation session White Oak sent TMC a letter of termination. Upon receipt of the termination letter, TMC immediately contacted White Oak to inquire as to the reasoning behind the termination. White Oak advised TMC that it was just protecting its legal rights and that White Oak intended to arbitrate its claims, which subsumed TMC's claim, against the DOT. At the same time, White Oak advised TMC that it still expected TMC to return to work on the project and began negotiating TMC's return to work on a cost plus basis.

TMC kept Gadsby Hannah informed of any communications concerning the Tomlinson project during the summer of 1999. In fact, Attorney Busconi engaged in several direct telephone conversations with Edward Lassman, the attorney for White Oak. Based on White Oak's representations, TMC remained on stand-by to complete its work on the Project. Finally, in July of 1999 Attorney Busconi learned from Attorney Lassman that White Oak had been taken over by its surety.

At the end of August 1999, Attorney Busconi contacted Attorney Lassman who told Busconi that White Oak was going to complete TMC's work on the Project itself and directed Millgard to remove the remainder of its equipment from the jobsite.

During the week ending September 7, 1999, TMC demobilized from the Project. That was the last day on which TMC furnished labor and/or equipment to the Project.

Although TMC performed its obligations under the subcontract with White Oak prior to its wrongful termination on May 21, 1999, White Oak refused and failed to pay TMC in accordance with the terms of the subcontract and section 49-41a of the Connecticut General Statutes. White Oak's wrongful termination of TMC, its failure to pay TMC the subcontract balance of $70,730.00, as well as $1,083,585.06 for additional work performed by TMC as the result of the differing site conditions constituted a material breach of its subcontract with TMC.

Connecticut General Statutes Section 49-42 (the payment bond statute) contains stringent requirements for notice of claims and commencement of lawsuits. For payment bonds issued prior to October 1994, the statute provided that notice of the claim must be provided to both the surety and the principal within 180 days of the claimant's last day of work on the job and a lawsuit must be commenced within one year of that date.

Beginning in September of 1998 Gadsby Hannah recommended to TMC that it forbear providing notice of claim under the payment bond to White Oak and National Union and erroneously advised TMC that notice to the surety and principal need not be made until within 210 days of payment by DOT to White Oak and a lawsuit commenced within one year of that date. (The language of the post October 1994 revision of C.G.S. § 49-42.)

On April 7, 2000 Gadsby Hannah sent a letter to National Union on behalf of TMC asserting a claim against the payment bond. Subsequently realizing that its April 7, 2000 letter was technically deficient, on May 5, 2000 Gadsby Hannah sent another demand letter to National Union on behalf of Millgard asserting a claim against the payment bond. National Union denied the claim on the basis that notice was untimely and that Millgard failed to file suit within the time required under C.G.S. § 49-42.

In July of 2000 TMC retained the law firm of Michelson, Kane Royster & Barger, P.C. to

review the denial by National Union. On August 31, 2000 Millgard filed a civil action brought in United States District Court for the District Court of Connecticut [3:00CV1685(CFD)] against White Oak and National Union.

On September 30, 2002 the claims against National Union in that action were dismissed by the Court because Gadsby Hannah failed to provide timely notice of TMC's bond claim or to file suit in accordance with the time requirements of C.G.S. § 49-42.

Based upon disclosure of White Oak's assets in that lawsuit, which indicated that White Oak is judgment proof, Millgard voluntarily dismissed its case against White Oak prior to trial because its assets appeared to be fully encumbered by secured debts to National Union and other secured creditors.

TMC has been damaged by the erroneous legal advice and negligent representation provided by Gadsby Hannah in the amount of the subcontract balance of $70,730.00, as well as $1,083,585.06 for additional work performed by Millgard as the result of the differing site conditions plus other consequential damages sustained by Millgard as the result of Gadsby Hannah's negligent representation and erroneous legal advice.

From October of 1993 through December of 2001, Gadsby Hannah maintained twenty (20) files and invoiced TMC nearly $480,000.00 for its services. On the Tomlinson Bridge Project, from June 1998 through September of 2000, Gadsby Hannah invoiced TMC $19,010.03 for its services.

**B.**    **Defendant**

*Introduction*

Gadsby Hannah believes that the evidence will establish that it was not retained to provide advice or representation with respect to the payment bond until a year after the period of limitations for making a bond claim had expired.  Prior to that time, TMC, an experienced and

sophisticated contractor undertook its own representation through negotiation and a mediation of its claim against the owner and general contractor, eschewing the opportunity to engage Gadsby Hannah for the purpose of providing counsel in the process.  When mediation failed and TMC was discharged from the project, it finally turned to Gadsby Hannah to pursue a claim but by that time, the time period for pursuing a claim on the payment bond had already expired by more than a year.  In hindsight, TMC no doubt wishes that it had engaged the full scope of services from Gadsby Hannah for this purpose at an earlier time, but it did not do so.  It now seeks unfairly to blame Gadsby Hannah for its own short-sighted strategy.

Gadsby Hannah had no duty to provide advice that TMC never sought but which, in an effort at revisionist history, TMC now wishes that it had obtained.  TMC did not even provide Gadsby Hannah with the bond and other documents necessary for Gadsby Hannah to determine the time limitations on a bond claim until a year after the bond period had expired.

### *Background*

Dennis Millgard started TMC in the 1960s and was its president.  TMC was in the excavation business, specializing in the construction of deep foundation systems including caissons (drilled piers), high capacity piling and slurry walls.  By the 1990's, TMC grew to 75-80 full-time employees, with multiple offices.  TMC worked in 38 states and overseas on 3,000 to 4,000 public and private projects, at least four of which were in Connecticut.[1]

Due to the nature of its work, TMC frequently made claims for increased compensation from owners and general contractors for alleged changes in subsurface conditions.  It even had one of its changed site condition cases go to the Fifth Circuit Court of Appeals where it lost its

---

[1] TMC worked on such significant projects as Ford Field in Detroit Michigan where the 2006 Super Bowl was held, Rowes Wharf, and the Fleet Center.

claim.  See Millgard Corp. v. McKee/Mays, 49 F.3d 1070 (5th Cir. 1995).  Due to its experience

and expertise, TMC often negotiated its own contracts without the assistance of attorneys and

handled many of its own contract disputes and bond claims, including providing notice of and

prosecuting claims.  TMC was sophisticated in its use of attorneys and managing the host of

legal issues arising on its projects.

### The Tomlinson Bridge Project

White Oak Inc. ("White Oak") entered into a general contract with the State of

Connecticut ("ConnDot") to replace the Tomlinson Bridge on U.S. Route 1 in New Haven.

National Union issued the payment bond on the Tomlinson Bridge Project, naming White Oak as

principal, on June 6, 1994.

TMC entered into a Subcontract with White Oak on March 22, 1996 for the installation

of caissons, a test shaft, drilling of rock socket for the caissons, and one mobilization on the

project ("Subcontract").  Gadsby Hannah was not involved in the negotiation of TMC's

Subcontract with White Oak for the Tomlinson Bridge Project.  TMC began work on the

Tomlinson Bridge Project in October 1997.

TMC claims that it encountered unanticipated subsurface conditions on the Tomlinson

Bridge Project early on.  TMC gave notice of the alleged differing site conditions to White Oak

and ConnDot, claiming that the rock strata was harder and less fractured than the contract

documents indicated.  TMC was required to keep working under its contract even though it had

made a claim for differing site conditions.  ConnDot agreed to a change order in February 1998,

allowing TMC to use different more expensive machinery to accomplish its work.  In executing

the change order, TMC waived any right to additional compensation for installing the caissons.

Notwithstanding TMC claims that it encountered differing site conditions again as it installed the caisson, and sought to recover additional costs.  TMC contends that subsurface conditions that it encountered while installing caissons were not indicated by the contract documents and they significantly obstructed its ability to perform its Subcontract work as planned and caused TMC to incur additional costs.  ConnDot rejected TMC's claim for differing site conditions because it found that TMC should have reviewed the soils report, which showed quartz and granite, before executing the Subcontract and because of the fact that TMC claim for a change condition had been resolved in the first change order.

TMC walked off the job on September 15, 1998 because it could not resolve its claim for extra compensation with White Oak and ConnDot.  It did not inform Gadsby Hannah that it walked off the job in September 1998.

TMC alleges that it is owed $70,730.00 for unpaid invoices and $1,083,585 in extra work due to unforeseen subsurface conditions encountered on the project while installing caissons. When TMC still was not able to resolve its disputes over compensation, it asked Gadsby Hannah to make a claim on White Oak's bond in April 2000, which the surety denied as untimely.  All of the work upon which TMC's bond claim was based occurred prior to the time that TMC stopped work on September 15, 1998.  In other words, the last day that TMC provided labor or material for which it has made a bond claim was prior to September 15, 1998.  Connecticut law provides that TMC had 180 days to file a bond claim, measured from the last day of work for which it is making a claim.  Since the day that TMC last performed work or supplied material for which it is made a claim occurred on or before September 15, 1998, it had until March 15, 1999[2] to make a

---

[2] Technically, 180 days falls on March 14, 1999.  However, Dennis Millgard calculates the 180 days as expiring on March 15, 1999.

claim against the bond.  Therefore, in this legal malpractice case, Gadsby Hannah's involvement

prior to March 15, 1999, and not after, is relevant.  Gadsby Hannah has filed a motion seeking to

exclude such irrelevant evidence.

### TMC's Limited Use Of Gadsby Hannah

The first time that anyone from TMC spoke to Gadsby Hannah about the Tomlinson

Bridge Project was on May 27, 1998.  TMC had a general research question about whether

White Oak and ConnDot could successfully argue, as a defense to TMC's claim of differing site

conditions, that TMC had a duty to investigate other sources of data concerning the subsurface

conditions at the project site.  Attorney Busconi consulted with his partner Richard Allen and had

their associate perform the necessary research of Connecticut case law.  The work started on

May 27, 1998 and ended on June 2, 1998.  Gadsby Hannah billed TMC a total of 7 hours for the

research project.

Richard Millgard (Dennis's brother) claims that he asked Busconi on May 28, 1998 when

notification on the bond should be given, and cannot remember what, if anything Busconi, told

him.[3]  Attorney Busconi denies that Richard Millgard ever asked him about bond notification.

Richard Millgard and/or TMC did not provide Gadsby Hannah with the documents necessary to

advise TMC about bond notification requirements in May 1998.  In fact, TMC did not give

Gadsby Hannah those documents until April 2000 -- a year after the limitations period expired.

According to Gadsby Hannah's billing records, no one at Gadsby Hannah had further

communication with TMC about the Tomlinson Bridge Project for the next six months – from

---

[3] TMC was still performing work on the Tomlinson Bridge Project when it first contacted
Gadsby Hannah in May 1998, and as a result, the limitations period for making a claim on White
Oak's bond would not yet have started to run.

June 2, 1998 through early December 1998.  In December 1998, Attorneys Allen and Busconi

went out for a holiday lunch with Dennis Millgard, Ed Cardozza, and David Coleman at the

Meridien Hotel in Boston.  At the lunch, there was general discussion about TMC's business,

including the Tomlinson Bridge Project.  They did not discuss making a claim on the White Oak

bond.  TMC did not instruct Gadsby Hannah to do anything or perform any specific work

concerning the Tomlinson Bridge Project at the lunch.  Gadsby Hannah attorneys did not bill

TMC for their time spent at the lunch.

No one from TMC communicated with Gadsby Hannah about the Tomlinson Bridge

Project again until the end of February/early March 1999.  In March 1999, Attorney Busconi

received a few phone calls from Dennis Millgard and commented on the correspondence Dennis

Millgard sent him.  The total time spent on these tasks was 1.2 hours.

TMC, an experienced and seasoned contractor, handled the vast majority of tasks in the

claims process in-house.  In fact, in another Connecticut project in Bridgeport, it gave notice to

the surety without consultation with Gadsby Hannah.  Dennis Millgard purposefully limited the

use of counsel to only those tasks he specifically assigned.  It was not until well after the

limitations period for making a bond claim expired that TMC turned the matter over to Gadsby

Hannah to handle.

Prior to March 15, 1999, Gadsby Hannah had only performed approximately 8.2 hours of

work, 7 hours on a research project involving whether Connecticut law imposed a duty on a

contactor to investigate the subsurface condition in late May 1998, and 1.2 hours providing

general input to correspondence in early March 1999.  The two discrete assignments were ten

months apart.  Prior to March 15, 1999, TMC had not supplied Gadsby Hannah with its

Subcontract with White Oak, White Oak's bond, the relevant communications, including those

with White Oak and ConnDot, the reports of TMC's and ConnDot's experts concerning the underground conditions, and the calculation of its claim for extra work. TMC kept Gadsby Hannah so far removed from its handling of the claim that it did not even see fit to involve Gadsby Hannah in ConnDot's audit of TMC's financial records or inform Gadsby Hannah about the audit when it happened.

### *The ConnDot Mediation*

In the fall of 1998 and early winter 1999, Dennis Millgard communicated with officials from ConnDot, White Oak, and a mediator, Carmen Reiss in an attempt to resolve TMC's claim and get back to work. He did not ask Gadsby Hannah to represent TMC in these discussions or mediation.

Dennis Millgard is a self-described "benevolent dictator." He exercised complete control over the negotiations of TMC's claim for extra compensation for the alleged unanticipated site conditions. He called all the shots. He was optimistic that he could work it out and get TMC back to work since he had a relationship with White Oak, and did not want anything or anyone to jeopardize that negotiation and mediation process. He neither asked nor was willing to pay Gadsby Hannah to get involved in this claim process. While mediation was ongoing, communications concerning TMC's claim came through Dennis Millgard. He alone spoke to White Oak. He corresponded and met with the mediator, Carmen Reiss, on his own. He sought out and spoke to Peter Huntsman, the Assistant Attorney General of the State of Connecticut, on his own.

Ironically, Attorney Huntsman asked Dennis Millgard whether TMC was represented in connection with the Tomlinson Bridge Project in March or April 1999, and Dennis Millgard assured him on at least one occasion that he was not represented by counsel and that he did not

want to incur the expense of an attorney.  Dennis Millgard confirmed his position in writing, stating that "I discussed this matter with Mr. Busconi and he suggested that I send you this letter informing you that we are only consulting with his firm at this time and <u>have not formally retained them</u>."

The mediation between ConnDot, White Oak, and TMC finally occurred on April 26, 1999 and May 19, 1999 in Connecticut.  Attorney Busconi attended the April mediation at Dennis Millgard's last minute request as a personal favor to Dennis Millgard but was never given TMC's written submission prior to the mediation.  He also attended the May session. Dennis Millgard, not Ron Busconi, made the presentation of TMC's claim at the mediation.  The mediation was unsuccessful.

White Oak terminated TMC on May 21, 1999.  White Oak claimed that TMC had breached its Subcontract by walking off the job in September 1998 and refusing to return to work.

### *Post-Mediation*

After mediation, Dennis Millgard continued to communicate with White Oak's representatives on occasion concerning White Oak's arbitration with ConnDot and TMC's role in it.  Sometimes Dennis Millgard would advise Attorney Busconi of the communications, sometimes he would not.  TMC asked Gadsby Hannah about a claim for wrongful termination against White Oak and sent Gadsby Hannah a copy of its subcontract in the summer of 1999 so it could review the potential claim.  Attorney Busconi spoke to the attorney for White Oak during that summer, and was informed that White Oak intended to present TMC's claim in the arbitration to the extent it was able under Connecticut law.  There was minimal communication between TMC and Gadsby Hannah from the fall of 1999 through March 21, 2000, which is

likely due to the fact that TMC owed Gadsby Hannah a substantial amount in legal fees on other cases and TMC was avoiding Gadsby Hannah.

### *TMC Retains Gadsby Hannah To Pursue A Claim In March 2000*

On March 21, 2000, David Coleman of TMC wrote Attorney Busconi to confirm a meeting on March 29, 2000 to discuss work that TMC wanted Gadsby Hannah to perform on a number of matters so that TMC would get paid by its contractors.  Coleman noted that "The Tomlinson Bridge and Kane 'A' projects are probably the most complicated.  The others basically require a quick fix such as surety notification or demand for direct payments, prior to the meeting."  It was not until the meeting in late March 2000 that TMC directed Gadsby Hannah to take over the prosecution of the Tomlinson Bridge claim and make demand on White Oak's bond.  Gadsby Hannah ran a conflict check and opened a file on March 31, 2000.

On April 5, 2000, TMC provided Gadsby Hannah with the documents necessary to assess the applicable limitations period and make a claim on the bond.  Gadsby Hannah made demand on White Oak's bond for $70,730 for the balance of the contract and $1,083,585 for extra work on April 7, 2000.  National Union rejected the claim as untimely.

Subsequently, TMC hired a Connecticut firm to sue National Union and White Oak.  National Union obtained summary judgment because notice of the claim on the bond was not timely.  TMC voluntarily dismissed its claims against White Oak.  White Oak arbitrated its claims against ConnDot.  The panel awarded ConnDot over $1.1 million and awarded White Oak nothing.

### *TMC Was Negligent in the Prosecution Of Its Claim.*

TMC claims that Gadsby Hannah was negligent in not advising it of the date by which it had to file a claim on White Oak's bond and for failing to advise it sooner that it could not make a direct claim against ConnDot.  To the extent it was negligence, which Gadsby Hannah

adamantly denies, TMC's recovery, if any, should be reduced to account for its own negligence or barred.  For example, Richard Millgard claims that he asked Attorney Busconi about making a claim on White Oak's bond in May 1998 yet TMC did not send Gadsby Hannah the documents necessary to make a bond claim or assess the deadline for making a bond claim until after the limitations period expired.  Furthermore, if Richard Millgard really asked for information about making a bond claim, he was negligent in not following up with Attorney Busconi when he did not get the information requested.  TMC's own negligence will bar (or reduce) its recovery.

### *TMC Failed To Mitigate Its Alleged Damages.*

Although this issue may be more appropriately considered in Phase Two of the litigation because it does not concern Gadsby Hannah's direct liability to TMC, it is worth noting here. TMC has a duty to mitigate its alleged damages.  TMC claims that because of Gadsby Hannah's advice, it missed an opportunity to make a claim on White Oak's bond.  TMC alleges that this caused it harm because it had no one from whom to recover.  According to TMC, White Oak was insolvent and ConnDot could not be sued directly.  While ConnDot may not be subject to a direct suit, TMC could have forced its inclusion in the arbitration between White Oak and ConnDot if it had obtained a judgment against White Oak.  TMC foreclosed this opportunity for recovery and failed to mitigate its alleged damages by voluntarily stipulating to the dismissal of its claim against White Oak without first obtaining a judgment.

## II.    STATEMENT OF FACTS ESTABLISHED BY THE PLEADINGS, ADMISSIONS OR BY STIPULATIONS.

1.    Dennis Millgard started TMC in the 1960s and was its president.

2.    TMC was headquartered in Michigan and was in the excavation business, specializing in the construction of deep foundation systems including caissons (drilled piers), high capacity piling and slurry walls.

3.      By the 1990's, TMC grew to 75-80 full-time employees, with multiple offices.

4.      TMC worked in 38 states and overseas on 3,000 to 4,000 public and private projects, at least four of which were in Connecticut.

5.      TMC worked on such significant projects as Ford Field in Detroit Michigan where the 2006 Super Bowl was held, Rowes Wharf, and the Fleet Center.

6.      Due to the nature of its work, TMC made claims for increased compensation from owners and general contractors for alleged changes in subsurface conditions.

7.      Due to its experience and expertise, at times TMC negotiated its own contracts and handled some of its contract disputes, including providing notice of and prosecuting claims, without assistance of legal counsel.

8.      TMC is familiar with how payment bonds work, having dealt with them for over 40 years.

9.      Ronald Busconi was the attorney at Gadsby Hannah who worked primarily with TMC.

10.      Attorney Busconi has been a member of the Massachusetts bar since 1969 and is a partner at Gadsby Hannah.

11.      White Oak entered into a general contract with ConnDot to replace the Tomlinson Bridge on U.S. Route 1 in New Haven.

12.      National Union issued the payment bond on the Tomlinson Bridge Project, naming White Oak as principal, on June 6, 1994.

13.      TMC entered into a subcontract with White Oak on March 22, 1996 for excavation work and the installation of caissons.

14.    Gadsby Hannah was not involved in the negotiation of TMC's subcontract with White Oak for the Project.

15.    The commencement TMC's work on the Project was delayed.

16.    TMC's last day of drilling work was September 15, 1998.

17.    White Oak and ConnDOT agreed to enter into mediation to attempt resolve the many differences that had arisen between them with respect to the Project.

18.    TMC's claim of a differing subsurface condition was among the issues mediated.

19.    As part of the mediation process TMC communicated with the mediator, Carmen Reiss, directly and as a result TMC provided information to her both by letter and in a face to face meeting in January of 1999.

20.    All of the work upon which TMC's bond claim was based occurred prior to the time that TMC stopped work on September 15, 1998.

21.    On the 14th and 15th of September 1998, TMC returned the equipment that it rented for the project, it cleaned up the drilling barge, secured the reverse circulation tool, tied the drill rig down, and laid off the local help.

22.    White Oak terminated TMC by letter of May 21, 1999.

## III.    CONTESTED ISSUES OF FACT

### A.    Plaintiff

1.    Did an attorney-client relationship exist between Millgard and Gadsby Hannah with respect to the Tomlinson Bridge Project?

2.    If an attorney-client relationship existed, what was the nature of that relationship?

3.    Was the legal advice provided by Gadsby Hannah, or lack thereof, with respect to the Tomlinson Project of a quality less than Millgard had the right to expect in light of its historical attorney-client relationship with Gadsby Hannah?

4.      Did the Defendant's failure to inform the Plaintiff of C.G.S. § 4-61 in late May or early June of 1998 result in avoidable damage to the Plaintiff?

5.      Did the Defendant's lack of understanding of the requirements of C.G.S. § 49-42 result in avoidable damage to the Plaintiff?

6.      Has The Millgard Corporation been damaged by Gadsby Hannah's failure to provide timely legal advice, erroneous legal advice and negligent representation?

7.      Was September 7, 1999 TMC's last day of work on the project as defined under C.G.S. § 42-49?

**B.      Defendant**

1.      Whether anyone from TMC asked Gadsby Hannah about bond notification in Connecticut prior to March 21, 2000.

2.      Was TMC negligent?

3.      Did TMC's negligence contribute to the loss it alleges to have suffered?

4.      Does TMC's negligence exceed Gadsby Hannah's?

5.      If not, how much negligence is attributable to TMC?

In addition, Gadsby Hannah has outlined a number of issues in Section VI, which it submits are issues of law for the Court to decide

**IV.     JURISDICTIONAL QUESTIONS**

None anticipated.

**V.      PENDING MOTIONS**

**Plaintiff**

None.

**Defendant**

Gadsby Hannah has filed three motions in limine.

1.      The first motion requests an order excluding evidence of its conduct after March 15, 1999 because it is not relevant to TMC's malpractice claims, and will confuse the jury and waste the time of the court and the parties.  Gadsby Hannah submits that the limitations period for making the bond claim at the heart of this case expired as a matter of law on March 15, 1999.  This issue is ripe for determination and a ruling prior to trial is necessary to streamline the issues for trial, assist the parties in their preparation and presentation of their cases, and avoid any potential confusion of the jury

2.      Gadsby Hannah filed a motion in limine to preclude TMC from introducing evidence concerning events after April 7, 20000, the day upon which Gadsby Hannah served notice of TMC's bond claim upon the surety for TMC's general contractor, White Oak.  The surety denied TMC's bond claim as untimely.  The events after April 7, 2000, besides the surety's rejection of the bond claim, are irrelevant to TMC's malpractice claim, and will confuse the jury and waste the time of the court and the parties.

3.      The third motion is a motion in limine to exclude any evidence of TMC's claim that Gadsby Hannah did not inform it of Connecticut General Laws Section 4-61.  That evidence should be excluded because TMC needs an expert, which it does not have, to establish that Gadsby Hannah breached a duty by not advising it of the statute.  Additionally, there is no causal connection between the alleged failure to inform TMC of Connecticut General Laws Section 4-61 and any recoverable damages.

VI.    **ISSUES OF LAW**

       **Plaintiff**

       1.      *Did Gadsby Hannah owe TMC a duty of care?*

An attorney owes his client an obligation to exercise a reasonable degree of care and skill in the performance of his legal duties.  *Pongonis v. Saab*, 396 Mass. 1005, 1005, 486 N.E.2d 28,

29 (1985) citing *Glidden v. Terranova*, 12 Mass.App.Ct. 597, 598, 427 N.E.2d 1169 (1981)

*McLellan v. Fuller*, 226 Mass. 374, 377-378, 115 N.E. 481 (1917).  The issue of whether such a

duty exists is a question of law.  *DaRoza v. Arter*, 416 Mass. 377, 381, 622 N.E.2d 604, 607

(1993).

    A duty of care arises from the attorney-client relationship. *Spinner* at 417 Mass. at 552,

631 N.E.2d at 544 (1994).  The relationship need not be expressed; it may be implied from the

parties' conduct.  *Fitzsimmons v. Soutter*, 1994 WL 879599 (Mass. Super.) (Sosman, J.) citing

*Robertson v. Gaston Snow & Ely Bartlett*, 404 Mass. 515, 522, 356 N.E.2d 344, cert. denied, 493

U.S. 894 (1989), quoting *Page v. Frazier*, 388 Mass. 55, 62, 445 N.E.2d 148 (1983).  A formal

contract or retainer agreement is not required to impose a duty; the parties' conduct governs the

existence and scope of an attorney-client relationship.  *National Credit Union Admin. Board v.*

*Stone*, 1994 WL 175044 (D.Mass. 1994) (Zobel, J.) citing *Robertson*, 356 N.E.2d at 348; *Devaux*

*v. Amer. Home Assurance Co. et al*, 387 Mass. 814, 444 N.E.2d 355, 357 (1983).  See also

*Brandlin v. Belcher*, 67 Cal.App.3d 997, 1001, 134 Cal.Rptr. 1 (1977).

    "(U)nder Massachusetts law, an attorney-client relationship may be demonstrated when

(1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought

pertains to matters within the attorney's professional competence, and (3) the attorney expressly

or impliedly agrees to give the desired advice or assistance . . .  In appropriate cases, the third

element may be established by proof of detrimental reliance, when the person seeking legal

services reasonably relies on the attorney to provide them, and the attorney, aware of such

reliance, does nothing to negate it." *International Stategies Group, LTD. V. Greenberg Traurig*,

LLP, 2006 Westlaw 229034 (D.Mass. 2006) (Zobel, J.) citing *Devaux*, 387 Mass. at 818 (1983),

quoting *Kurtenbach*, 260 N.W.2d at 56 (Iowa 1977).  See also *Flaherty v. Baybank Merrimack Valley, N.A.*, 808 F.Supp. 55 (1st Cir. 1992)(Zobel, J.).

If reasonable persons could differ regarding the attorney-client relationship, the issue must be resolved by the fact finder.  *National Credit Union Admin. Board v. Stone*, 1994 WL 175044 (D.Mass. 1994) (Zobel, J.) citing *Sheinkopf v. Stone*, 927 F.2d 1259,1264 (1st Cir. 1991). *See also Robertson*, 404 Mass. at 522; *Page*, 388 Mass. at 61 (1983); *Devaux*, 387 Mass. at 818, (1983); *Kurtenbach*, 260 N.W.2d at 57 (Iowa 1977).  Furthermore, the question whether an attorney-client relationship exists depends on the reasonableness of the plaintiff's reliance.  The application of the reasonable person standard is uniquely within the competence of the jury. *Devaux*, 387 Mass. at 818 (1983); see 10 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2729, 1t 560 (1973).

2.      *Is an expert required to establish that Gadsby Hannah had duty to advise TMC with respect to Connecticut law with a reasonable degree of care and skill in the performance of its duties?*

In an action for legal malpractice, Massachusetts has recognized that expert testimony is generally needed to establish the level of care owed by the attorney in the particular case. *Pongonis*, 396 Mass. at 1005, 486 N.E.2d at 29 (1985).  However, no such expert testimony is required where the facts demonstrate that the attorney's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge. Id.; *Lima v. Delaney*, 1990 WL 57648 (D.Mass. 1990) (Zobel, J.); *Glidden*, 12 Mass.App.Ct. at 598(1981).   See also *Focus Inv. Assoc. Inc. v. American Title Ins Co.*, 992 F.2d 1231, 1239 (1st Cir. 1993) (Cases which can be resolved based on a layperson's common knowledge are those where negligence is "clear and palpable" and where the fact finder need not analyze the attorney's exercise of legal

expertise); _Flanders & Medeiros, Inc. v. Bogosian_, 868 F.Supp 412 (1st Cir. 1994) (Failure to file

an action within the statute of limitations is a situation where negligence is "clear and palpable".)

      3.      _What was TMC's last day of work on the project as defined under C.G.S. § 42-_

_49?_

      In Blakeslee Arpaia Chapman, Inc. v. EI Constructors, Inc., 239 Conn. 708, 724,-25

(1999) there was a similar fact pattern to the present case, and its application of law is supportive

of TMC's position.   _See also_ Safe Environment of America, Inc. v. Employers Insurance of

Warsau, 278 F.Supp.2d 121, 126 (D. Mass. 2003) (In its limitation argument, Defendant used

plaintiff's payroll report regarding demobilization of equipment from the project site to

determine the last day of work performed); United States Dep't of Navy ex rel. Andrews v. Delta

Contractors Corp., 893 F. Supp. 125 (D.P.R. 1995) (Where a lessee left a crane at a job site, the

limitations period did not commence until the crane was removed) citing United States of

America for and on behalf of Carlisle Const. Co., Inc. v. Coastal Structures, Inc., 689 F.Supp.

1092 (M.D. Fla. 1988)(Rental period of crane started upon crane's arrival and ended when crane

loaded on a vehicle for return); Steenberg Construction Co. v. Prepakt Concrete Co., 381 F.2d

769 (10th Cir. 1967) (Removal of supplies, material and equipment constituted performance of

labor under the contract).

      **Defendant**

      1.      Whether TMC needs an expert to establish that Gadsby Hannah had a duty to

TMC to advise it of the time period to make a bond claim prior to March 15, 1999.

      2.      Whether TMC needs an expert to establish that Gadsby Hannah had a duty to

TMC to advise it of the time period to make a bond claim prior to late March 2000.

      3.      Whether TMC needs an expert to establish that Gadsby Hannah had a duty to advise it of Connecticut General Laws Section 4-61.

      Under Massachusetts law, the standard of care against which an attorney's actions must be measured is generally beyond the experience and knowledge of the ordinary layperson and therefore, must be established by expert testimony.  Pongonis v. Saab, 396 Mass. 1005, 1005 (1985); Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein PC, 25 Mass. App. Ct. 107, 111 (1987).  A plaintiff generally has the burden of introducing expert testimony that the attorney did not exercise that degree of skill ordinarily possessed by attorneys in similar circumstances.  If the plaintiff fails to present credible expert testimony that the attorney breached the applicable standard of care, its legal malpractice claim fails.  See, e.g., Brown v. Gerstein, 17 Mass. App. Ct. 558, 566 (1984); DiPiero v. Goodman, 14 Mass. App. Ct. 929, 930 (1982).  TMC does not have an expert to establish what the standard of care required of Gadsby Hannah and that the firm's conduct fell below that standard.  TMC responded to Gadsby Hannah's expert interrogatory stating that "Millgard does not intend to call any expert witnesses at trial of this matter on the issue of liability."  Without an expert to establish its claim, TMC's claim fails.

      In the absence of expert testimony by TMC, Gadsby Hannah submits that some of the following issues are legal issues.

      4.      Whether Gadsby Hannah owed TMC a duty to advise it of the time period for making a bond claim on the Tomlinson Bridge Project?

      5.      Whether Gadsby Hannah owed a duty to TMC to inform it of Conn. Gen. Laws Section 4-61.

      6.      If so, when did the duty arise?

7.    Did Gadsby Hannah breach any duty to TMC?

8.    Whether the time period for making a bond claim expired on or before March 15, 1999 based upon TMC's last day of work on September 15, 1998.  TMC's alleged "demobilization" of idle equipment in September 1999 did not extend the limitations period because (1) extra-contractual work does not extend the period for making a bond claim pursuant to Section 49-42; (2) TMC's claim does not even include the alleged costs for idle equipment or demobilization that occurred after September 15, 1998; (3) TMC cannot make a claim for demobilization under the mobilization line item in the subcontract because it was paid in full for mobilization; and (4) TMC is not entitled to compensation for idle equipment under its unit price subcontract.

## VII.    AMENDMENTS TO PLEADINGS

None anticipated.

## VIII.    ADDITIONAL MATTERS

### Defendant

Gadsby Hannah has objected to TMC's disclosure of Richard Millgard's notes allegedly dated May 28, 1998, May 29, 1998 and June 1, 1998.  They were disclosed for the first time in connection with TMC's opposition to Gadsby Hannah's motion for summary judgment, well after the close of discovery and therefore deprived Gadsby Hannah an opportunity to question Richard Millgard about them in discovery.  Gadsby Hannah objects to the notes as an exhibit because of the late disclosure and because they are hearsay.  If this Court does not exclude Richard Millgard's notes from testimony, Gadsby Hannah requests that it be allowed to depose Richard Millgard concerning the notes and the option of disclosing and calling a forensic handwriting expert.

TMC has listed Attorney Christopher Huck as a witness. Gadsby Hannah intends to seek a ruling from the Court concerning the appropriate scope of Attorney Huck's testimony since he was not disclosed as an expert and his testimony concerning matters during and after the summer of 2000 are irrelevant and will confuse the jury.

## IX.    LENGTH OF TRIAL

Six to eight days. Counsel for Gadsby Hannah is amendable to full trial days in order to ensure that the trial is concluded on or before the eighth day.

## X.    WITNESSES

### A.    <u>Plaintiff</u>[4]

1.    V. Dennis Millgard, Former President
Millgard Contracting Co.
33039  Schoolcraft Road
Livonia, MI 48150
734-425-8550

   Subjects:    Knowledge of contract negotiation
   Knowledge of project problems and disputes
   Knowledge of White Oak's wrongful termination of Millgard
   Knowledge of Gadsby Hannah's representation of Millgard

2.    C. Richard Millgard,
Former Executive Vice President
Case Foundation Company
17028 Lochmoor Circle East
Northville, MI 48167
734-453-8876

   Initial Project Executive for The Millgard Corporation

   Subjects:    Knowledge of bidding of project
   Knowledge of contract negotiation

---

[4] If any of the witnesses are not available for trial, TMC reserves the right to read in the applicable portions of their deposition testimony.

Knowledge of project problems and disputes
Knowledge of White Oak's wrongful termination of Millgard
Knowledge of Gadsby Hannah's representation of Millgard

3.      David B. Coleman
Former Vice President for Millgard
Underpinning and Foundation Constructors, Inc.
P.O. Box 765
Fenton, MI 48430
810-714-5790

Project Manager for The Millgard Corporation

Subject:      Knowledge of contract negotiation
Knowledge of project problems and disputes
Knowledge of White Oak's wrongful termination of Millgard
Knowledge of Gadsby Hannah's representation of Millgard

4.      Edmund J. Cardoza, Jr.
Former Vice President for Millgard
7 Weyland Circle
North Andover, MA 01845
978-681-8181

Subject:      Knowledge of core samples
Knowledge of Gadsby Hannah's representation of Millgard

5.      Christine E. Moretto
Former CFO & Current Director
The Millgard Corporation
33039 Schoolcraft Road
Livonia, MI 48150
734-425-8550

Subject:      Knowledge of accounting and financial matters

6.      Christopher W. Huck, Esq.
Michelson, Kane, Royster & Barger, P.C.
93 Oak Street
Hartford, CT 06106-1552
860-522-1243

Successor Counsel to Gadsby Hannah, LLP

Subjects:      Knowledge of legal actions taken by Millgard in Connecticut subsequent to the separation of the Millgard – Gadsby Hannah attorney – client relationship

7.     Ronald Busconi, Esq.
Gadsby Hannah, LLP
225 Franklin Street
Boston, MA 02110
617-345-7002

Subjects:      Knowledge of White Oak's termination of Millgard
Knowledge of Gadsby Hannah's representation of Millgard

8.     John P. Giffune, Esq.
Attorney at Law
Verrill Dana, LLP
1 Portland Square
Portland, ME 04101
207-774-4000

Subjects:      Knowledge of Gadsby Hannah's representation of Millgard
Knowledge of facts and circumstances surrounding Gadsby Hannah's bond claim to National Union on behalf of Millgard

The Plaintiff reserves the right to supplement this list prior to the time of trial.

The Plaintiff also reserves the right to call any witnesses identified and/or listed by the

Defendant.

**B.    DEFENDANT**[5]

Defendant expects to call the following individuals as witnesses at trial:

1.     Richard K. Allen (fact)
Senior Vice President
Stantec
P.O. Box 29
54 Route 106
North Springfield, VT 05150

---

[5] If any of the witnesses are not available for trial, Gadsby Hannah reserves the right to read in the applicable portions of their deposition testimony.

2.    Ron Busconi (fact)
      McCarter & English
      225 Franklin Street
      Boston, MA 02110
      (617) 345-7000

3.    William Edwards (fact)
      Stantec
      175 Canal Street, 6th Floor
      Manchester, NH 03101-2335
      (603) 669-8672

4.    John Giffune (fact)
      Verrill Dana LLP
      One Portland Square
      Portland, ME 04112-0586
      (207) 774-4000

5.    Peter Huntsman (fact)
      Assistant Attorney General
      55 Elm Street
      Hartford, CT 06106

6.    Joel Lewin (expert)
      Hinckley Allen & Snyder, LLP
      28 State Street
      Boston, MA 02109
      (617) 345-9000

7.    Brian J. O'Rourke, Jr. (fact)
      McCarter & English
      225 Franklin Street
      Boston, MA 02110
      (617) 345-7082

Defendants may call the following individuals as witnesses if the need arises:

1.    Edward Cardozza (fact)
      7 Weyland Circle
      North Andover, MA 01845

2.    David Coleman (fact)
      13400 Torrey Road
      Fenton, MI 48430

3.      Dennis Millgard (fact)
         4747 Old Orchard Trail
         Orchard Lake, MI

4.      Richard Millgard (fact)
         17028 Lochmoon Circle
         East Northville, MI

5.      Jack Morrissey (fact)
         3910 Scarborough Court
         Clairmont, FL 34711

6.      KOR TMC (fact)

7.      KOR White Oak (fact)

The Defendant reserves the right to call any of the witnesses in the plaintiff's list and any

rebuttal witnesses.  Because trial preparation is ongoing, the Defendant reserves the right to

supplement the above list.

## XI.    PROPOSED EXHIBITS

A list if exhibits to which the parties agree is attached as Exhibit A.  A list of exhibits to

which there are objections is attached as Exhibit B.

                                        Respectfully submitted,

THE MILLGARD CORPORATION          GADSBY HANNAH LLP

By its attorneys                             By its attorneys,


  /s/ John S. Davagian                       /s/ Terri L. Pastori
John S. Davagian, II, Esq. BBO#114740     Michael J. Stone, Esquire, BBO#482060
Thomas E. Sartini, Esq.  BBO#637971       Terri L. Pastori, Esquire, BBO#635323
Davagian & Associates                      PEABODY & ARNOLD LLP
365 Boston Post Road, Suite 200            30 Rowes Wharf
Sudbury, MA 01776                          Boston, MA 02110
(978) 443-3773                             (617) 951-2100

PABOS2:TPASTOR:653848_1

# EXHIBIT A
## AGREED TO EXHIBITS

1.      Drawing from Hardesty & Hanover dated September 20, 1993.

2.      Payment bond from White Oak and National Union to ConnDot dated June 6, 1994

3.      Subcontract Agreement dated March 26, 1996

4.      Subcontractor's Invoices, dated November 5, 1997 through September 30, 1998.  (MK 06219-06230)

5.      Superintendent's Daily Reports for October 30, 1997 through November 13, 1997.  (MK 2893-2903).

6.      TMC's Application and Certificate for Payment dated February 20, 1998.  (MK 04597-98)

7.      Letter dated February 23, 1998 from ConnDot to White Oak (MK 1071-72)

8.      Ron Busconi's notes on telephone call with Richard Millgard dated May 28, 1998.

9.      Ron Busconi's notes on telephone call with Richard Millgard dated May 29, 1998

10.     Memo to file from Ron Busconi regarding law as to TMC's responsibilities for information in boring logs and handnotes dated June 1, 1998.  (Deposition Exhibit 52).

11.     Letter of Richard Millgard to Jack Morrissey at White Oak dated July 8, 1998 regarding written notification of differing site conditions. (MK 05858)

12.     Letter of Jack Morrissey to Richard Millgard dated July 9, 1998 directing TMC to proceed with work.  (MK 03908)

13.     Letter of Dennis Millgard to Jack Morrissey, dated July 15, 1998, responding to White Oak's position that Millgard is in default and stating that attorneys not brought in yet.  (MK 03366-68)

14.     Letter of Arthur Gruhn of ConnDot to Jack Morrissey (White Oak) dated September 11, 1998 rejecting TMC's differing site condition claim.  (MK 00373-74)

15.     Letter dated September 11, 1998 from Dennis Millgard to Jack Morrissey regarding discontinuing work on project.  (Depo. Exhibit 20) (MK 01424)

16.     Superintendent Daily Report for September 14 and 15, 1998. (MK 00850-51)

17.     Letter dated September 17, 1998 from Arthur Gruhn (ConnDot) to Jack Morrissey regarding differing site conditions.  (Depo. Exhibit 5)  (MK 01425-26)

18.     Letter dated November 5, 1998 from Carmin Reiss to Peter Huntsman regarding mediation schedule

19.     Letter dated November 24, 1998 from John Luebbe (TMC) to L. Brian Castler (Connecticut) regarding claims White Oak violated the prompt payment statute.  (Depo. Exhibit 6)  (MK 03784)

20.     Letter dated December 11, 1998 from Dennis Millgard to Ron Busconi regarding lunch.  (Depo. Exhibit 8)

21.     Letter dated December 17, 1998 from Dennis Millgard to Carmin Reiss enclosing information.  (Depo. Exhibit 80) (MK 04111)

22.     Letter dated January 11, 1999 from Dennis Millgard to Carmin Reiss of Resolution, Inc. regarding meeting.  (Depo. Exhibit 9)  (MK 00765-66)

23.     Letter dated January 26, 1999 from Kenneth Woodard of TMC to American Home Assurance Company regarding bond claim on Bridgeport Project.  (Depo. Exhibit 41) (462)

24.     Letter of John Luebbe to Jack Morrissey dated February 4, 1999 regarding request to remobilize.  (MK 05887-88)

25.     Fax dated February 26, 1999 from Dennis Millgard to Ronald Busconi regarding February 26, 1999 letter sent to White Oak Corporation. (Depo. Exhibit 53) (GH 0868-71)

26.     Letter dated March 1, 1999 from Paul Mayotte to Richard Millgard regarding payments made to TMC.  (Depo. Exhibit 4) (MK 03872)

27.     Letter of Dennis Millgard to Carmin Reiss dated March 2, 1999 regarding impact of differing subsurface conditions on return to work orders.

28.     Letter dated March 3, 1999 from Dennis Millgard to Ron Busconi regarding White Oak's letter.  (Depo. Exhibit 11)

29.     Fax of Dennis Millgard to Ron Busconi regarding Jack Morrissey's letter of March 2, 1999.  (Depo. Exhibit 10)

30.     Fax of Dennis Millgard to Ron Busconi dated March 9, 1999 regarding TMC's letter to White Oak regarding Pre-Construction meeting.

31.     Notes dated March 11, 1999.

32.     Letter of Dennis Millgard to Pinnacle One dated March 26, 1999 providing information requested.  (M00623-625)

33.     Fax of Dennis Millgard to Ron Busconi dated March 26, 1999 regarding ConnDot's position paper regarding TMC's claims.

34.     Memo from Brian O'Rourke to Ron Busconi dated March 29, 1999 regarding legal analysis of ConnDot's defenses regarding TMC's claims.

35.     Fax of Dennis Millgard to Ron Busconi dated March 29, 1999 enclosing handnotes regarding TMC's counter to ConnDot's position paper with VDM's memo to file dated March 30, 1999 attached.

36.     Letter of Dennis Millgard to John F. Morrissey, Jr. dated April 30, 1999 regarding Revised unit prices for North East Lift Pier.

37.     Letter of Carmin Reiss to Dennis Millgard dated April 9, 1999 regarding mediation schedule with fax line to Gabsby Hannah dated April 9,1999.

38.     Joseph DeMarco's (ConnDot) letter to White Oak, dated April 12, 1999, disagreeing with TMC's contention that there has been a change in the hardness of rock or the angle of the rock and conditions known at time prices were renegotiated for the revised shoes.  (GH 840-41)

39.     Letter of Dennis Millgard to Ron Busconi dated April 13, 1999 transmitting fax from White Oak with ConnDOT's rejection of TMC's claims.

40.     Letter of Dennis Millgard to Peter Huntsman dated April 13, 1999 regarding TMC document request.

41.     Letter of Peter Huntsman to Ron Busconi dated April 13, 1999 regarding explanation of C.G.S. §4-61 and request that communications with CT go through Gabsby Hannah.

42.     Notes of Ron Busconi dated April 15, 1999 regarding telephone conversation.

43.     Letter dated April 16, 1999 from Dennis Millgard to Peter Huntsman regarding TMC has not retained Gadsby Hannah.  (Depo. Exhibit 13) (259)

44.     Notes of Ron Busconi dated April 26, 1999 regarding mediation session.

45.     Fax of Carmin Reiss to Dennis Millgard dated May 13, 1999 regarding request for additional pricing.

46.     Fax of Ron Busconi to Dennis Millgard dated May 18, 1999 regarding TMC's "potential defenses" to ConnDot's position.

47.     Notes of Ron Busconi dated May 19, 1999 regarding second mediation session as well as handnotes on TMC's letter to White Oak of May 18, 1999 with revised pricing.

48.     Fax dated May 24, 1999 from Dennis Millgard to Ron Busconi of Jack Morrissey's letter regarding termination.  (Depo. Exhibit 65) (GH 0705)

49.     Fax of Dennis Millgard to Ron Busconi dated May 24, 1999 enclosing draft letter to White Oak and letter to Carmin Reiss.

50.     Letter of Dennis Millgard to White Oak dated May 25, 1999 regarding TMC response to White Oak termination letter.

51.     Fax dated June 14, 1999 from Richard Millgard to John Giffune enclosing White Oak/TMC subcontract.  (Depo. Exhibit 14) (M 00428-35)

52.     Memo from John Giffune to Ron Busconi dated June 14, 1999 regarding TMC's remedies for wrongful termination.

53.     Memo from John Giffune to Ron Busconi dated June 17, 1999 regarding calculation of TMC's owned equipment costs.

54.     Memo from John Giffune to Ron Busconi dated June 22, 1999 regarding White Oak's right to take over TMC's work under the subcontract.

55.     Letter of Dennis Millgard to John F. Morrissey, Jr., dated July 19, 1999 regarding request to remove equipment from jobsite. (Deposition Exhibit 39)

56.     Notes of Ron Busconi dated July 27, 1999 regarding telephone conversation with Edward Lassman, Esq.

57.        Notes of Ron Busconi dated August 25, 1999 regarding telephone conversation with Edward Lassman, Esq.

58.        Letter dated December 7, 1999 from David Coleman to American Home Assurance Company regarding non-payment of contract monies on Bridgeport Project.  (Depo. Exhibit 72) (00465)

59.        Dennis Millgard's letter to Ron Busconi dated March 15, 2000, regarding paying outstanding fees.  (GH 1689)

60.        Letter dated March 21, 2000 from David Coleman to Ron Busconi regarding Tomlinson Project requiring action by Gadsby Hannah. (Depo. Exhibit 76) (GH 1692-93)

61.        Letter dated March 29, 2000 from Thomas Guy to Frank Librera regarding monies owed to Millgard (Depo. Exhibit 43)  (MK 01752)

62.        Gadsby Hannah's new matter form dated March 31, 2000. (GH0153)

63.        Fax dated April 5, 2000 from David Coleman to John Giffune providing White Oak bond.  (Depo. Exhibit 32) (GH 0625-31)

64.        Memorandum dated April 7, 2000 from Chris Moretto to John Giffune regarding filing demand with surety on Tomlinson.  (Depo. Exhibit 77) (GH 1698-1712)

65.        Letter of John Giffune to National Union dated April 7, 2000 regarding Bond claim letter.

66.        Stipulation of Dismissal of Claims against White Oak in <u>The Millgard Corporation v. White Oak Corporation</u>, dated July 20, 2004.

67.        Joel Lewin's Expert Report.  (Depo. Exhibit 88)

# EXHIBIT B
## CONTESTED EXHIBITS

A.    Edmund Cardozza's facsimile to Richard Millgard, dated July 8, 1993, enclosing his memorandum and letter from Ron Busconi.  Hearsay/Irrelevant.

B.    Rich Allen's letter to Dennis Millgard, dated August 18, 1997, regarding review of Flushing bay Subcontract enclosing draft letter to Franklin Tretter.  Irrelevant.

C.    Richard Millgard's notes (May 28, 1998, May 29, 1998, and June 1, 1998). Hearsay and not timely disclosed.

D.    Ron Busconi's letter to Dennis Millgard, dated July 20, 1998, regarding Flushing Bay.  Irrelevant.

E.    Dennis Millgard's memorandum dated December 16, 1998.  Hearsay.

F.    Letter of Dennis Millgard to Carmin Reiss dated March 1, 1999 regarding White Oak's request that it return to work.  (MK 04041-53)  Objection to fax confirmation.  Authentication.

G.    Attachments (case and statute) to Ron Busconi's facsimile to Paul DiPirro, dated April 16, 1999.  Irrelevant/Law.

H.    Rich Allen's electronic mail to Ron Busconi, dated April 23, 1999, to the extent it contains Richard Millgard's hearsay statement.

I.    Dennis Millgard's memorandum to the file dated June 10, 1999.  Hearsay.

J.    Edmund Cardozza's facsimile to David Coleman, dated January 12, 2000, re projects.  Information concerning Logan, Boston Latin, and Kane are not relevant.  The entire memorandum is hearsay.

K.    John Giffune's memorandum to Ron Busconi, dated May 2, 2000, regarding conversation with White Oak's attorney.  Irrelevant/Hearsay.

L.    John Giffune's notes dated May 5, 2000.  Irrelevant.

M.    David Coleman's facsimile to Ron Busconi, dated May 5, 2000, regarding last day of work.  Irrelevant.

N.    Letter of John Giffune to AIG dated May 5, 2000 regarding bond claim.

O.    Letter of Dennis Millgard to John F. Morrissey, Jr., dated May 17, 1999 regarding additional pricing requested by Carmin Reiss.  Relevance/Hearsay

P.    Email from John Giffune to Ron Busconi dated August 25, 1999 regarding CT statute of limitations.

Q.    John Giffune's letter to George Rettig, dated June 9, 2000, regarding bond claim. Irrelevant.

R.    Gary Case's letter to John Giffune, dated June 22, 2000, regarding claim. Irrelevant.

S.    Chris Huck's letter to Ron Busconi, dated July 12, 2000, regarding engagement. Irrelevant/Hearsay.

T.    David Coleman's memorandum to Cardozza et al, dated July 17, 2000, regarding project close out.  Hearsay/Irrelevant.

U.    Dennis Millgard's letter to Chris Huck, dated July 26, 2000, regarding legal services agreement.  Hearsay/Irrelevant.

V.    Gadsby Hannah's letter to BDO Seldman LLP, dated August 3, 2000, regarding Millgard.  Statements concerning items 1, 2, 4, and 5 are irrelevant.

W.    Chris Huck's letter to Dennis Millgard, dated August 9, 2000, regarding his analysis.  Hearsay/Irrelevant.  This constitutes expert testimony and Millgard has specifically represented that it would not use Chris Huck as an expert.

X.    Ruling on motion by United States District Court in Connecticut.  Relevance. Cumulative.

Y.    Gadsby Hannah invoices.  Irrelevant to the extent the invoices contain entries that do not concern Tomlinson.

Z.    TMC's Summary of legal services.  Irrelevant to the extent that contains information that does not concern Tomlinson.

AA.    Gadsby Hannah's summary of fees.

BB.    TMC notes.  (MK 6478)

PABOS2:TPASTOR:653737_1
       14825-90693